# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

-------------------------------------------------------------x
: 
**In re**     :     **Chapter 11**
: 
**HAWKEYE RENEWABLES, LLC, *et al.*,**[1]    :    **Case No. 09-_____ (___)**
: 
**Debtors.**     :     **(Joint Administration Requested)**
: 
-------------------------------------------------------------x

## DECLARATION OF TIMOTHY B. CALLAHAN IN SUPPORT OF THE DEBTORS' CHAPTER 11 PETITIONS AND REQUESTS FOR FIRST DAY RELIEF

I, Timothy B. Callahan, being fully sworn, hereby declare that the following is true to the best of my knowledge, information, and belief:

1.     I am the Chief Financial Officer and Secretary of both Hawkeye Renewables, LLC ("Renewables") and Hawkeye Intermediate, LLC ("Intermediate" and together with Renewables, the "Companies"), debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"). I have been employed in such capacity since 2006 and, as such, am familiar with their day-to-day operations, business, and financial affairs.

2.     Concurrently with the filing of this declaration (the "Declaration"), the Debtors have each filed in this Court a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). To enable the Debtors to operate effectively and minimize certain of the potential adverse effects of the commencement of their chapter 11 cases, the Debtors have requested certain relief in "first day" applications and motions filed with the Court (collectively, the "First Day Pleadings"). The First Day Pleadings, described in detail

---

[1] The Debtors in these chapter 11 cases, along with the last four (4) digits of each Debtor's federal tax identification number, are: Hawkeye Renewables, LLC (3162) and Hawkeye Intermediate, LLC (5356). The Debtors' corporate headquarters and service address is: 224 S. Bell Avenue, Ames, Iowa 50010.

below, seek to, among other things, ensure the continuation of the Debtors' cash management system and other business operations without interruption, use cash collateral in the operation of the business, preserve valuable relationships with their suppliers, customer, and end-users, maintain employee morale and confidence, and establish certain other administrative procedures to promote a seamless transition into chapter 11. This relief will be critical to the Debtors' restructuring efforts.

3.     I submit this Declaration to assist the Court and other parties in interest in understanding the circumstances that compelled the commencement of these chapter 11 cases and in support of (i) the petitions for relief under the Bankruptcy Code filed on the date hereof (the "Petition Date") and (ii) the First Day Pleadings. Any capitalized term used but not defined herein shall have the meaning ascribed to such term in the relevant First Day Pleading.

4.     Except as otherwise indicated herein, all facts set forth in this Declaration are based on my personal knowledge, my discussions with other members of the Debtors' senior management and the Debtors' advisors, my review of relevant documents, or my opinion based on my experience and knowledge of the Debtors' operations and financial condition. If called upon to testify, I could and would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration on behalf of the Debtors.

5.     This Declaration is intended to provide a summary overview of the Debtors and these chapter 11 cases. Sections I through IV of this Declaration provide an overview of the Companies' business, corporate history and organizational structure, significant indebtedness and recent financial information, and the circumstances giving rise to the commencement of these chapter 11 cases. Section V summarizes the First Day Pleadings filed

concurrently herewith and the relief sought therein, which the Debtors believe is critical to their successful reorganization.

## I.

## The Companies' Business

6.     The Companies are headquartered in Ames, Iowa. They, along with certain affiliates who have no obligations with respect to the debt of the Companies and are not debtors in these chapter 11 cases, comprise a privately-owned renewable energy enterprise that is a leading producer of ethanol in the United States based on production capacity. Renewables was established in 2003 to bring renewable fuels to the marketplace. Today, Renewables owns and operates a 105 million gallon ethanol production facility in Iowa Falls, Iowa and a 120 million gallon ethanol production facility near Fairbank, Iowa. As of the Petition Date, Renewables had 101 full-time and 2 part-time employees in the United States; Intermediate does not have any employees.

7.     Corn is the principal raw material used to produce ethanol and distillers grains. The Debtors' two production facilities, which incorporate state-of-the-art equipment, control programs, and pollution control equipment to manage the process, use proven technology to convert corn starch to ethanol using yeast and enzymes. The ethanol is then stripped and refined to 200 proof (measure of purity) before denaturant is added. The remaining factions of the corn are then dried in dryers powered by natural gas and sold as livestock feed, either as (i) Modified Wet Distillers Grains with solubles ("MWDGs"), which is used mainly for cattle feed, or (ii) Dried Distillers Grains with solubles ("DDGs"), which has more varied applications, including cattle feed, swine feed, and poultry feed. This process yields approximately 2.80 gallons denatured ethanol from each bushel of corn processed. The ethanol is used as a fuel

additive in gasoline (generally 10% addition) or sold as E85 (85% ethanol and 15% gasoline) for use in Flex Fuel vehicles.

8.    As briefly described above, Renewables manufactures two products – (i) ethanol, which is 84% of Renewables' revenues, and (ii) distillers grains (MWDGs and DDGs), which is 16% of Renewables' revenues (collectively, the "Products"):

- *Ethanol*: Ethanol is both an important fuel component to reduce consumption of fossil fuels from gasoline and an octane enhancer to improve the octane rating of gasoline with which it is blended. At present, annual usage of ethanol is approximately 11 billion gallons in the United States; it is expected to reach 15 billion gallons by 2015. Ethanol revenue is generated by Renewables from the sale of ethanol through fixed price and index-based contracts and through transactions at prevailing market prices.

- *Distillers Grains*: A co-product of the ethanol process is distillers grains. Distillers grains are an excellent source of digestible protein and energy for livestock and compete with other animal feed products such as corn and soybeans. Distillers grains revenue is generated by Renewables from the sale of distillers grains through fixed price and formula-based contracts and through transactions at prevailing market prices.

Renewables closely coordinates with its suppliers to efficiently manage supply purchases and to maintain the proper raw materials needed to manufacture the Products. Hawkeye Gold, LLC ("Gold"), a non-debtor affiliate of the Companies, markets the Products manufactured by Renewables to end-users.

## II.

## Corporate History and Organizational Structure

9.    Both Renewables and Intermediate are privately-held Delaware limited liability companies. Renewables is a wholly-owned subsidiary of Intermediate, and Intermediate is a wholly-owned subsidiary of Hawkeye Energy Holdings, LLC ("HEH"), a holding company formed soon after the June 30, 2006 sale of a majority interest in Intermediate to certain affiliates of Thomas H. Lee Partners, L.P., a Massachusetts-based private equity firm. HEH and its other

direct or indirect subsidiaries, none of which are obligated on the debt of the Companies, are not debtors in these chapter 11 cases. Attached hereto as <u>Exhibit 1</u> is a chart that shows the corporate relationships between the Companies, HEH, and their respective affiliates (the "<u>Organizational Chart</u>").

10.    The Organizational Chart also depicts Renewables' investments. Renewables owns 29.55% of Hawkeye Growth Holdings, LLC (a non-debtor affiliate of Renewables which owns 100% of Hawkeye Growth, LLC, which in turn indirectly operates two (2) ethanol production facilities, one in Menlo, Iowa and the other in Shell Rock, Iowa), 100% of Hawkeye Grain, LLC (a non-debtor wholly-owned subsidiary of Renewables from which Renewables purchases its corn), and approximately 63.94% of D&W Railroad, LLC (a non-debtor subsidiary of Renewables which owns a short-line railroad used by Renewables to transport corn and other supplies to one of its manufacturing facilities from the Iowa Northern Railroad and as the initial shipping point for finished products from the manufacturing facility).

### III.

### Significant Indebtedness and Recent Financial Information

11.    As of the Petition Date, the outstanding material indebtedness of the Debtors consists of approximately $761 million in secured debt under the Credit Agreements (as defined below), described in detail below:

**A.    Prepetition Secured Indebtedness**

12.    <u>First Lien Credit Facility</u>:  Intermediate and Renewables (as successor-in-interest to THL-Hawkeye Acquisition LLC) are party to that certain First Lien Credit Agreement, dated as of June 30, 2006, together with Credit Suisse AG, Cayman Islands Branch (formerly known as "Credit Suisse, Cayman Islands Branch"), as administrative and collateral

agent (the "First Lien Agent"), and the lenders from time to time party thereto (the "First Lien Lenders") (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time through and including the Petition Date, the "First Lien Credit Agreement"). The First Lien Credit Facility provides for (i) a revolving credit facility in the maximum aggregate amount of $50 million and (ii) a term loan facility in the amount of $500 million. Obligations arising under the First Lien Credit Agreement are the direct obligation of Renewables and are guaranteed by Intermediate. As of the Petition Date, there is approximately $593.4 million outstanding under the First Lien Credit Agreement, consisting of (i) revolving credit loans in the aggregate outstanding principal amount of $50 million, (ii) a term loan in the aggregate principal amount of approximately $483.5 million, (iii) all accrued and unpaid interest thereon, (iv) obligations under any outstanding letters of credit issued under the First Lien Credit Agreement, and (v) termination obligations under certain outstanding interest rate swaps.

13.    Second Lien Credit Facility:  In addition, Renewables (as successor-in-interest to THL-Hawkeye Acquisition LLC) and Intermediate are party to that certain Second Lien Credit Agreement, dated as of June 30, 2006, together with Wilmington Trust Company, as successor administrative and collateral agent (the "Second Lien Agent"), and the lenders from time to time party thereto (the "Second Lien Lenders" and together with the First Lien Lenders, the "Prepetition Lenders") (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time through and including the Petition Date, the "Second Lien Credit Agreement" and together with the First Lien Credit Agreement, the "Credit Agreements"). The Second Lien Credit Agreement provides for a term loan facility in the maximum aggregate amount of $150 million. Obligations arising under the Second Lien Credit Agreement are the direct obligation of Renewables and are guaranteed by Intermediate. As of the Petition Date,

there is approximately $167.6 million outstanding under the Second Lien Credit Agreement, consisting of (i) a term loan in the aggregate principal amount of $150 million and (ii) all accrued and unpaid interest thereon.

14.   Collateral:  In connection with the Credit Agreements, the Debtors granted liens and executed security agreements in favor of the Prepetition Lenders in substantially all of the Debtors' assets, including, but not limited to, (i) accounts, (ii) chattel paper, (iii) documents, (iv) equipment, (v) general intangibles, (vi) instruments, (vii) inventory, (viii) investment property, (ix) letter-of-credit rights, (x) commercial tort claims, (xi) books and records, and (xii) proceeds and products of the foregoing.

15.   Intercreditor Agreement:  The relative priorities of liens held by the First Lien Lenders and the Second Lien Lenders are subject to that certain Intercreditor Agreement, dated as of June 30, 2006, between Renewables (as successor-in-interest to THL-Hawkeye Acquisition LLC), Intermediate, the First Lien Agent (in its capacity as first lien collateral agent), and the Second Lien Agent (in its capacity as second lien collateral agent) (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time through and including the Petition Date, the "Prepetition Intercreditor Agreement").  In accordance with the terms of the Prepetition Intercreditor Agreement, the Second Lien Lenders have agreed, among other things, that liens on any collateral securing obligations under the First Lien Credit Agreement will be senior in all respects and priority to any lien on the collateral securing obligations under the Second Lien Credit Agreement.

## B.    Recent Financial Information

16.    For the fiscal year ending December 31, 2008, the Debtors, on a consolidated basis, generated approximately $584 million in net revenue and reported liabilities of $720 million.

## IV.

## Events Leading to the Chapter 11 Cases

## A.    Industry-Specific Events

17.    The Debtors' operating results during 2008 and 2009 were significantly impacted by various factors including, most significantly, unprecedented volatility in the price of raw materials, such as corn, natural gas, and denaturant, and the Debtors' Products (ethanol and distillers grains). This volatility resulted in ethanol industry EBITDA margins, which were as high as $1.00 per gallon of ethanol produced in 2006, falling precipitously to less than 10 cents per gallon and on some occasions to negative EBITDA margins.

18.    The price of corn rose precipitously in mid-2008, from $4.00 per bushel to nearly $8.00 per bushel, driven by flooding conditions in the major corn producing state of Iowa and the unprecedented rise in most commodity prices, including crude oil futures (which approached $150 per barrel for the first time).  When oil prices finally came down in the Fall of 2008, margins for the ethanol industry evaporated, leading to the bankruptcies of several of the Debtors' largest competitors, including Verasun, Aventine, and Pacific Ethanol.  Renewables fared better than some of its competitors during the period due to its risk management strategy. Nevertheless, margins deteriorated to the point where it was clear that Renewables could no longer support the amount of debt it had on its balance sheet with the margins the industry was experiencing and the projected operating profile of the industry on a going-forward basis.

## B. Defaults under the Credit Agreements and Liquidity Constraints

19.     The above-described commodity price fluctuations and resulting margin losses collectively resulted in the substantial deterioration of the Debtors' financial condition such that, in the last fiscal quarter of 2008, the Debtors appeared likely to suffer financial covenant defaults under the Credit Agreements. On January 20, 2009, Renewables sent the First Lien Agent and the Second Lien Agent a notice of potential default regarding Renewables' likely failure to comply with its year end 2008 financial covenants in each of the respective Credit Agreements.

20.     As a result of decreased cash on hand and diminished cash flows, Renewables did not make any interest payments due in 2009, as required under the Credit Agreements, and failed to make required payments under its interest rate swap agreements on January 30, 2009, which resulted in termination of the swap agreements by counterparties. From the earliest payment default forward, and continuing up to the Petition Date, the Debtors and their representatives have pursued discussions with an ad hoc steering committee for the First Lien Lenders (the "First Lien Steering Committee") and their legal and financial advisors regarding a possible negotiated restructuring of the Debtors' capital structure.

## C. Value of the Debtors

21.     The Debtors retained Blackstone Advisory Partners, L.P. ("Blackstone") pursuant to an engagement letter, executed on December 9, 2008 and effective as of October 1, 2008, to provide advice in connection with a financial restructuring, evaluation of liquidity, negotiations with the Prepetition Lenders, and, ultimately, a valuation of the Companies, amongst other services. Based on financial projections whose preparations I supervised, Blackstone advised that the values of the Companies fell within the range of $191 million to

$228 million, with a mid-point of approximately $210 million (approximately 35% of the claims of the First Lien Lenders). The financial projections and Blackstone's valuation are set forth in the Disclosure Statement (as defined below).

### D.   Negotiations with the Prepetition Lenders

22.   On February 4, 2009, the Debtors entered into a forbearance agreement with the First Lien Agent and the holders of, in the aggregate, a majority in principal amount outstanding of the obligations under the First Lien Credit Agreement pursuant to which the respective parties agreed to forbear from exercising certain rights during the term of the forbearance agreement. As the discussions regarding a restructuring continued, these forbearance agreements were extended a number of times, with the term of the latest extension dated as of July 23, 2009, expiring at midnight on August 5, 2009.

23.   On May 29, 2009, Renewables sent its lenders a compliance certificate for the period 1Q-2009 which showed that Renewables was out of compliance with its Interest Coverage Ratio and Total Leverage Ratio (in each case as defined in the Credit Agreements) for the then-current period. On March 26, 2009, Renewables received a notice from the Second Lien Agent informing Renewables that an Event of Default had occurred under Article VII(c) of the Second Lien Credit Agreement and declaring due and payable in full all outstanding loans, accrued interest, unpaid fees, and other liabilities pursuant to the Second Lien Credit Agreement and any other Loan Document (as defined in the Second Lien Credit Agreement).

24.   Over the course of the last eleven (11) months, the Debtors have negotiated in good faith with the First Lien Steering Committee on the terms of a financial restructuring. Those negotiations were essentially completed in September 2009. The Companies were advised by representatives of the First Lien Steering Committee that they

engaged in restructuring negotiations from September 2009 through the commencement of the Prepetition Solicitation (as defined below) with an *ad hoc* steering committee formed by certain of the Second Lien Lenders (the "Second Lien Steering Committee"). Although no final deal between the First Lien Steering Committee and the Second Lien Steering Committee was reached, my understanding is that the treatment of the claims of the Second Lien Lenders under the Prepackaged Plan (as defined below) reflects the last offer made to the Second Lien Steering Committee by the First Lien Steering Committee.

E.     **The Financial Restructuring**

   1.     **Restructuring Support Agreement**

       25.     On November 24, 2009, the Debtors, the First Lien Agent, and certain of the First Lien Lenders (the "Consenting Lenders") entered into that certain Restructuring Support Agreement (the "RSA"). Pursuant to the RSA, the Consenting Lenders agreed to support the Prepackaged Plan (as defined below) and the Debtors agreed to implement the restructuring transactions described in the RSA through the solicitation of votes for the Prepackaged Plan and the filing of the chapter 11 cases. While the Debtors, the Debtors' advisors, and the First Lien Steering Committee continued to engage in restructuring negotiations with the Second Lien Steering Committee and invited its members to support the Prepackaged Plan, the Second Lien Steering Committee members declined.

       26.     Given the expiration of the Debtors' forbearance period with the First Lien Agent, the enterprise valuation prepared by Blackstone demonstrating that the Second Lien Lenders are "out of the money," and the willingness of holders of more than two-thirds in principal amount of obligations under the First Lien Credit Agreement to enter into the RSA, the

Debtors concluded that proceeding with the restructuring contemplated under the RSA was in the best interests of the estate and their creditors.

**2.      Prepetition Solicitation**

27.      Prior to the Petition Date, the Debtors solicited votes from the First Lien Lenders and the Second Lien Lenders (the "Prepetition Solicitation") on the Debtors' *Joint Prepackaged Plan of Reorganization of Hawkeye Renewables, LLC, et al. under Chapter 11 of the Bankruptcy Code* (the "Prepackaged Plan") through their *Disclosure Statement for Debtors' Joint Prepackaged Plan of Reorganization under Chapter 11 of the Bankruptcy Code,* pursuant to sections 1125 and 1126(b) of the Bankruptcy Code (the "Disclosure Statement").

28.      As set forth in the Epiq Bankruptcy Solutions, LLC affidavit filed contemporaneously herewith, the Prepackaged Plan has been accepted by Class 3A (comprised of claims of the First Lien Lenders) in excess of the statutory thresholds specified in section 1126(c) of the Bankruptcy Code and has been rejected by Class 4A (comprised of claims of the Second Lien Lenders).  Notwithstanding the rejection of the Prepackaged Plan by Class 4A, the Debtors believe that the Prepackaged Plan is confirmable.

29.      The Prepackaged Plan sets forth the Debtors' capital structure after the effective date of the Prepackaged Plan (the "Effective Date") and the distribution each class of the Debtors' creditors is to receive under the Prepackaged Plan.  Specifically, on the Effective Date, or as soon thereafter as is practicable, among other things:[2]

- Each holder of an Allowed Other Priority Claim, except to the extent that such holder (a) has been paid by the Debtors, in whole or in part, prior to the Effective Date, or (b) agrees to less favorable treatment, will receive Cash in the full amount of such Allowed Other Priority Claim.

---

[2] All capitalized terms used in this paragraph but not defined herein shall have the meanings ascribed to them in the Prepackaged Plan.

- Each holder of an Allowed Other Secured Claim will receive the collateral securing such Claims, receive cash equal to the value of such collateral, or have such Claims reinstated.

- Each holder of a First Lien Credit Agreement Claim (approximately $593 million, in the aggregate) will receive its pro rata share of (i) $25 million of new secured term loans and (ii) all the membership interests and profit participation interests in reorganized Renewables; provided, however, that certain profit participation interests (see below) shall be distributed to the holders of Second Lien Credit Agreement Claims. Certain additional profit participation interests (see below) would have been distributed to the holders of Second Lien Credit Agreement Claims if they had voted to accept the Prepackaged Plan. No distributions will be made with respect to any deficiency claims of the holders of the First Lien Credit Agreement Claims.

- Each holder of a Second Lien Credit Agreement Claim (approximately $168 million, in the aggregate) will receive, from the holders of the First Lien Credit Agreement Claims, such holders' pro rata share of profit participation interests (the "Class C Units"). The Class C Units will entitle the holders to 10% of the value of all distributions in excess of $580 million. If the class of Second Lien Credit Agreement Claims had voted to accept the Prepackaged Plan, holders of claims in that class would have received additional profit participation interests (the "Class B Units"). The Class B Units would have entitled the holders of such units to 7.5% of the value of all distributions in excess of $435 million.

- Each holder of a General Unsecured Claim will receive no property under the Prepackaged Plan. The Debtors do not expect there to be General Unsecured Claims in excess of $1,000,000.

- Each holder of Equity Interests in Renewables will receive no property under the Prepackaged Plan.

- Each holder of Equity Interests in Intermediate will receive no property under the Prepackaged Plan.

**3.   Purpose of Commencing the Chapter 11 Cases**

30.    The Debtors believe it is in the best interest of all stakeholders to commence the chapter 11 cases. On an immediate basis, chapter 11 will facilitate the stabilization of the Debtors' business, enable the Debtors to apply the provisions of chapter 11 to maximize the value of their estates in the short term though the use of cash collateral, and provide the Debtors with the best forum in which to reorganize their capital structure. In the

long-term, the financial restructuring will better position the Debtors to continue operating successfully within the current economic realities of the ethanol industry and enhance the Debtors' future growth potential. Furthermore, completion of the financial restructuring and the resolution of liquidity concerns will allow management to focus its attention on operations and long-term planning rather than on short-term financial management.

**V.**

**Summary of First Day Pleadings**

31.     Concurrently with the filing of their chapter 11 petitions, the Debtors have filed, for the Court's approval, a number of First Day Pleadings requesting relief which the Debtors believe is necessary to enable them to operate in chapter 11 with a minimum of disruption and loss of productivity. The Debtors respectfully request that the relief requested in each of the First Day Pleadings be granted to stabilize and facilitate their operations during the pendency of the chapter 11 cases. A description of the relief requested and the facts supporting the relief requested in each of the First Day Pleadings is set forth below. Any capitalized term not expressly defined herein shall have the meaning ascribed to that term in the relevant First Day Pleading.

**Motion of the Debtors for An Order Pursuant to Bankruptcy Rule 1015(b)
and Local Rule 1015-1 Directing Joint Administration of Chapter 11 Cases**

32.     The Debtors seek joint administration of their chapter 11 cases for procedural purposes only. Joint administration will allow the Debtors' cases to be administered as a single case, rather than two independent cases. Joint administration will obviate the need for duplicative notices, motions, applications, orders, and other pleadings, thereby saving considerable time and expense for the Debtors and their estates as well as creditors and other parties in interest. If these chapter 11 cases are jointly administered, the Court will be relieved of

the administrative burden of entering duplicative files and dockets, and supervision by the U.S. Trustee will be simplified. Moreover, joint administration will not adversely affect the rights of the Debtors' respective creditors; in fact, the creditors' rights will be enhanced by the reduction in costs resulting from joint administration of these chapter 11 cases.

33.     Accordingly, I believe that joint administration of the Debtors' chapter 11 cases is in the best interests of the Debtors, their creditors, and all parties in interest.

### Application of the Debtors Pursuant to 28 U.S.C. § 156(c), Bankruptcy Rule 2002, and Local Rule 2002-1(f) for Authorization to (I) Employ and Retain Epiq Bankruptcy Solutions, LLC as Claims and Noticing Agent for the Debtors and (II) Appoint Epiq Bankruptcy Solutions, LLC as Agent of the Bankruptcy Court

34.     The Debtors request authorization to (i) employ and retain Epiq Bankruptcy Solutions, LLC ("Epiq") as claims and noticing agent for the Debtors and (ii) appoint Epiq as agent of the Bankruptcy Court. After soliciting and evaluating proposals from other potential claims agents, the Debtors selected Epiq based on, among other things, its expertise in providing similar services in comparable chapter 11 cases. The Debtors request authorization to compensate and reimburse Epiq in accordance with the terms of the Services Agreement for all services rendered and expenses incurred in connection with these chapter 11 cases. The Debtors believe that such compensation is reasonable and appropriate for services of this nature and comparable to that charged by other providers of similar services.

35.     The Debtors estimate that there are in excess of 1,500 creditors in these chapter 11 cases. Thus, I believe that noticing the large number of interested parties in these chapter 11 cases would be unduly time consuming and burdensome for the Clerk's Office.

36.     Based on the foregoing, I believe the retention and appointment of Epiq in connection with the administration of these chapter 11 cases is in the best interests of the Debtors, and their creditors, and all parties in interest.

**Motion of the Debtors for an Order Pursuant to Sections 105(a), 345(b), 363(c), and 364(a) of the Bankruptcy Code (I) Authorizing the Debtors to (A) Continue Their Existing Cash Management System and (B) Maintain Their Existing Bank Accounts and Business Forms and (II) Granting an Extension of Time to Comply with Section 345(b) of the Bankruptcy Code**

37.     The Debtors request (i) authority to (a) continue to use their existing Cash Management System, (b) fund Renewables' operations, and (c) maintain the Debtors' existing Bank Accounts and Business Forms and (ii) an extension of time to comply with the requirements of section 345(b) of the Bankruptcy Code.

38.     In the ordinary course of business, the Debtors use the Cash Management System, which is similar to that used by other comparable companies, to collect, transfer, and disburse accurately and efficiently the funds generated by Renewables' business operations. Any disruption of the Debtors' cash management system, including closure of the Bank Accounts, would cause delays in the collection and disbursement of funds and could cause the Debtors to default on their postpetition accounts payable obligations. Moreover, if the relief requested is not granted, it would be extremely difficult (if not impossible) and expensive for the Debtors to promptly establish new bank accounts and a new cash management system with sufficient sophistication to fulfill the Debtors' business needs.

39.     Renewables purchases the corn used in the manufacturing of its Products from a wholly-owned subsidiary, Hawkeye Grain, LLC ("Grain"). Typically, Renewables places orders with Grain to supply corn to Renewables' plants. Grain then purchases corn from farmers and agricultural co-ops which deliver the corn to Renewables. Concurrent with such deliveries or soon thereafter, Grain invoices Renewables for that day's delivery of corn. Renewables cannot obtain its corn directly from farmers because it does not currently qualify for the licenses required by the Grain Bureau of the State of Iowa (the "Grain Bureau") to make such purchases

due to its current financial situation. Under the rules set by the Grain Bureau, Grain must maintain a ratio of one to one in respect of its current obligations to the farmers and co-ops, on the one hand, and its current assets, on the other. In other words, Grain must always have cash on hand to cover its payables to farmers. To achieve this balance, Renewables sends payments for the corn received by it to Grain at the time that Grain makes its payments to the farmers and agricultural co-ops. These intercompany transfers are integral to the Debtors' Cash Management System, and the Debtors request that the Court authorize them to continue, in the ordinary course, to make such intercompany transfers.

40. To further minimize their expenses and to avoid disruption of their financial affairs, the Debtors also are requesting authority to simply use their existing Business Forms rather than obtain new Business Forms reflecting their status as debtors in possession and listing the bankruptcy number under which these cases are being administered, as required by the UST Guidelines. In the event the Debtors need to purchase new Business Forms during the pendency of these chapter 11 cases, however, such forms will include the "Debtor in Possession" label and the corresponding bankruptcy number.

41. In connection with their Cash Management System, the Debtors use sweep options in the Operating Account and Concentration Account, which allow them to invest the funds in such accounts on an overnight basis. Because of high volatility in the corn, ethanol, and natural gas commodity markets, Renewables also maintains trading accounts with Commodity Brokers. The Debtors consider their accounts at the Commodity Brokers to be an integral part of their risk management system, and any disruption to their ability to use the Commodity Brokers to implement commodity hedging strategies could be detrimental to the Debtors' operations. The Debtors believe that these funds are secure and that investing their funds in the Bank

Accounts and maintaining the commodities accounts is commercially reasonable. Accordingly, the Debtors are requesting a 60-day extension of the time to comply with the requirements of section 345(b) of the Bankruptcy Code. During the extension period, the Debtors propose to engage the U.S. Trustee in discussions to determine what modifications to their current practices, if any, would be appropriate under the circumstances. The Debtors believe the benefits of the requested extension far outweigh any harm to their estates.

42. I believe that the continued operation of the Debtors' Cash Management System is in the best interests of the Debtors' estates and creditors, will avoid immediate and irreparable harm to the Debtors, and is both necessary and appropriate to further the reorganization policy of chapter 11.

### Motion of the Debtors Pursuant to Sections 105(a), 361, and 363 of Bankruptcy Code for Entry of an Order (I) Authorizing the Use of Cash Collateral, (II) Granting Adequate Protection, and (III) Scheduling a Final Hearing

43. The Debtors seek entry of an order (i) authorizing the Debtors to use Cash Collateral, (ii) granting adequate protection to the Prepetition Senior Lenders, and (iii) scheduling a final hearing.

44. The Debtors do not have available sources of working capital and financing to carry on the operation of their business during the pendency of these chapter 11 cases without the use of Cash Collateral. To operate in chapter 11 in a manner consistent with their ordinary course practice, the Debtors must have access to cash that is currently encumbered by the liens of their Prepetition Secured Lenders. Cash Collateral will be used to make payments to vendors and employees and to satisfy the other ordinary costs of operations, all in accordance with the Approved Budget and any Supplemental Budget. In the absence of authority to use Cash Collateral, the continued operation of the Debtors' business, even for a limited period of

time, would not be possible, and serious and irreparable harm to the Debtors and their estates would occur. The use of Cash Collateral is therefore critical to preserve and maintain the going concern value of the Debtors, for the benefit of all stakeholders.

45. Recognizing the importance of obtaining authority to continue to use Cash Collateral in the ordinary course, the Debtors approached the First Lien Steering Committee prior to the commencement of these chapter 11 cases to discuss the terms upon which the First Lien Lenders would agree to the Debtors' use of Cash Collateral. After extensive arm's-length negotiations, the parties agreed on the form of Interim Order, which will allow the Debtors to continue to operate their business in the ordinary course during these chapter 11 cases. The Debtors submit that, under the circumstances, the terms and conditions contained in the Interim Order are fair and reasonable and in the best interests of the Debtors and their estates and creditors.

46. To protect the Prepetition Senior Lenders from any diminution in value of their respective interests in the Cash Collateral, the Debtors propose to provide adequate protection in the form of postpetition payments to the First Lien Professionals and liens and claims in favor of the Prepetition Senior Lenders. Specifically, the Prepetition Agents will receive, on behalf of the Prepetition Senior Lenders, as adequate protection for the Debtors' use of Cash Collateral, (a) the Adequate Protection Reimbursement Claims, (b) the Adequate Protection Liens, and (c) the Superpriority Claims. These forms of adequate protection will sufficiently protect the Prepetition Secured Lenders' interests in the Cash Collateral.

47. Accordingly, I believe that the relief requested in the motion seeking authority to use Cash Collateral is in the best interests of the Debtors and their estates and will

avoid immediate and irreparable harm and will enable the Debtors to continue to operate and reorganize their business during these chapter 11 cases without significant disruption.

**Motion of the Debtors For Interim and Final Orders Pursuant to Sections 105(a) and 366 of the Bankruptcy Code (I) Prohibiting Utilities from Altering, Refusing, or Discontinuing Service; (II) Approving the Debtors' Proposed Adequate Assurance; (III) Approving Procedures for Resolving Requests for Additional Adequate Assurance; and (IV) Scheduling a Final Hearing**

48.     The Debtors seek entry of an interim order (i) prohibiting the Utility Companies from altering, refusing, or discontinuing services to, or discriminating against, the Debtors on account of prepetition amounts outstanding or on account of any perceived inadequacy of the Debtors' proposed adequate assurance pending the entry of the Final Order, (ii) approving the Debtors' Proposed Adequate Assurance, (iii) approving the Debtors' proposed procedures for resolving any Additional Assurance Requests, and (iv) scheduling a hearing on the motion to consider granting the relief requested on a final basis.

49.     In connection with the operation of its business and management of its properties, Renewables obtains electricity, natural gas, water, telephone services, and other similar services from a number of Utility Companies. Renewables' business operations are dependent upon these Utility Services. If the Utility Services are interrupted, Renewables' business operations would be severely disrupted and the ability of the Debtors to reorganize would be adversely impacted. It is therefore critical that the Utility Services continue uninterrupted during these chapter 11 cases.

50.     The Debtors propose to place a cash deposit equal to two (2) weeks of Utility Services, calculated as a historical average over the past twelve (12) months (the "Adequate Assurance Deposit") into a newly created, segregated account (the "Utility Deposit Account") for the benefit of the Utility Companies other than those Utility Companies that (i)

expressly agree to a lesser amount in writing (which shall include electronic mail) or (ii) are currently paid in advance for their Utility Services. Based on prepayments, the Debtors estimate that the Adequate Assurance Deposit will be approximately $280,000. The Debtors propose, however, that the provision of the Proposed Adequate Assurance be without prejudice to the right of any Utility Company to seek additional assurance for itself pursuant to the Adequate Assurance Procedures proposed by the Debtors.

51.     I believe that the relief requested and the proposed procedures are in the best interests of the Debtors and their estates, will avoid immediate and irreparable harm to the Debtors, and will enable the Debtors to continue to operate their business in chapter 11 without disruption.

### Motion of the Debtors for an Order Pursuant to Sections 105(a), 363(b), and 507(a)(8) of the Bankruptcy Code (I) Authorizing Payment of Certain Prepetition Taxes and Fees and (II) Authorizing and Directing Financial Institutions to Honor and Process Related Checks and Electronic Funds Transfers

52.     The Debtors seek authority to pay to various local, state, and federal taxing authorities (the "Taxing Authorities") certain Taxes and Fees that arose prior to the Petition Date, including all taxes and fees subsequently determined, by audit or otherwise, to be owed for periods prior to the Petition Date, and including any penalties and interest thereon.

53.     The Debtors estimate that, as of the Petition Date, approximately $1,000 in Use Taxes, $526,000 in Property Taxes, and $31,000 in Other Taxes – an aggregate of approximately $558,000 in Taxes and Fees – will have accrued but remain unpaid and will become due postpetition in the ordinary course of business. Accordingly, the Debtors request authority to pay up to $670,000 in prepetition Taxes and Fees postpetition in the ordinary course of the Debtors' business. Out of an abundance of caution, the Debtors request a cap in excess of the estimated Taxes and Fees to account for potential variances between the estimated and actual

Taxes and Fees accrued as of the Petition Date; such relief minimizes the need to file separate motions with the Court in the event the Debtors have underestimated the Taxes and Fees.

54. Payment of the prepetition Taxes and Fees is critical to the Debtors' continued and uninterrupted operations. Nonpayment of these obligations may cause Taxing Authorities to take precipitous action, including, but not limited to, filing liens, preventing the Debtors from conducting business in the applicable jurisdictions, seeking to lift the automatic stay, and imposing personal liability on the Debtors' officers and directors, all of which would disrupt the Debtors' day-to-day operations and could potentially impose significant costs on the Debtors' estates. Indeed, unsecured creditors will not be prejudiced by payment of the Taxes and Fees because most, if not all, of the Taxes and Fees are entitled to priority status under the Bankruptcy Code, and therefore, must be paid in full before any general unsecured obligations of the Debtors may be satisfied.

55. Accordingly, I believe payment of the Taxes and Fees to the Taxing Authorities in accordance with the Debtors' prepetition business practices is in the best interests of the Debtors and their estates and will enable the Debtors to continue to operate their business in chapter 11 in an economic and efficient manner without disruption.

**Motion of the Debtors for an Order Pursuant to Sections 105(a), 363(b), and 507(a) of the Bankruptcy Code (I) Authorizing the Debtors to Pay Wages, Salaries, Compensation, and Employee Benefits and (II) Authorizing and Directing the Debtors' Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations**

56. The Debtors are seeking authority to (a) pay, in their sole discretion, all amounts related to Wage Obligations, Payroll Taxes, Garnishment Obligations, Expense Reimbursements, and the Bonus Program (collectively, the "Employee Obligations") and Employee Benefits, and all costs incident to the foregoing, (b) maintain and continue to honor

their Employee Benefits for their Employees as they were in effect as of the Petition Date, and as such may be modified, amended, or supplemented from time to time in the ordinary course of business, and (c) authorize the Banks to receive, honor, process, and pay any and all checks or wire transfers drawn on the Debtors' accounts to the extent that such checks or transfers relate to Employee Obligations or Employee Benefits.

57. As of the Petition Date, the Debtors employ approximately 100 individuals in the United States. The Debtors have outstanding costs and obligations with respect to their Employees, some of which became due and payable in the prepetition period and some of which will become due and payable in the ordinary course of business in the postpetition period. If the Debtors fail to pay these Employee Obligations or maintain these Employee Benefits, the morale of the Employees will be jeopardized and there will be a significant risk of attrition. A deterioration in the morale of Employees at this critical time would undoubtedly have a devastating impact on the Debtors' workforce, the value of the Debtors' assets and business, and their ability to reorganize. Moreover, if the checks issued and fund transfers requested in payment of the prepetition Employee Obligations or in respect of the Employee Benefits are dishonored, or if such earned obligations are not timely paid postpetition, the Debtors' employees may suffer extreme personal hardship and may even be unable, in some instances, to pay their daily living expenses. It is therefore critical that the Debtors be authorized to satisfy their Employee-related obligations and continue their prepetition plans, policies, and programs.

58. Accordingly, I believe that paying all Employee Obligations and honoring and maintaining all Employee Benefits in accordance with the Debtors' prepetition business practices are in the best interests of the Debtors and their estates, will avoid immediate and

irreparable harm to the Debtors, and will enable the Debtors to continue to operate their business in chapter 11 without disruption.

**Motion of the Debtors for an Order (I) Authorizing Payment of Prepetition Claims of Certain Critical Vendors and Service Providers and (II) Granting Administrative Expense Priority Status to All Undisputed Obligations Arising from Postpetition Delivery of Goods and Services Ordered Prepetition**

59.     The Debtors seek authority to (i) pay, in the Debtors' sole discretion, the prepetition fixed, liquidated, and undisputed claims of the Critical Vendors (collectively, the "Critical Vendor Claims") on the terms set forth herein and (ii) grant administrative expense priority status to all undisputed obligations arising from the postpetition delivery of goods and services ordered in the prepetition period. The Debtors' senior management undertook a thorough analysis to determine which of the Renewables' vendors are critical to its ability to manufacture and distribute the Products. Based on certain criteria, the Debtors identified the Critical Vendors, which consist principally of railway providers, material and chemical suppliers, and certain contract counterparties.

60.     It is crucial that the Debtors have continued and uninterrupted access to the goods, materials, and services provided by the Critical Vendors. Accordingly, the Debtors propose that the Court enter an order providing that:

(i)     When feasible, appropriate, and in the Debtors' business judgment, the Debtors are authorized, but not required, to make payment from available funds to any or all of the Critical Vendors in amounts not to exceed, in the aggregate, $2,750,000 on a final basis, on account of the Critical Vendor Claims, on the conditions that (i) all such claims shall be paid by check, wire transfer of funds, or issuance of a credit, (ii) by accepting payment under the terms of the Critical Vendor Order, the Critical Vendor shall (a) continue extending credit and supplying materials, goods and/or services to the Debtors after the Petition Date, and such credit must generally be provided on ordinary and acceptable terms and conditions that are at least as favorable or better than those provided to the Debtors in the 180-day period prior to the Petition Date, and (b) not file or otherwise assert against the Debtors, their affiliates, or any other person or entity, or

against any of the respective assets or property of the foregoing, whether real or personal, any lien (regardless of the statute or other legal authority upon which such lien is asserted) related in any way to any remaining prepetition amounts allegedly owed to the Critical Vendor by the Debtors arising from agreements entered into prior to the Petition Date and will take the necessary steps to remove any lien obtained prior to receipt of the postpetition payment on the Critical Vendor Claim, and (iii) the Debtors shall transmit a copy of the Critical Vendor Order to each Critical Vendor to which any payment permitted thereunder is made;

(ii) A Critical Vendor's acceptance of payment on account of a Critical Vendor Claim is deemed acceptance of the terms of the Critical Vendor Order, and if the Critical Vendor thereafter does not provide the Debtors with customary trade terms during the pendency of these chapter 11 cases, any payments of Critical Vendor Claims made after the Petition Date may be deemed to be unauthorized postpetition transfers and, therefore, recoverable by the Debtors, without further order of the Court; and

(iii) The Debtors shall be authorized to obtain written verification of the trade terms to be supplied by the Critical Vendors before issuing payment under the Critical Vendor Order.

61. The Debtors submit that the amount of the Critical Vendor Claims is small in relation to the size of their estates, their average expenditures per month on commodities and other inputs, including services, used in the manufacture of the Products, and the value that will be lost if they are unable to pay such claims. The Debtors seek to pay the Critical Vendor Claims only to the extent that nonpayment of such claims would lead to a cessation in the delivery of products and/or services that are essential to the Debtors' operations. I believe payment of the Critical Vendor Claims will not create an imbalance in the Debtors' cash flow because payment of these claims will allow Renewables to continue manufacturing, transporting, and selling its Products, which, in turn, will generate additional revenues from which the Debtors and their creditors will benefit.

62. In addition to payment of the Critical Vendor Claims, the Debtors seek authority to grant administrative expense status to all undisputed obligations arising from the

postpetition delivery of goods ordered in the prepetition period. As of the Petition Date, the Debtors may have Outstanding Orders with various vendors, including, without limitation, the Critical Vendors, for materials that are necessary to Renewables' operations. As a consequence of the commencement of the chapter 11 cases, a vendor may be concerned that delivery of materials after the Petition Date pursuant to a prepetition Outstanding Order will render such vendor a general unsecured creditor and may, therefore, refuse to ship or deliver materials to the Debtors on a postpetition basis. In order to avoid disruption in the delivery of goods and services, the Debtors seek (a) authorization to grant such vendors administrative expense status for undisputed obligations arising from the postpetition delivery or performance of the Outstanding Orders and (b) out of an abundance of caution, authorization to satisfy such undisputed obligations in the ordinary course of business. Absent such relief, the Debtors may be required to expend substantial time and effort reissuing or reaffirming Outstanding Orders to provide these vendors with assurance of administrative priority. Moreover, because most, if not all, of these obligations are in fact administrative priority claims, the payment of such obligations will not provide those vendors with any greater priority than they would otherwise be entitled to and, consequently, such payment will not prejudice any other creditors or parties in interest.

63.     Based upon the foregoing, I believe that the relief requested is essential, appropriate, and in the best interests of the Debtors and their estates and creditors.

**Motion of the Debtors for an Order (I) Scheduling a Combined
Hearing to Consider (A) Approval of the Disclosure Statement, (B) Approval of
Solicitation Procedures and Forms of Ballots, and (C) Confirmation of the
Prepackaged Plan; (II) Establishing a Deadline to Object to the Disclosure
Statement and the Prepackaged Plan; (III) Approving the Form and
Manner of Notice Thereof; and (IV) Granting Related Relief**

64.     The Debtors seek entry of an order (the "Scheduling Order")

(I) scheduling a combined hearing (the "Combined Hearing") to consider (a) approval of the

Disclosure Statement, (b) approval of the Solicitation Procedures employed to solicit votes to accept or reject the Prepackaged Plan and the form of ballots, and (c) the confirmation of the Prepackaged Plan; (II) establishing a deadline to object to the adequacy of the Disclosure Statement or confirmation of the Prepackaged Plan; (III) authorizing and approving the form and manner of notice of the Combined Hearing; and (IV) granting related relief (the "Scheduling Order").

65.     Below is a table highlighting the dates relevant to the Solicitation Procedures and setting forth the Debtors' proposed dates for the mailing of the Notice of Commencement, objection and reply deadlines with respect to the adequacy of the Disclosure Statement and confirmation of the Prepackaged Plan, and the Combined Hearing, subject to the Court's availability:

| Proposed Timetable | |
| --- | --- |
| Commencement of Solicitation | November 24, 2009 |
| Voting Deadline | December 14, 2009 |
| Petition Date | December 21, 2009 |
| Mailing of Notice of Commencement | December 29, 2009 |
| Objection Deadline | February 5, 2010 |
| Reply Date (if necessary) | February 12, 2010 |
| Combined Hearing | February 16, 2010 |

66.     The Debtors spent over nine months negotiating the terms of the Prepackaged Plan with holders of the First Lien Credit Agreement Claims. Once agreement was reached, I understand that holders of the First Lien Credit Agreement Claims attempted to negotiate a consensual deal with the largest holders of the Second Lien Credit Agreement Claims. After two months of such negotiations, the Debtors determined that it was not in their interests to further delay a restructuring. I believe that further delay or a protracted bankruptcy process would pose risks to the Debtors' relationships with their customer, suppliers, and

employees and would potentially weaken the Debtors' ability to compete with other companies in the ethanol and distillers grains industry. At this point, the Debtors have already accomplished the most sensitive and complex task required to effectuate a successful reorganization – negotiation of a restructuring that will convert over $750 million of debt to a combination of $25 million of debt and new membership interests for the holders of the First Lien Credit Agreement Claims who are, effectively, the residual owners of the Debtors.

67. Prior to the Petition Date, the Debtors completed their solicitation of votes under the Prepackaged Plan from the holders of the First Lien Credit Agreement Claims in Class 3A and the holders of the Second Lien Credit Agreement Claims in Class 4A – the only classes entitled to vote to accept or reject the Prepackaged Plan. Despite the rejection of the Prepackaged Plan by Class 4A, Class 3A voted to accept the Prepackaged Plan in excess of the statutory thresholds specified in section 1126(c) of the Bankruptcy Code. The Debtors believe that the Prepackaged Plan is confirmable under section 1129(b) of the Bankruptcy Code notwithstanding the rejection by Class 4A. The Debtors respectfully submit, and I believe, that because (i) the terms of the Prepackaged Plan were extensively negotiated prior to the Petition Date, (ii) votes thereon have been fully solicited prior to the Petition Date, and (iii) the Prepackaged Plan is confirmable, there is no reason to delay consideration of the adequacy of the Disclosure Statement and confirmation of the Prepackaged Plan. Accordingly, the proposed Combined Hearing date of February 16, 2010 is appropriate.

68. It is my opinion that the proposed schedule is in the best interests of the Debtors' estates and their creditors. The proposed schedule – including the Debtors' proposal to serve the Notice of Commencement on all parties in interest and publish the Notice of Commencement on or before December 29, 2009 – will ensure all parties in interest are provided

with the requisite twenty-eight (28) days' notice. Insofar as the solicitation period was completed before the Petition Date, the proposed schedule provides all parties in interest more than the required twenty-eight (28) days' notice of the Combined Hearing to evaluate and, if necessary, file an objection to the Disclosure Statement and/or the Prepackaged Plan before the proposed Combined Hearing. In addition to providing adequate notice and protecting the rights of all parties in interest, the proposed schedule also assists in the expeditious confirmation of the Prepackaged Plan. It is in the best interests of the Debtors' estates and creditors to proceed with the confirmation process as expeditiously as possible for the reasons discussed above. I believe that the proposed Scheduling Order should be entered at this time so that stakeholders may be informed as promptly as possible of the anticipated scheduling of events preceding confirmation of the Prepackaged Plan.

69. In sum, it is my opinion that given the circumstances of these prepackaged chapter 11 cases, the relief requested herein is appropriate. Indeed, such relief is necessary to close the transactions specified in the Restructuring Support Agreement, assist the Debtors in obtaining expeditious confirmation of the Prepackaged Plan with the least possible disruption or harm to their business, and ensure the Debtors' continued viability. Based on the foregoing, I believe that the relief requested is necessary and appropriate, is in the best interests of the Debtors and their estates and creditors, and should be granted in all respects.

## Conclusion

70. For the reasons stated herein and in each of the First Day Pleadings, I respectfully request that the Court enter orders approving such First Day Pleadings.

By: _____

Timothy B. Callahan
Chief Financial Officer and Secretary
Hawkeye Renewables, LLC and
Hawkeye Intermediate, LLC

**Exhibit 1**



**Hawkeye Renewables, LLC
and
Hawkeye Intermediate, LLC**
(and Affiliates)
Organizational Structure as of 12/21/09

Hawkeye Energy Holdings, LLC

Hawkeye Gold, LLC*

--SEPARATENESS RESTRICTIONS*--

100%

100%

100%

Growth Intermediate, LLC

Affiliates of Thomas H. Lee Partners, L.P.

88.95%

1.5%

Hawkeye Growth Holdings, LLC*

100%

Hawkeye Growth, LLC*

100%

100%

Hawkeye Menlo, LLC*

Hawkeye Shell Rock, LLC*

--SEPARATENESS RESTRICTIONS*--

29.55%

Hawkeye Intermediate, LLC* (DEBTOR)

100%

Hawkeye Renewables, LLC* (DEBTOR)

100%

Hawkeye Grain, LLC

--SEPARATENESS RESTRICTIONS*--

63.94%

D&W Railroad, LLC

* Separateness Restrictions:
The operating agreement of each entity so designated contains restrictions requiring arm's-length interactions with any affiliate or third party outside the designated perimeter.