IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------x
                                         :
**In re**                                :      **Chapter 11**
                                         :
**HAWKEYE RENEWABLES, LLC,** *et al.*,   :      **Case No. _____ (____)**
                                         :
            **Debtors.**                 :      **(Jointly Administered)**
                                         :
                                         :
---------------------------------------------------------------x

## DISCLOSURE STATEMENT FOR DEBTORS' JOINT PREPACKAGED PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Michael F. Walsh
(212) 310-8000

-and-

RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware  19801
Mark D. Collins
(302) 651-7700

ATTORNEYS FOR DEBTORS AND DEBTORS IN POSSESSION

Dated: November 24, 2009
        Wilmington, Delaware

THIS SOLICITATION IS BEING CONDUCTED TO OBTAIN SUFFICIENT ACCEPTANCES OF A JOINT PREPACKAGED CHAPTER 11 REORGANIZATION PLAN PRIOR TO THE FILING OF VOLUNTARY REORGANIZATION CASES UNDER CHAPTER 11 OF TITLE 11 OF THE UNITED STATES CODE. BECAUSE NO CHAPTER 11 CASES HAVE YET BEEN COMMENCED, THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING "ADEQUATE INFORMATION" WITHIN THE MEANING OF SECTION 1125(a) OF THE BANKRUPTCY CODE. FOLLOWING THE COMMENCEMENT OF THEIR CHAPTER 11 CASES, THE DEBTORS EXPECT TO SEEK PROMPTLY AN ORDER OF THE BANKRUPTCY COURT APPROVING THIS DISCLOSURE STATEMENT AS CONTAINING ADEQUATE INFORMATION AND THE SOLICITATION OF VOTES AND CONFIRMING THE JOINT PREPACKAGED REORGANIZATION PLAN DESCRIBED HEREIN.

# DISCLOSURE STATEMENT

## DATED NOVEMBER 24, 2009

PREPETITION SOLICITATION OF VOTES
WITH RESPECT TO THE JOINT PREPACKAGED REORGANIZATION PLAN

OF

# HAWKEYE RENEWABLES, LLC

AND

# HAWKEYE INTERMEDIATE, LLC

FROM THE HOLDERS OF CLAIMS UNDER THE HEREINAFTER DESCRIBED

## FIRST LIEN CREDIT AGREEMENT

AND

## SECOND LIEN CREDIT AGREEMENT

> THE VOTING DEADLINE TO ACCEPT OR REJECT THE JOINT PREPACKAGED REORGANIZATION PLAN IS 5:00 P.M. NEW YORK CITY TIME, ON DECEMBER 14, 2009, UNLESS EXTENDED BY THE DEBTORS. IN ORDER TO BE COUNTED, BALLOTS MUST BE RECEIVED BY THE SOLICITATION AGENT BY THE VOTING DEADLINE.

> THE BOARDS OF MANAGERS OF HAWKEYE RENEWABLES, LLC AND HAWKEYE INTERMEDIATE, LLC HAVE EACH APPROVED THE TRANSACTIONS CONTEMPLATED BY THE SOLICITATION AND THE PLAN AND RECOMMEND THAT THE HOLDERS OF FIRST LIEN CREDIT AGREEMENT CLAIMS AND SECOND LIEN CREDIT AGREEMENT CLAIMS WHOSE VOTES ARE BEING SOLICITED SUBMIT BALLOTS TO ACCEPT THE PLAN.

UNLESS OTHERWISE DEFINED IN THIS DISCLOSURE STATEMENT, CAPITALIZED TERMS USED HEREIN HAVE THE MEANINGS ASCRIBED TO THEM IN THE PLAN.

THE DEBTORS ARE FURNISHING THE SOLICITATION PACKAGE TO EACH RECORD HOLDER OF FIRST LIEN CREDIT AGREEMENT CLAIMS AND SECOND LIEN CREDIT AGREEMENT CLAIMS AS OF THE VOTING RECORD DATE IN CONNECTION WITH THE DEBTORS' SOLICITATION OF ACCEPTANCES OF THE PLAN DESCRIBED HEREIN PURSUANT TO SECTIONS 1125 AND 1126(B) OF THE BANKRUPTCY CODE. THIS DISCLOSURE STATEMENT IS TO BE USED BY EACH SUCH HOLDER OF FIRST LIEN CREDIT AGREEMENT CLAIMS OR SECOND LIEN CREDIT AGREEMENT CLAIMS SOLELY IN CONNECTION WITH ITS EVALUATION OF THE PLAN; USE OF THIS DISCLOSURE STATEMENT FOR ANY OTHER PURPOSE IS NOT AUTHORIZED.   THIS DISCLOSURE STATEMENT MAY NOT BE REPRODUCED OR PROVIDED TO ANYONE OTHER THAN ADVISORS TO THE RECIPIENT WITHOUT THE PRIOR WRITTEN CONSENT OF THE DEBTORS.

THE DEBTORS HAVE NOT COMMENCED REORGANIZATION CASES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE AS OF THE DATE OF THIS DISCLOSURE STATEMENT. IF, HOWEVER, THE DEBTORS RECEIVE PROPERLY COMPLETED BALLOTS (THAT ARE NOT SUBSEQUENTLY REVOKED) INDICATING ACCEPTANCE OF THE PLAN IN SUFFICIENT NUMBER AND AMOUNT TO MEET THE VOTING REQUIREMENTS PRESCRIBED BY SECTION 1126 OF THE BANKRUPTCY CODE, THE DEBTORS INTEND TO FILE (BUT HEREBY EXPRESSLY RESERVE THE RIGHT NOT TO FILE) WITH THE BANKRUPTCY COURT VOLUNTARY PETITIONS FOR RELIEF UNDER CHAPTER 11 OF THE BANKRUPTCY CODE, AND TO SEEK, AS PROMPTLY THEREAFTER AS PRACTICABLE, CONFIRMATION OF THE PLAN. THE EFFECTIVE DATE OF THE PLAN IS EXPECTED TO OCCUR SHORTLY AFTER THE BANKRUPTCY COURT'S ENTRY OF THE CONFIRMATION ORDER.

IN THE EVENT THAT THE REQUISITE ACCEPTANCES ARE NOT RECEIVED OR, IF RECEIVED, ARE SUBSEQUENTLY REVOKED PRIOR TO TERMINATION OF THE SOLICITATION, THE DEBTORS HEREBY RESERVE THE ABSOLUTE RIGHT TO USE ANY AND ALL BALLOTS ACCEPTING THE PLAN THAT WERE RECEIVED PURSUANT TO THE SOLICITATION AND NOT SUBSEQUENTLY REVOKED TO SEEK CONFIRMATION OF THE PLAN (OR OF ANY MODIFICATION THEREOF THAT DOES NOT MATERIALLY AND ADVERSELY AFFECT THE TREATMENT OF THE CLASSES OF CLAIMS WITH RESPECT TO WHICH SUCH BALLOTS WERE CAST) PURSUANT TO SECTION 1129(B) OF THE BANKRUPTCY CODE. SEE SECTION XI.F – "CONFIRMATION OF THE PLAN - SECTION 1129(B) – NON-CONSENSUAL CONFIRMATION."

\* \* \* \* \*

BECAUSE ACCEPTANCE OF THE PLAN WILL CONSTITUTE ACCEPTANCE OF ALL THE PROVISIONS THEREOF, HOLDERS OF FIRST LIEN AND SECOND LIEN CREDIT AGREEMENT CLAIMS ARE URGED TO CONSIDER CAREFULLY THE INFORMATION REGARDING TREATMENT OF THEIR CLAIMS CONTAINED IN THIS DISCLOSURE STATEMENT.

THE DEBTORS INTEND TO CONTINUE OPERATING THEIR BUSINESS IN CHAPTER 11 IN THE ORDINARY COURSE AND TO SEEK TO OBTAIN THE NECESSARY RELIEF FROM THE BANKRUPTCY COURT TO PAY THEIR EMPLOYEES, TRADE, AND CERTAIN OTHER CREDITORS IN FULL AND ON TIME.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO MATERIAL CONDITIONS PRECEDENT.  SEE SECTION IV.B – "TRANSACTIONS TO BE CONSUMMATED UNDER THE PLAN AND CERTAIN CORPORATE AND SECURITIES LAWS MATTERS – CONDITIONS PRECEDENT."  THERE CAN BE NO ASSURANCE THAT THOSE CONDITIONS WILL BE SATISFIED.

THE DEBTORS PRESENTLY INTEND TO SEEK TO CONSUMMATE THE PLAN AND TO CAUSE THE EFFECTIVE DATE TO OCCUR PROMPTLY AFTER CONFIRMATION OF THE PLAN. THERE CAN BE NO ASSURANCE, HOWEVER, AS TO WHEN AND WHETHER CONFIRMATION OF THE PLAN AND THE EFFECTIVE DATE ACTUALLY WILL OCCUR. PROCEDURES FOR DISTRIBUTIONS UNDER THE PLAN, INCLUDING MATTERS THAT ARE EXPECTED TO AFFECT THE TIMING OF THE RECEIPT OF DISTRIBUTIONS BY HOLDERS OF CLAIMS IN CERTAIN CLASSES AND THAT COULD AFFECT THE AMOUNT OF DISTRIBUTIONS ULTIMATELY RECEIVED BY SUCH HOLDERS, ARE DESCRIBED IN SECTION III – "OVERVIEW OF THE PLAN."

THE TERMS OF THE PLAN HAVE BEEN DEVELOPED IN THE COURSE OF DISCUSSIONS AND GOOD FAITH NEGOTIATIONS BETWEEN THE DEBTORS AND HOLDERS OF A MAJORITY IN AMOUNT OF FIRST LIEN CREDIT AGREEMENT CLAIMS. THE HOLDERS OF A MAJORITY IN AMOUNT OF FIRST LIEN CREDIT AGREEMENT CLAIMS APPROVE AND ENDORSE THE PLAN AND RECOMMEND THAT OTHER HOLDERS OF FIRST LIEN CREDIT AGREEMENT CLAIMS VOTE TO ACCEPT THE PLAN.

\* \* \* \* \*

IF THE REQUISITE ACCEPTANCES ARE NOT RECEIVED, THE DEBTORS BELIEVE THAT THEY MAY HAVE TO FILE TRADITIONAL, NON-PREPACKAGED PETITIONS UNDER CHAPTER 11 OF THE BANKRUPTCY CODE. THERE CAN BE NO ASSURANCE, HOWEVER, THAT THE DEBTORS WILL BE ABLE TO EMERGE FROM CASES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE IN SUCH CIRCUMSTANCES, AND THE DEBTORS MIGHT BE FORCED INTO LIQUIDATION UNDER CHAPTER 7 OF THE BANKRUPTCY CODE. THE DEBTORS BELIEVE THAT IF THEY ARE LIQUIDATED UNDER CHAPTER 7, THE VALUES OF THE ASSETS AVAILABLE FOR PAYMENT TO CREDITORS WOULD BE SIGNIFICANTLY LOWER THAN THE VALUES OF THE DISTRIBUTIONS CONTEMPLATED BY AND UNDER THE PLAN. SEE SECTION XI.D – "CONFIRMATION OF THE PLAN –LIQUIDATION ANALYSIS."

\* \* \* \* \*

THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN, STATUTORY PROVISIONS, DOCUMENTS RELATED TO THE PLAN, ANTICIPATED EVENTS IN THE DEBTORS' CHAPTER 11 CASES, AND FINANCIAL INFORMATION. ALTHOUGH THE DEBTORS BELIEVE THAT THE PLAN AND RELATED DOCUMENTS AND STATUTORY PROVISION SUMMARIES ARE FAIR AND ACCURATE, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY MANAGEMENT, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS ARE UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN, INCLUDING THE FINANCIAL PROJECTIONS AND OTHER FINANCIAL INFORMATION, IS WITHOUT ANY INACCURACY OR OMISSION.

IN DETERMINING WHETHER TO VOTE TO ACCEPT THE PLAN, HOLDERS OF FIRST LIEN CREDIT AGREEMENT CLAIMS AND SECOND LIEN CREDIT AGREEMENT CLAIMS MUST RELY ON THEIR OWN EXAMINATION OF THE DEBTORS AND THE TERMS OF THE PLAN, INCLUDING THE MERITS AND RISKS INVOLVED. THE CONTENTS OF THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL, AND TAX ADVISORS WITH RESPECT TO ANY SUCH MATTERS CONCERNING THIS DISCLOSURE STATEMENT, THE SOLICITATION, THE PLAN AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY. SEE SECTION X – "CERTAIN RISK FACTORS TO BE CONSIDERED" FOR A DISCUSSION OF VARIOUS FACTORS THAT SHOULD BE CONSIDERED IN CONNECTION WITH THE PLAN.

\* \* \* \* \*

NEITHER THIS DISCLOSURE STATEMENT NOR THE PLAN DESCRIBED HEREIN HAS BEEN FILED WITH OR REVIEWED BY, AND THE NEW MEMBERSHIP INTERESTS TO BE ISSUED ON OR AFTER THE EFFECTIVE DATE WILL NOT HAVE BEEN THE SUBJECT OF A REGISTRATION STATEMENT FILED WITH, THE SECURITIES AND EXCHANGE COMMISSION OR ANY SECURITIES REGULATORY AUTHORITY OF ANY STATE UNDER THE SECURITIES ACT OR UNDER ANY STATE SECURITIES OR "BLUE SKY" LAWS.  THE PLAN HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION, AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN.    ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.  THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN OFFER OR SOLICITATION IN ANY STATE OR OTHER JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED.

TO THE EXTENT THAT THE OFFER OR ISSUANCE OF ANY NEW SECURITY UNDER THE PLAN IS NOT EXEMPT UNDER SECTION 1145(a) OF THE BANKRUPTCY CODE, THE OFFER OR ISSUANCE IS BEING MADE ONLY TO THOSE CREDITORS WHO ARE ACCREDITED INVESTORS AS DEFINED IN REGULATION D UNDER THE SECURITIES ACT.

THIS DISCLOSURE STATEMENT CONTAINS PROJECTED FINANCIAL INFORMATION REGARDING REORGANIZED RENEWABLES AND CERTAIN OTHER FORWARD-LOOKING STATEMENTS ARE PROVIDED IN THIS DISCLOSURE STATEMENT PURSUANT TO THE SAFE HARBOR ESTABLISHED UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995 AND, TO THE EXTENT APPLICABLE, SECTION 1125(e) OF THE BANKRUPTCY CODE, AND SUCH INFORMATION AND FORWARD-LOOKING STATEMENTS SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES, AND RISKS DESCRIBED HEREIN, ALL OF WHICH ARE BASED ON VARIOUS ESTIMATES AND ASSUMPTIONS.  SUCH INFORMATION AND STATEMENTS ARE SUBJECT TO INHERENT UNCERTAINTIES AND TO A WIDE VARIETY OF SIGNIFICANT BUSINESS, ECONOMIC, AND COMPETITIVE RISKS, INCLUDING, AMONG OTHERS, THOSE SUMMARIZED HEREIN.  SEE SECTION X – "CERTAIN RISK FACTORS TO BE CONSIDERED."

WHEN USED IN THIS DISCLOSURE STATEMENT, THE WORDS "ANTICIPATE," "BELIEVE," "ESTIMATE," "WILL," "MAY," "INTEND," "EXPECT," AND SIMILAR EXPRESSIONS GENERALLY IDENTIFY FORWARD-LOOKING STATEMENTS.  ALTHOUGH THE DEBTORS BELIEVE THAT THEIR PLANS, INTENTIONS AND EXPECTATIONS REFLECTED IN THE FORWARD-LOOKING STATEMENTS ARE REASONABLE, THEY CANNOT BE SURE THAT THEY WILL BE ACHIEVED.  FORWARD-LOOKING STATEMENTS IN THIS DISCLOSURE STATEMENT INCLUDE THOSE RELATING TO THE PAYMENTS ON THE DEBTORS' CURRENT AND FUTURE DEBT INSTRUMENTS.  THESE FACTORS ARE NOT INTENDED TO REPRESENT A COMPLETE LIST OF THE GENERAL OR SPECIFIC FACTORS THAT MAY AFFECT REORGANIZED RENEWABLES.  IT SHOULD BE RECOGNIZED THAT OTHER FACTORS, INCLUDING GENERAL ECONOMIC FACTORS AND BUSINESS STRATEGIES, MAY BE SIGNIFICANT, PRESENTLY OR IN THE FUTURE, AND THE FACTORS SET FORTH IN THIS DISCLOSURE STATEMENT MAY AFFECT REORGANIZED RENEWABLES TO A GREATER EXTENT THAN INDICATED.  ALL FORWARD-LOOKING STATEMENTS ATTRIBUTABLE TO THE DEBTORS OR PERSONS ACTING ON THEIR BEHALF ARE EXPRESSLY QUALIFIED IN THEIR ENTIRETY BY THE CAUTIONARY STATEMENTS SET FORTH IN THIS DISCLOSURE STATEMENT. EXCEPT AS REQUIRED BY LAW, THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE ANY FORWARD-LOOKING STATEMENT, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS OR OTHERWISE.

EXCEPT AS SET FORTH IN SECTION V – "VOTING PROCEDURES AND REQUIREMENTS," NO PERSON HAS BEEN AUTHORIZED BY THE DEBTORS IN CONNECTION WITH THE PLAN OR

THE SOLICITATION TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS ATTACHED HERETO OR INCORPORATED BY REFERENCE OR REFERRED TO HEREIN, AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MAY NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE DEBTORS. THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY ANY SECURITIES OTHER THAN THOSE TO WHICH IT RELATES, OR AN OFFER TO SELL OR A SOLICITATION OF AN OFFER TO BUY ANY SECURITIES IN ANY JURISDICTION IN WHICH, OR TO ANY PERSON TO WHOM, IT IS UNLAWFUL TO MAKE SUCH OFFER OR SOLICITATION.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS OTHERWISE EXPRESSLY SET FORTH HEREIN. ANY ESTIMATES OF CLAIMS SET FORTH IN THIS DISCLOSURE STATEMENT MAY VARY FROM THE AMOUNTS OF CLAIMS ULTIMATELY ALLOWED BY THE BANKRUPTCY COURT.

THE SUMMARIES OF THE PLAN AND OTHER DOCUMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN ITSELF, THE EXHIBITS ATTACHED THERETO AND ALL DOCUMENTS DESCRIBED THEREIN. IN THE EVENT OF ANY INCONSISTENCY BETWEEN THE SUMMARIES PROVIDED HEREIN AND THE TERMS OF THE PLAN OR SUCH RELATED DOCUMENTS, THE TERMS OF THE PLAN SHALL GOVERN.   THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING, BUT NOT LIMITED TO, THE INFORMATION REGARDING THE HISTORY, BUSINESS, AND OPERATIONS OF THE DEBTORS, THE HISTORICAL AND PROJECTED FINANCIAL INFORMATION OF REORGANIZED RENEWABLES AND THE LIQUIDATION ANALYSIS RELATING TO REORGANIZED RENEWABLES ARE INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN. AS TO ANY JUDICIAL PROCEEDINGS IN ANY COURT, INCLUDING ANY ADVERSARY PROCEEDINGS OR CONTESTED MATTERS THAT MAY BE FILED IN THE BANKRUPTCY COURT, SUCH INFORMATION IS NOT TO BE CONSTRUED AS AN ADMISSION OR STIPULATION BUT RATHER AS STATEMENTS MADE IN SETTLEMENT NEGOTIATIONS AND SHALL BE INADMISSIBLE FOR ANY PURPOSE ABSENT THE EXPRESS WRITTEN CONSENT OF THE DEBTORS.

NO INDEPENDENT AUDITOR OR ACCOUNTANT HAS REVIEWED OR APPROVED THE FINANCIAL PROJECTIONS OR THE LIQUIDATION ANALYSIS HEREIN.

**INTERNAL REVENUE SERVICE CIRCULAR 230 NOTICE:** TO ENSURE COMPLIANCE WITH INTERNAL REVENUE SERVICE CIRCULAR 230, HOLDERS OF CLAIMS ARE HEREBY NOTIFIED THAT:   (A) ANY DISCUSSION OF FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE DEBTORS OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

# GLOSSARY

The terms in the following table are used in this Disclosure Statement and are the same as, or plain English summaries of, those used in the Plan.  Please refer to the Plan for the complete definition of these terms.

| | |
|---|---|
| *Administrative Expense Claim* | Any actual and necessary expense incurred after the commencement of the Chapter 11 Cases and related to their administration or the operation of the Debtors' business. |
| *Allowed* | With reference to a Claim, (i) any Claim against a Debtor that has been listed by such Debtor in the Schedules, as such Schedules may be amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not being disputed or contingent and for which no contrary proof of claim has been filed, (ii) any Claim that has been timely filed and as to which no objection to allowance or request for estimation has been timely interposed and not withdrawn, or (iii) any Claim expressly allowed by a Final Order or under the Plan. |
| *Amended DG Marketing Agreement* | The new marketing agreement that amends and restates in their entirety both (i) that certain Distiller's Grains Marketing Agreement (Iowa Falls, IA Plant), dated as of October 19, 2007, between Gold and Renewables, and (ii) that certain Distiller's Grains Marketing Agreement (Fairbank, IA Plant), dated as of October 19, 2007, between Gold and Renewables, in the form attached to the RSA, including any supplement thereto. |
| *Amended Ethanol Marketing Agreement* | The amended and restated form of the Exclusive Ethanol Marketing Agreement, dated May 30, 2008, between Gold and Renewables, in the form attached to the RSA, including any supplement thereto. |
| *Amended Management Agreement* | The amended and restated form of the Amended and Restated Services Agreement, dated January 29, 2009, between HEH and Renewables, in the form attached to the RSA, including any supplement thereto. |
| *Amended Organizational Documents* | The LLC Agreement, certificate of formation, or other forms of organizational documents and bylaws for Reorganized Renewables, the terms of which shall be acceptable to the First Lien Agent and Required Lenders, substantially final forms of which will be included in the Plan Supplement. |
| *Bankruptcy Code* | Title 11 of the United States Code. |
| *Bankruptcy Court* | The United States Bankruptcy Court for the District of Delaware having jurisdiction over the Chapter 11 Cases. |
| *Bankruptcy Rules* | The Federal Rules of Bankruptcy Procedure. |

| | |
|---|---|
| *Business Day* | Any day other than a Saturday, a Sunday, or any other day on which banking institutions in New York, New York are required or permitted to close by law or executive order. |
| *Chapter 11 Cases* | The above-captioned, jointly administered cases under chapter 11 of the Bankruptcy Code. |
| *Claim* | As defined in section 101(5) of the Bankruptcy Code. |
| *Class* | Any group of Claims or Equity Interests classified in the Plan. |
| *Commencement Date* | The date the Chapter 11 Cases are commenced in the Bankruptcy Court. |
| *Confirmation Date* | The date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court with respect to the Chapter 11 Cases. |
| *Confirmation Order* | The order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code. |
| *Debtors* | Intermediate and Renewables. |
| *Disbursing Agent* | Any entity (including any applicable Debtor if it acts in such capacity) in its capacity as a disbursing agent as set forth in the Plan. |
| *Disclosure Statement* | This document, together with the annexed exhibits and schedules. |
| *Effective Date* | A Business Day on or after the Confirmation Date specified by the Debtors on which (i) no stay of the Confirmation Order is in effect and (ii) the conditions to the effectiveness of the Plan have been satisfied or waived, which date shall be no later than five days after such conditions have been satisfied or waived, provided, however, that the Debtors, with the consent of the First Lien Agent and Required Lenders, may defer the occurrence of the Effective Date for a period of no more than fifteen days beyond such date in order to facilitate closing of the Exit Facility, if any. |
| *Exit Facility* | A senior secured credit facility, if any, with terms and conditions which shall be mutually acceptable to the First Lien Agent, the Required Lenders and Reorganized Renewables. |
| *Exit Facility Agreement* | A credit agreement, dated on or after the Effective Date, by and among Reorganized Renewables and the lender or lenders party thereto, as the same may have been subsequently amended, restated, amended and restated, supplemented or otherwise modified from time to time, together with all instruments and agreements related thereto, the terms and conditions of which shall be acceptable to the First Lien Agent and the Required Lenders. |
| *Final Order* | An order or judgment of the Bankruptcy Court entered by the Clerk of the Bankruptcy Court on the docket in the Chapter 11 Cases, which has not been reversed, vacated, or stayed and as to which (i) the time to appeal, petition for *certiorari*, or move for |

a new trial, reargument, or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument or rehearing shall then be pending, or (ii) if an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari* or move for a new trial, reargument, or rehearing shall have expired; *provided, however*, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order shall not cause such order to not be a Final Order.

| | |
|---|---|
| *First Lien Agent* | Credit Suisse AG, Cayman Islands Branch (formerly known as "Credit Suisse, Cayman Islands Branch"), as administrative and collateral agent under the First Lien Credit Agreement. |
| *First Lien Credit Agreement* | That certain First Lien Credit Agreement, dated as of June 30, 2006, by and among Renewables, as borrower, Intermediate as guarantor, the lenders from time to time party thereto, and Credit Suisse, as administrative and collateral agent on behalf of the First Lien Lenders (as amended, restated, amended and restated, supplemented, waived or otherwise modified from time to time). |
| *First Lien Credit Agreement Claims* | The Claims arising under or in connection with the First Lien Credit Agreement and all documents relating thereto. |
| *First Lien Lenders* | The lenders party to the First Lien Credit Agreement as of the date hereof. |
| *General Unsecured Claims* | An unsecured Claim that is not entitled to priority under section 507 of the Bankruptcy Code, including the claims of suppliers and other vendors, landlords with prepetition rent claims and/or claims based on the rejection of leases, litigation claimants to the extent not covered by insurance, parties to contracts with the Debtors that are being rejected, deficiency claims of secured creditors (other than the deficiency claims arising out of First Lien Credit Agreement Claims and Second Lien Credit Agreement Claims), and other general unsecured claimants. |
| *Gold* | Hawkeye Gold, LLC, a Delaware limited liability company, and wholly-owned subsidiary of HEH. |
| *HEH* | Hawkeye Energy Holdings, LLC, a Delaware limited liability company, and parent of Gold. |
| *Intermediate* | Hawkeye Intermediate, LLC, a Delaware limited liability company, and parent of Renewables. |

| | |
|---|---|
| *LLC Agreement* | The limited liability company agreement of Reorganized Renewables dated as of the Effective Date, a substantially final form of which will be contained in the Plan Supplement, the terms of which shall be acceptable to the First Lien Agent and the Required Lenders. |
| *New Membership Interests* | The membership interests of Reorganized Renewables issued under Section 5.3 of the Plan and governed by the LLC Agreement. |
| *New Secured Term Loan Agreement* | The new secured term loan agreement, to be dated as of the Effective Date, a substantially final form of which will be included in the Plan Supplement, in form and substance acceptable to the First Lien Agent and the Required Lenders. |
| *New Secured Term Loan Agent* | Credit Suisse, Cayman Islands Branch, as administrative and collateral agent under the New Secured Term Loan Agreement. |
| *New Secured Term Loans* | Newly-issued subordinated secured term notes issued by Reorganized Renewables in the aggregate principal amount of $25 million, to be issued on the Effective Date, on terms and conditions set forth in the New Secured Term Loan Agreement. |
| *Plan* | The Debtors' Joint Prepackaged Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, attached hereto as <u>Exhibit A</u>. |
| *Plan Supplement* | A supplemental appendix to the Plan containing legal documents relevant to the implementation of the Plan. |
| *Renewables* | Hawkeye Renewables, LLC, a Delaware limited liability company and wholly-owned subsidiary of Intermediate. |
| *Required Lenders* | Holders of, in the aggregate, a majority in principal amount outstanding First Lien Credit Agreement Claims. |
| *Reorganized Renewables* | Renewables, as reorganized on the Effective Date, in accordance with the terms of the Plan (including any successor corporation, partnership or limited liability company by merger). |
| *RSA* | That certain restructuring support agreement among the Debtors, the First Lien Agent, the Second Lien Agent and certain of the holders of First Lien Credit Agreement Claims and Second Lien Credit Agreement Claims, dated as of November 24, 2009, attached hereto as <u>Exhibit F</u>. |
| *Schedules* | The schedules of assets and liabilities and the statements of financial affairs filed by the Debtors under section 521 of the Bankruptcy Code, Bankruptcy Rule 1007, and the Official Bankruptcy Forms of the Bankruptcy Rules, as such schedules and statements have been or may be supplemented or amended from time to time on or prior to the Confirmation Date. |
| *SEC* | The Securities and Exchange Commission. |
| *Second Lien Agent* | Wilmington Trust Company, as successor administrative and collateral agent under the Second Lien Credit Agreement. |

| | |
|---|---|
| *Second Lien Credit Agreement* | That certain Second Lien Credit Agreement, dated as of June 30, 2006, by and among Renewables, as borrower, Intermediate as guarantor, the lenders from time to time party thereto, and Credit Suisse, as administrative and collateral agent on behalf of the Second Lien Lenders (as amended, restated, amended and restated, supplemented, waived or otherwise modified from time to time). |
| *Second Lien Credit Agreement Claims* | The Claims arising under or in connection with the Second Lien Credit Agreement and all documents relating thereto. |
| *Second Lien Lenders* | The lenders party to the Second Lien Credit Agreement as of the date hereof. |
| *Securities Act* | The Securities Act of 1933, as amended, and all rules and regulations promulgated thereunder. |
| *Solicitation Agent* | Epiq Bankruptcy Solutions, LLC.  See Section I of this Disclosure Statement for contact information. |
| *Tax Code* | Title 26 of the United States Code. |
| *Voting Deadline* | December 14, 2009 at 5:00 p.m. (New York City time) is the deadline for the actual receipt of ballots to accept or reject the Plan. |

## TABLE OF CONTENTS

Page

I.      Introduction ................................................................................................................. 1

II.     Chapter 11 .................................................................................................................. 2

III.    Overview of the Plan .................................................................................................. 3

        A.      Summary of the Plan ...................................................................................... 3

        B.      Summary of Classification and Treatment ..................................................... 4

        C.      Description and Treatment of Unclassified Claims ........................................ 4

        D.      Description of Classified Claims .................................................................... 5

                1.      Other Priority Claims (Class 1) .......................................................... 5

                2.      Other Secured Claims (Class 2) .......................................................... 5

                3.      First Lien Credit Agreement Claims (Classes 3A, 3B and 3C) ........... 5

                4.      Second Lien Credit Agreement Claims (Classes 4A and 4B) ............. 6

                5.      General Unsecured Claims of the Debtors (Classes 5A and 5B) ........ 7

                6.      Equity Interests in Renewables (Class 6) ............................................ 7

                7.      Equity Interests in Intermediate (Class 7) .......................................... 7

IV.     Transactions to be Consummated Under the Plan and Certain Corporate and
        Securities Laws Matters ............................................................................................. 8

        A.      Restructuring Transactions ............................................................................. 8

                1.      Exit Facility ......................................................................................... 8

                2.      Settlement of Certain Claims .............................................................. 8

                3.      Issuance of New Membership Interests ............................................... 8

                4.      New Secured Term Loans .................................................................... 9

                5.      Assumption of Certain Agreements ..................................................... 9

                6.      Cancellation of Agreements and Securities ......................................... 9

                7.      Managers and Executive Officers ....................................................... 9

                8.      Section 1145 Exemption .................................................................... 10

                9.      Listing of New Membership Interests ............................................... 10

                10.     Effectuating Documents; Further Transactions ................................. 10

        B.      Conditions Precedent .................................................................................... 11

        C.      Company Action ........................................................................................... 11

V.      Voting Procedures and Requirements ...................................................................... 12

        A.      Vote Required for Acceptance by a Class .................................................... 12

        B.      Classes Not Entitled to Vote ........................................................................ 13

        C.      Voting ........................................................................................................... 13

VI.     Financial Information, Projections and Valuation Analysis ..................................... 13

        A.      Introduction .................................................................................................. 13

| | | | |
|---|---|---|---|
| | B. | Operating Performance | 14 |
| | C. | Projections | 14 |
| | D. | Valuation | 22 |
| VII. | | General Information | 25 |
| | A. | Description of Debtors | 25 |
| | | 1. | Corporate Structure and Business | 25 |
| | B. | Prepetition Capital Structure of the Debtors | 25 |
| | | 1. | Prepetition Secured Indebtedness | 26 |
| | | 2. | Other Indebtedness | 27 |
| | | 3. | Equity | 27 |
| | C. | Events Leading to the Commencement of the Chapter 11 Cases | 27 |
| | | 1. | Decreased Results of Operations / Commodity Price Fluctuations | 27 |
| | | 2. | Default Under the First Lien Credit Agreement and Second Lien Credit Agreement | 28 |
| | | 3. | Discussions and Negotiations with First Lien Lender and Second Lien Lender Advisors | 28 |
| | | 4. | Restructuring Support Agreement | 29 |
| | D. | Anticipated Events During the Chapter 11 Cases | 29 |
| | | 1. | Administration | 29 |
| | | 2. | Commencement of the Chapter 11 Cases | 29 |
| | | 3. | Anticipated Timetable for the Chapter 11 Cases | 32 |
| | | 4. | Preference Actions | 32 |
| | | 5. | Anticipated Recoveries | 32 |
| VIII. | | Governance | 33 |
| | A. | Current Board of Managers, Management and Executive Compensation | 33 |
| | B. | Board of Managers of Reorganized Renewables | 33 |
| | C. | Officers of Reorganized Renewables | 33 |
| | D. | Continued Legal Existence | 33 |
| | E. | Obligations of Any Successor Entity | 34 |
| IX. | | Other Aspects of the Plan | 34 |
| | A. | Distributions | 34 |
| | | 1. | Timing and Conditions of Distributions | 34 |
| | | 2. | Procedures for Treating Disputed Claims Under the Plan | 36 |
| | B. | Treatment of Executory Contracts and Unexpired Leases | 37 |
| | | 1. | Contracts and Leases Not Expressly Rejected are Assumed | 37 |

**TABLE OF CONTENTS**
(continued)

| | | | | Page |
|---|---|---|---|---|

2. Cure of Defaults ............ 38
3. Rejection Claims ............ 38
4. Assignment ............ 38
5. Survival of the Debtors' Indemnification Obligations ............ 39
6. Treatment of Certain Affiliate Agreements ............ 39
7. Survival of Other Employment Arrangements ............ 39
8. Insurance Policies ............ 40
C. Effect of Confirmation ............ 40
1. Vesting of Assets ............ 40
2. Discharge of Claims and Termination of Equity Interests ............ 40
3. Term of Injunctions or Stays ............ 41
4. Releases ............ 41
5. Exculpation ............ 42
6. Injunction ............ 42
D. Miscellaneous Provisions ............ 43
X. CERTAIN RISK FACTORS TO BE CONSIDERED ............ 43
A. Certain Bankruptcy Considerations ............ 43
B. Risks to Recovery By Holders of First Lien Credit Agreement Claims and Second Lien Credit Agreement Claims ............ 44
1. Variances from Projections ............ 44
2. Unforeseen Events ............ 44
3. Risks Related to the Reorganized Debtors' Business and Operations ............ 45
C. Reorganized Renewables May Fail to Meet All Conditions Precedent to the Restructuring Transactions ............ 59
XI. Confirmation of the Plan ............ 59
A. Confirmation Hearing ............ 59
B. General Requirements of Section 1129 ............ 60
C. Best Interests Test ............ 60
D. Liquidation Analysis ............ 60
E. Feasibility ............ 61
F. Acceptance by Impaired Class ............ 62
G. Section 1129(b) – Non-Consensual Confirmation ............ 62
1. No Unfair Discrimination ............ 62
2. Fair and Equitable Test ............ 62
XII. Alternatives to Confirmation and Consummation of the Plan ............ 63

**TABLE OF CONTENTS**
(continued)

Page

A.    Liquidation Under Chapter 7 ............................................................ 63

B.    Alternative Plan ............................................................................. 64

XIII.  CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ............ 64

A.    Consequences to the Debtors ......................................................... 65

B.    Consequences to Holders of Certain Claims .................................... 65

    1.    Consequences to Holders of First Lien Credit Agreement Claims ....... 66

    2.    Consequences to Holders of Second Lien Credit Agreement
       Claims ...................................................................................... 67

    3.    Distributions in Discharge of Accrued but Unpaid Interest ................. 68

    4.    Ownership and Disposition of New Secured Term Loans ................... 69

    5.    Ownership and Disposition of New Membership Interests ................. 71

C.    Information Reporting and Withholding ........................................... 74

XIV.   Conclusion .................................................................................... 76

**TABLE OF EXHIBITS:**

**EXHIBIT A**    Joint Prepackaged Plan of Reorganization
**EXHIBIT B**    December 31, 2008 Consolidated Financial Statement
**EXHIBIT C**    March 31, 2009 Consolidated Financial Statement
**EXHIBIT D**    June 30, 2009 Consolidated Financial Statement
**EXHIBIT E**    Liquidation Analysis
**EXHIBIT F**    Restructuring Support Agreement

## I.    INTRODUCTION

The Debtors hereby transmit this Disclosure Statement pursuant to section 1126(b) of the Bankruptcy Code for use in the solicitation of acceptances of the Plan, a copy of which is annexed as <u>Exhibit A</u> to this Disclosure Statement. At this time, the Debtors have not commenced cases under chapter 11 of the Bankruptcy Code, but the Debtors are soliciting acceptances of the Plan from holders of First Lien and Second Lien Credit Agreement Claims. If sufficient votes for acceptance of the Plan are received, the Debtors expect to commence the Chapter 11 Cases and to seek promptly confirmation of the Plan before the United Stated Bankruptcy Court for the District of Delaware. The Debtors believe that this prepetition solicitation will significantly simplify, shorten, and reduce the cost of the administration of, and minimize disputes during, their Chapter 11 Cases and minimize the disruption of their business that could result from a traditional bankruptcy case, which could be contested and protracted. Further, in a lengthy bankruptcy case, the Debtors believe that there is a substantial risk that recoveries by holders of First Lien and Second Lien Credit Agreement Claims would have significantly less value than the recoveries proposed under the Plan.

*Capitalized terms used but not otherwise defined in this Disclosure Statement shall have the respective meanings given to such terms in the Plan.*

The purpose of the Disclosure Statement is to provide information of a kind and in sufficient detail to enable the creditors of the Debtors who are entitled to vote on the Plan to make an informed decision as to whether to accept or reject the Plan.

Attached as exhibits to this Disclosure Statement are copies of the following documents:

- the Plan;

- certain historical consolidated financial statements;

- a liquidation analysis of the Debtors; and

- the RSA, pursuant to which the Required Lenders have agreed to vote for the Plan.

Please note that if there is any inconsistency between the Plan (including the attached exhibits and any supplements to the Plan) and the descriptions in this Disclosure Statement, the terms of the Plan (and the attached exhibits and any supplements to the Plan) will govern.

This Disclosure Statement and the Plan are the only materials that should be used to determine whether to vote to accept or reject the Plan. Any information, representations, or inducements made to obtain acceptance of the Plan, which are other than or inconsistent with the information contained in this Disclosure Statement and in the Plan, should not be relied on by any Claim holder entitled to vote on the Plan.

The Plan was developed over several months and after extensive negotiations among the Debtors and holders of a majority in amount of First Lien Credit Agreement Claims. The Debtors believe that approval of the Plan presents the best chance for the Debtors' successful emergence from chapter 11.

Additional copies of this Disclosure Statement are available on request made to the Epiq Bankruptcy Solutions, LLC (the "***Solicitation Agent***"), at the following address:

> **Hawkeye, Ballot Processing Center**
> **c/o Epiq Bankruptcy Solutions, LLC**
> **757 Third Avenue, 3rd Floor**
> **New York, NY 10017**

The Bankruptcy Code provides that only creditors who vote on the Plan will be counted for purposes of determining whether the requisite acceptances have been attained. Failure to timely deliver a properly completed ballot by December 14, 2009 at 5:00 p.m., New York City time (the "***Voting Deadline***" for the actual receipt of ballots to accept or reject the Plan) will constitute an abstention (*i.e.*, will not be counted as either an acceptance or a rejection). Any improperly completed or late ballot will not be counted, except in the case of a late ballot in the discretion of the Debtors.

## II.  CHAPTER 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11 of the Bankruptcy Code, a debtor is authorized to reorganize its business for the benefit of itself, its creditors, and equity interest holders. In addition to permitting the rehabilitation of a debtor, another goal of chapter 11 is to promote equality of treatment for similarly situated creditors and similarly situated equity interest holders with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the commencement date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The consummation of a plan of reorganization is the principal objective of a chapter 11 reorganization case. A plan of reorganization sets forth the means for satisfying claims against and interests in a debtor. Confirmation of a plan of reorganization by the bankruptcy court that binds the debtor, any issuer of securities under the plan, any person acquiring property under the plan, and any creditor or equity interest holder of a debtor. Subject to certain limited exceptions, the order confirming a plan discharges a debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefor the obligations specified under the confirmed plan.

## III. OVERVIEW OF THE PLAN

### A.    Summary of the Plan

The Debtors have two principal prepetition creditor groups. The first group consists of holders of the First Lien Credit Agreement Claims. As of the anticipated Commencement Date of December 16, 2009, the Debtors expect that there will be approximately $592.8 million outstanding under the First Lien Credit Agreement, consisting of (i) revolving credit loans in the aggregate outstanding principal amount of $50.0 million, (ii) a term loan in the aggregate principal amount of $483.5 million, (iii) approximately $47.5 million of accrued and unpaid interest on account of the revolver and term loan, (iv) $11.2 million on account of the obligations arising from the termination of certain Hedging Agreements (as defined in the First Lien Credit Agreement), and (v) approximately $0.6 million of accrued and unpaid interest on account of the termination of the Hedging Agreements. The First Lien Credit Agreement Claims are secured by a first priority lien on substantially all of the Debtors' assets. The second group consists of Second Lien Credit Agreement Claims. As of the anticipated Commencement Date of December 16, 2009, the Debtors expect that there will be approximately $167.3 million outstanding under the Second Lien Credit Agreement, consisting of (i) a term loan in the aggregate principal amount of $150 million, and (ii) approximately $17.3 million of accrued and unpaid interest. Pursuant to the Prepetition Intercreditor Agreement (defined below), the liens and priorities that secure the Second Lien Credit Agreements Claims are subordinate in all respects to the liens and priorities that secure the First Lien Credit Agreement Claims.

The Plan, among other things:

- provides holders of the First Lien Credit Agreement Claims in Class 3A their *pro rata* share of (i) the New Secured Term Loans and (ii) the following New Membership Interests: (a) the Class A Units, (b) the Class B Units (which units shall only be issued if the holders of Second Lien Credit Agreement Claims in Class 4A vote to accept the Plan, and will then be transferred to holders of Class 4A Second Lien Credit Agreement Claims), and (iii) the Class C Units (which will be transferred to holders of Class 4A Second Lien Credit Agreement Claims), in each case subject to dilution, if any, on account of the Management Incentive Program;

- provides holders of the Second Lien Credit Agreement Claims in Class 4A with the following New Membership Interests: (i) the Class B Units (only if the holders of Class 4A Second Lien Credit Agreement Claims vote to accept the Plan, in which case the Class B Units will first be issued to holders of Class 3A First Lien Credit Agreement Claims, and will then be transferred to holders of Second Lien Credit Agreement Claims), and (ii) all Class C Units (which will first be issued to holders of Class 3A First Lien Credit Agreement Claims and will then be transferred to holders of Class 4A Second Lien Credit Agreement Claims), in each case subject to dilution, if any, on account of the Management Incentive Program; and

- provides no recovery to General Unsecured Creditors and holders of Equity Interests.

**B.    Summary of Classification and Treatment**

       The following table shows the Classes of Claims against and equity interests in the Debtors and specifies which of those Classes are (i) impaired or unimpaired by the Plan, (ii) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code, and (iii) deemed to reject the Plan.

| Class | Designation | Treatment | Entitled to Vote | Estimated Recovery % |
|---|---|---|---|---|
| 1A<br>1B | Other Priority Claims | Unimpaired | No (deemed to accept) | 1A: 100<br>1B: 100 |
| 2 | Other Secured Claims | Unimpaired | No (deemed to accept) | 100 |
| 3A<br>3B<br>3C | First Lien Credit Agreement Claims | Impaired | Yes for Class 3A<br>No for Class 3B and 3C<br>(deemed to reject) | 3A: 33.1% to 34.1%<br>3B: 0<br>3C: 0 |
| 4A<br>4B | Second Lien Credit Agreement Claims | Impaired | Yes for Class 4A<br>No for Class 4B<br>(deemed to reject) | 4A: 4.1% to 7.7%[*]<br>4B: 0 |
| 5A<br>5B | General Unsecured Claims | Impaired | No (deemed to reject) | 5A: 0<br>5B: 0 |
| 6 | Equity Interests in Renewables | Impaired | No (deemed to reject) | 0 |
| 7 | Equity Interests in Intermediate | Impaired | No (deemed to reject) | 0 |

[*] This range is the Debtors' best estimate of recoveries that will be distributed to holders of Class 4A Claims. The Debtors determined this recovery range using a Black-Scholes option pricing model based on information known to date, as reflected in this Disclosure Statement.

**C.    Description and Treatment of Unclassified Claims**

       Generally, the Plan provides for the payment in full of Administrative Expense Claims and Claims by taxing authorities that are entitled to priority under the Bankruptcy Code. The aggregate amount of these Claims will depend on the length of the Chapter 11 Cases. Delays in the case due to litigation, obtaining regulatory approvals, or unforeseen events could materially increase the amount of such Claims.

       For a detailed description of the payment of (i) Administrative Expense Claims, (ii) compensation and reimbursement Claims, and (iii) Priority Tax Claims, please refer to Section 2 of the Plan.

### D.   Description of Classified Claims

#### 1.   *Other Priority Claims (Class 1)*

Except to the extent that a holder of an Allowed Other Priority Claim (a) has been paid by the Debtors, in whole or in part, prior to the Effective Date, or (b) agrees to less favorable treatment, each holder of an Allowed Other Priority Claim will receive, in full satisfaction, settlement, release, and discharge of, and in exchange for such Other Priority Claim, Cash in the full amount of such Allowed Other Priority Claim.

#### 2.   *Other Secured Claims (Class 2)*

The Claims in Class 2 include any Secured Claim against the Debtors, other than the First Lien Credit Agreement Claims and the Second Lien Credit Agreement Claims. Other Secured Claims include, without limitation, Secured Claims arising under or in connection with capital equipment leases, judicial liens, mechanic's liens and artisan's liens. Other Secured Claims will receive the collateral securing such Claims, receive cash equal to the value of such collateral, or have such Claims reinstated.

#### 3.   *First Lien Credit Agreement Claims (Classes 3A, 3B and 3C)*

Class 3A consists of the portion of the First Lien Credit Agreement Claims against Renewables that are Secured Claims. Class 3B consists of the deficiency portion of the First Lien Credit Agreement Claims against Renewables. Class 3C consists of the First Lien Credit Agreement Claims against Intermediate based on its guaranty of the First Lien Credit Agreement Claims.

Under the Plan, Reorganized Renewables will be obligated under a new secured term loan in the principal amount of $25 million (the ***New Secured Term Loans***") and will issue new equity interests and profit participation interests. Holders of First Lien Credit Agreement Claims will receive 100% of the New Secured Term Loans, equity interests, and profit participation interests. However, as described below, the holders of the First Lien Credit Agreement Claims will transfer certain profit participation interests issued pursuant to the Plan to the holders of the Second Lien Credit Agreement Claims (Class 4A).

The equity interests are in the form of membership interests because Renewables, as reorganized, will continue to be a limited liability company. The membership units, which are denominated as the "Class A Units" under the Plan, will entitle the holders of the First Lien Credit Agreement Claims to elect the board of managers for Reorganized Renewables and to receive all distributions of value from Reorganized Renewables, whether by liquidation of the company or otherwise, except for potential distributions to be made with respect to the profit participation interests.

The profit participations are denominated the "Class B Units" and the "Class C Units" under the Plan. The Class B Units, which will be issued only if Class 4A votes to accept the Plan, will entitle the holders to receive, in the aggregate, 7.5% of all distributions from Reorganized Renewables (whether made pursuant to a liquidation or otherwise, and whether in cash or property) after such time as holders of Class A Units have received, in the aggregate,

5

cumulative distributions equal to $435,000,000. The Class C Units will entitle the holders to receive, in the aggregate, 10.0% of all distributions from Reorganized Renewables (whether made pursuant to a liquidation or otherwise, and whether in cash or property) after such time as holders of Class A Units have received, in the aggregate, cumulative distributions equal to $580,000,000. As noted above, the Plan provides that the holders of the First Lien Credit Agreement Claims will transfer the Class B Units (if issued) and the Class C Units to the holders of the Second Lien Credit Agreement Claims as of the Effective Date.

The membership interests (Class A Units) and profit participation interests (Class B Units and Class C Units) are subject to dilution for any profit participation interests issued to management under any management incentive plan adopted by the new board of managers of Reorganized Renewables. These profit participation interests are denominated as the "Class D Units" under the Plan. No Class D Units have been committed to any member of management and any decision to award Class D Units will be made by the new board of managers in its sole discretion.

The Debtors estimate that the recovery to the holders of First Lien Credit Agreement Claims will be approximately 33.1%. This recovery (i) assumes that the holders of the Second Lien Credit Agreement Claims vote to accept the Plan and is net of the Class B Units and the Class C Units, and (ii) is based on the midpoint of the valuation range for the Reorganized Debtors described in Section VI, below.

4.    *Second Lien Credit Agreement Claims (Classes 4A and 4B)*

Class 4A consists of the Second Lien Credit Agreement Claims against Renewables. Class 4B consists of the Claims against Intermediate, based on its guaranty of the Second Lien Credit Agreement Claims.

The Debtors believe that all of the distributable value in these Chapter 11 Cases is encumbered by the liens granted pursuant to the First Lien Credit Agreement and the Second Lien Credit Agreement. The Prepetition Intercreditor Agreement provides that holders of the Second Lien Credit Agreement Claims are not entitled to any distributions until the obligations under the First Lien Credit Agreement are discharged in full. As described in Section VI, below, the distributable value of Reorganized Renewables will be between $191 and $228 million. Based upon this valuation, the obligations due and owing under the First Lien Credit Agreement will not be discharged in full. Consequently, the holders of the Second Lien Credit Agreement Claims are not entitled to any recovery in the Chapter 11 Cases. Nonetheless, the Plan provides that certain profit participation interests will be issued to the holders of the First Lien Credit Agreement Claims (Class 3A) and will be transferred on the Effective Date to the holders of Second Lien Credit Agreement Claims. The profit participation interests are denominated the "Class B Units" and the "Class C Units" under the Plan. The Class B Units, which will be issued only if Class 4A votes to accept the Plan, will entitle the holders to receive, in the aggregate, 7.5% of all distributions from Reorganized Renewables (whether made pursuant to a liquidation or otherwise, and whether in cash or property) after such time as holders of Class A Units have received, in the aggregate, cumulative distributions equal to $435,000,000. The Class C Units will entitle the holders to receive, in the aggregate, 10.0% of all distributions from Reorganized Renewables (whether made pursuant to a liquidation or otherwise, and whether in cash or

property) after such time as holders of Class A Units have received, in the aggregate, cumulative distributions equal to $580,000,000. As noted above, the Plan provides that the holders of the First Lien Credit Agreement Claims will transfer the Class B Units (if issued) and the Class C Units to the holders of the Second Lien Credit Agreement Claims as of the Effective Date.

The Class B Units and Class C Units (as well as the Class A Units to be owned by the holders of the First Lien Credit Agreement Claims) are subject to dilution for any profit participation interests issued to management under any management incentive plan adopted by the new board of managers of Reorganized Renewables. These profit participation interests are denominated as the "Class D Units" under the Plan. No Class D Units have been committed to any member of management and any decision to award Class D Units will be made by the new board of managers in its sole discretion.

In addition, the Class B Units and the Class C Units will expire on the seventh anniversary of the Effective Date if such units are not "in the money" by such date. In particular, the Class B Units will expire if the holders of the Class A Units either have not received distributions of at least $435 million of value by the seventh anniversary of the Effective Date and would not receive such value if Reorganized Renewables were liquidated on such date. Similarly, the Class C Units will expire if the holders of the Class A Units either have not received distributions of at least $580 million of value by the seventh anniversary of the Effective Date and would not receive such value if Reorganized Renewables were liquidated on such date.

The Debtors estimate that the recovery to the holders of Second Lien Credit Agreement Claims will be approximately 7.7% if Class 4A votes to accept the Plan. If Class 4A votes to reject the Plan, the Debtors estimate that the recovery will be approximately 4.1%. For purposes of estimating a recovery for these Claims, the Class B Units and the Class C Units were treated as options and valued using a Black-Scholes option pricing model. The principal assumptions under the model (among others) are that (i) the Class B Units and the Class C Units will expire in seven years and (ii) the enterprise value of the Reorganized Debtors is $186 million (see Section VI, below).

5.    *General Unsecured Claims of the Debtors (Classes 5A and 5B)*

Class 5A consists of General Unsecured Claims against Renewables. Class 5B consists of General Unsecured Claims against Intermediate. Holders of General Unsecured Claims will not receive or retain any distribution or payment under the Plan. On the Effective Date, all General Unsecured Claims will be cancelled and extinguished.

6.    *Equity Interests in Renewables (Class 6)*

The existing equity interests in Renewables will be cancelled.

7.    *Equity Interests in Intermediate (Class 7)*

The existing equity interests in Intermediate will be cancelled.

7

## IV. TRANSACTIONS TO BE CONSUMMATED UNDER THE PLAN AND CERTAIN CORPORATE AND SECURITIES LAWS MATTERS

### A.   Restructuring Transactions

1.   *Exit Facility*

On or after the Effective Date, Reorganized Renewables will be authorized, but not required, to enter into the Exit Facility. Confirmation of the Plan shall be deemed approval of the Exit Facility and the execution of any documents required or useful to implement such facility. Reorganized Renewables will be able to use the Exit Facility for any purpose permitted thereunder, including the funding of obligations under the Plan and satisfaction of ongoing working capital needs.

Upon the execution, delivery and effectiveness of the Exit Facility Agreement, the New Secured Term Loans will be subordinated to the Exit Facility by the terms of an Intercreditor Agreement, in form and substance acceptable to the lenders under the Exit Facility, the New Secured Term Loan Agent and the Required Lenders.

2.   *Settlement of Certain Claims*

Pursuant to Bankruptcy Rule 9019, and in consideration for the classification, distribution, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims or controversies resolved pursuant to the Plan. All Plan distributions made to creditors holding Allowed Claims in any Class are intended to be and shall be final, and no Plan distribution to the holder of a Claim in one Class shall be subject to being shared with or reallocated to the holders of any Claim in another Class by virtue of any prepetition collateral trust agreement, shared collateral agreement, subordination agreement, or other similar inter-creditor arrangement.

3.   *Issuance of New Membership Interests*

The issuance of the New Membership Interests by Reorganized Renewables is authorized without the need for any further company action or without any further action by a holder of Claims or Interests.

The New Membership Interests shall consist of the Class A Units, the Class B Units, the Class C Units and the Class D Units. At the close of business on the Effective Date, the Class A Units, Class B Units and Class C Units shall be issued to the holders of First Lien Credit Agreement Claims; provided, that the Class B Units will only be issued if Class 4A votes to accept the Plan. The Class C Units shall be immediately transferred to the holders of Second Lien Credit Agreement Claims; if Class 4A votes to accept the Plan, then the Class B Units shall be immediately transferred to holders of Class 4A Claims, in accordance with the Plan. The Class D Units, if any, shall be issued at such time after the Effective Date as the board of managers of Reorganized Renewables may determine pursuant to the Management Incentive Program to be adopted by such board.

All of the New Membership Interests issued pursuant to the Plan shall be duly authorized, validly issued and, if applicable, fully paid and non-assessable. Each distribution and issuance of New Membership Interests (other than the issuance, if any, of Class D Units) shall be governed by the terms and conditions set forth in the Plan.

Upon the Effective Date, the LLC Agreement shall be deemed to become valid, binding and enforceable in accordance with its terms, and each holder of New Membership Interests shall be bound thereby, in each case, without need for execution by any party thereto other than Reorganized Renewables.

4.    *New Secured Term Loans*

The incurrence of obligations under the New Secured Term Loans by Reorganized Renewables will be authorized without the need for any further company action and without any further action by a holder of Claims or Interests. On the Effective Date and immediately following the issuance of the New Membership Interests, Reorganized Renewables, the New Secured Term Loan Agent and the holders of the First Lien Credit Agreement Claims will be deemed to execute the New Secured Term Loan Agreement.

Upon the execution, delivery and effectiveness of the Exit Facility Agreement, the New Secured Term Loans will be subordinated to the Exit Facility pursuant to the Intercreditor Agreement described in Section IV.A.1, above.

5.    *Assumption of Certain Agreements*

On the Effective Date, Reorganized Renewables is authorized and directed, without any requirement of further action by the equity holders or board of managers of the Debtors, to assume (i) the Amended DG Marketing Agreement, (ii) the Amended Ethanol Marketing Agreement, and (iii) the Amended Management Agreement, each in the form previously executed and delivered, as attached to the RSA.

6.    *Cancellation of Agreements and Securities*

Except (i) for purposes of evidencing a right to distributions under the Plan, (ii) with respect to executory contracts and unexpired leases assumed by the Debtors, or (iii) otherwise as provided in the Plan, all the agreements and other documents evidencing the Claims, Equity Interests, or rights of any holder of a Claim or Equity Interest Impaired under the Plan shall be cancelled on the Effective Date, provided, however, that the First Lien Credit Agreement and the Second Lien Credit Agreement shall continue in effect solely for the purposes of (a) allowing the First Lien Agent and Second Lien Agent to make distributions on account of Claims in Class 3 and Class 4, respectively, and to perform such other necessary administrative functions with respect thereto, and (b) permitting such parties to maintain any rights or liens they may have for fees, costs, and expenses thereunder.

7.    *Managers and Executive Officers*

On the Effective Date, the term of each member of the current Boards of Managers of the Debtors shall automatically expire. The initial Board of Managers of

Reorganized Renewables on and after the Effective Date shall consist of five (5) members which shall be persons designated by the First Lien Agent at the direction of the Required Lenders. The persons serving as executive officers of Renewables immediately before the Effective Date shall maintain their current positions after the Effective Date.

8.     *Section 1145 Exemption*

Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of any New Membership Interests and any and all settlement agreements incorporated in the Plan shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable law requiring registration prior to the offering, issuance, distribution, or sale of the New Membership Interests. In addition, under section 1145 of the Bankruptcy Code, any New Membership Interests and any and all settlement agreements incorporated therein will be freely tradable by the recipients thereof, subject to (1) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act; (2) compliance with any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of any the New Membership Interests or instruments; (3) the restrictions, if any, on the transferability of the New Membership Interests set forth in the LLC Agreement; and (4) applicable regulatory approval.

9.     *Listing of New Membership Interests*

Reorganized Renewables shall not be obligated to list the New Membership Interests on a national securities exchange or over-the-counter market. In order to ensure that Reorganized Renewables will not become subject to the reporting requirements of the Exchange Act except in connection with a public offering, the New Membership Interests will be subject to certain trading restrictions to limit the number of record holders thereof as shall be more fully described in the Plan Supplement.

10.    *Effectuating Documents; Further Transactions*

On the Effective Date or as soon as reasonably practicable thereafter, Reorganized Renewables may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including: (1) the execution and delivery of appropriate agreements or other documents of merger, consolidation, or reorganization containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan; (3) the filing of appropriate certificates of incorporation, merger, or consolidation with the appropriate governmental authorities pursuant to applicable law; and (4) all other actions that Reorganized Renewables determines are necessary or appropriate.

**B.     Conditions Precedent**

The transactions described in <u>Section IV.A</u> above are subject to various conditions precedent, including those set forth below.

(a)     With respect to confirmation of the Plan:

1.     The Confirmation Order, in form and substance satisfactory to the Debtors, the First Lien Agent and the Required Lenders, shall have been entered and shall be in full force and effect and there shall not be a stay or injunction in effect with respect thereto; and

2.     The Plan, Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been filed in form and substance acceptable to the First Lien Agent and the Required Lenders, without prejudice to Reorganized Renewables's rights under the Plan to alter, amend, or modify certain of the schedules, documents, and exhibits contained in the Plan Supplement, subject to the consent of the First Lien Agent and the Required Lenders.

(b)     With respect to the Effective Date of the Plan:

1.     The Confirmation Order, in form and substance satisfactory to the Debtors, the First Lien Agent, and the Required Lenders, shall have been entered at least fourteen (14) days prior to the Effective Date and shall be in full force and effect and there shall not be a stay or injunction in effect with respect thereto;

2.     The Debtors shall have received all authorizations, consents, regulatory approvals, rulings, letters, no-action letters, opinions, or documents that are necessary to implement the Plan and required by law, regulation, or order;

3.     Reorganized Renewables shall have entered into the New Secured Term Loan Agreement; and

4.     All actions, documents, certificates, and agreements necessary to implement the Plan shall have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws.

**C.     Company Action**

Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including (i) rejection or assumption, as applicable, of executory contracts and unexpired leases, (ii) selection of the managers and officers for Reorganized Renewables, (iii) the execution and entry into the Exit Facility Agreement, if any,

(iv) the distribution of the New Membership Interests, (v) the execution and entry into the New Secured Term Loan Agreement, and (vi) all other actions contemplated by the Plan (whether to occur before, on or after the Effective Date). All matters provided for in the Plan involving the organizational structure of the Debtors or Reorganized Renewables, and any company action required by the Debtors or Reorganized Renewables in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, managers or officers of the Debtors or Reorganized Renewables. On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors or Reorganized Renewables (including, any vice-president, president, chief executive officer, treasurer or chief financial officer of any Debtor or Reorganized Renewables), as applicable, shall be authorized and directed to issue, execute and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of Reorganized Renewables, including (i) the Exit Facility, if any, (ii) Amended Organizational Documents, (iii) the New Secured Term Loan Agreement and (iv) any and all other agreements, documents, securities and instruments relating to the foregoing. The authorizations and approvals contemplated by this section shall be effective notwithstanding any requirements under nonbankruptcy law.

Reorganized Renewables shall adopt the Amended Organizational Documents and shall file such documents with the Secretary of State of Delaware. In addition, on or about the Effective Date, pursuant to and only to the extent required by section 1123(a)(6) of the Bankruptcy Code, the organization documents for the Debtors, shall be amended, subject to the consent of the First Lien Agent and Required Lenders, as necessary to satisfy the provisions of the Bankruptcy Code and shall include, among other things, (i) a provision prohibiting the issuance of non-voting equity securities and (ii) a provision setting forth an appropriate distribution of voting power among classes of equity securities possessing voting power. On the Effective Date, the board of managers for Reorganized Renewables shall be deemed to have adopted the LLC Agreement.

## V.  VOTING PROCEDURES AND REQUIREMENTS

Detailed voting instructions are provided with the ballot accompanying this Disclosure Statement. For purposes of the Plan, only Class 3A, which is comprised of the First Lien Credit Agreement Claims against Renewables, and Class 4A, which is comprised of the Second Lien Credit Agreement Claims against Renewables, are entitled to vote. If your Claim is not in one of these Classes, you are not entitled to vote on the Plan and you will not receive a ballot with this Disclosure Statement. If your Claim is in one of these Classes, you should read your ballot and follow the listed instructions carefully. Please use only the ballot that accompanies this Disclosure Statement.

---

**IF YOU HAVE ANY QUESTIONS CONCERNING THE BALLOT, YOU MAY CONTACT THE SOLICITATION AGENT AT (646) 282-2400.**

---

### A.    Vote Required for Acceptance by a Class

Under the Bankruptcy Code, acceptance of a Plan by creditors in a class of Claims is determined by calculating the number and the amount of Claims voting to accept,

based on the actual total Allowed Claims voting. Acceptance by a class of creditors requires an affirmative vote of more than one-half of the total Allowed Claims voting and two-thirds in amount of the total Allowed Claims voting.

**B.    Classes Not Entitled to Vote**

Under the Bankruptcy Code, creditors are not entitled to vote on, and are deemed to have accepted, the Plan if their contractual rights are left unimpaired by the Plan. In addition, classes of Claims or interests that are not entitled to receive property under the Plan are not entitled to vote on, and deemed not to have accepted the Plan. Based on this standard, the holders of Other Priority Claims are not being affected by the Plan and are thus deemed to have accepted the Plan. Conversely, holders of First Lien Credit Agreement Claims in Classes 3B and 3C, Second Lien Credit Agreement Claims in Class 4B, General Unsecured Claims and Equity Interests in Renewables and Intermediate, are not entitled to vote on, and are deemed not to have accepted, the Plan because they are not receiving any property under the Plan.

**C.    Voting**

In order for your vote to be counted, your vote must be actually **_received_** by the Solicitation Agent at the address below before the Voting Deadline of 5:00 p.m. (New York City Time), on December 14, 2009:

> **Hawkeye, Ballot Processing Center**
> **c/o Epiq Bankruptcy Solutions, LLC**
> **757 Third Avenue, 3rd Floor**
> **New York, NY 10017**

**If your vote is received by the Solicitation Agent after the Voting Deadline, the Debtors, in their sole discretion, will decide whether or not your vote will be counted. No Ballot should be sent to the Debtors or to the Debtors' financial or legal advisors, but only to the Solicitation Agent as set forth above.**

If the instructions on your ballot require you to return the ballot to your bank, broker, or other nominee, or to their agent, you must deliver your ballot to them in sufficient time for them to process it and return it to the Solicitation Agent before the Voting Deadline. If a ballot is damaged or lost, you may contact the Solicitation Agent at the number set forth above. Any ballot that is executed and returned but which does not indicate an acceptance or rejection of the Plan will not be counted.

## VI. FINANCIAL INFORMATION, PROJECTIONS AND VALUATION ANALYSIS

**A.    Introduction**

This section provides summary information concerning the recent financial performance of the Debtors, as well as projections for the remainder of fiscal year 2009, and fiscal years 2010 through 2012. This section also sets forth an estimate of a going concern valuation for the Debtors.

The projections assume an effective date for the Plan of March 31, 2010, with Allowed Claims treated in accordance with the Plan. Expenses incurred as a result of the Chapter 11 Cases are assumed to be paid on the Effective Date.

Please refer to Section IX of this Disclosure Statement for a discussion of some of the factors that could have a material effect on the information provided in this section.

The estimates of value are not intended to reflect the values that may be attainable in public or private markets. They also are not intended to be appraisals or reflect the value that may be realized if assets are sold.

B.      **Operating Performance**

The Debtors' consolidated financial statements for the year ended December 31, 2008, the three months ended March 31, 2009 and the three months ended June 30, 2009 are attached hereto as Exhibits B, C and D, respectively.

C.      **Projections**

The following projected *pro forma* balance sheets and projected financial performance (the "***Projections***") reflect the operations of the Debtors.

It is important to note that the Projections described below may differ from actual performance and are highly dependent on significant assumptions concerning the future operations of the Debtors' businesses. These assumptions include predictions regarding commodity pricing, the stability of vendor pricing and credit terms, labor and other operating costs, inflation, and the level of investment required for capital expenditures and working capital.

The Projections assume that the Plan will be confirmed and consummated in accordance with its terms and that there will be no material changes in the current regulatory environment that will have an unexpected impact on the Debtors' operations. The Projections assume an effective date of the Plan of March 31, 2010, with Allowed Claims treated in accordance with the Plan. Expenses incurred as a result of the Chapter 11 Cases are assumed to be paid upon the Effective Date. If the Debtors do not emerge from chapter 11 by March 31, 2010, as assumed for purposes of this analysis, additional bankruptcy expenses will be incurred until such time as a Plan is confirmed. These expenses could significantly impact the Debtors' results of operations and cash flows.

The Projections should be read in conjunction with the assumptions, qualifications and footnotes to the Projections set forth herein, the historical consolidated financial information (including the notes and schedules thereto) and the unaudited actual results reported in the monthly operating reports of the Debtors. The Projections were prepared by management in good faith based upon assumptions believed to be reasonable and applied in a manner consistent with past practice. The assumptions regarding the operations of the business leading to and after the assumed effective date were prepared in November 2009 and were based, in part, on economic, competitive, regulatory and

general business conditions prevailing at the time, as well as management's forecast for the ethanol industry and future performance.

The Debtors do not, as a matter of course, publicly disclose projections as to their future revenues, earnings, or cash flow. Accordingly, neither the Debtors nor Reorganized Renewables intends to update or otherwise revise the Projections to reflect circumstances existing since their preparation, the occurrence of unanticipated events, or changes in general economic or industry conditions, even in the event that any or all of the underlying assumptions are shown to be in error.

The Projections were not prepared with a view toward complying with the guidelines for prospective financial statements published by the American Institute of Certified Public Accountants. The Projections have not been compiled, or prepared for examination or review, by the Debtors' independent auditors (who accordingly assume no responsibility for them).

While presented with numerical specificity, the Projections are based upon a variety of assumptions and are subject to significant business, economic, and competitive uncertainties and contingencies, many of which are beyond the control of the Debtors. The inclusion of the Projections herein should not be regarded as a representation by the Debtors (or any other person) that the Projections will be realized, and actual results may vary materially from those presented below. The industry in which the Debtors compete is highly competitive and the Debtors' earnings may be significantly adversely affected by, among other things, changes in the competitive environment, fluctuations in commodity prices, increased federal, state and local regulatory and licensing requirements, and general declines in the national or global economy. Due to the fact that such Projections are subject to significant uncertainty and are based upon assumptions which may not prove to be correct, neither the Debtors nor any other person assumes any responsibility for their accuracy or completeness.

The following Projections have been prepared using accounting policies that are materially consistent with those applied in the Debtors' historical financial statements. The Projections do not reflect formal implementation of fresh start accounting pursuant to Statement of Position 90-7 as issued by the AICPA. The estimated adjustments regarding the reorganized equity value of Reorganized Renewables, certain write-downs of its assets, or estimates of its liabilities as of the Effective Date will be based upon the fair value of its assets as of that date, which could be materially greater or lower than the values assumed in the foregoing estimates.

1.    *Unaudited Pro Forma Balance Sheet*

| BALANCE SHEET ($'s in 000s) | March 31, 2010 | | |
|---|---|---|---|
| | Projected | Adjustments | Pro Forma |
| **Current Assets** | | | |
| Cash & Cash Equivalents | $ 48,814 | $ (5,058) (1) | $ 43,757 |
| Accounts Receivable | 22,784 | - | 22,784 |
| Inventory | 16,865 | - | 16,865 |
| Commodity Derivative Assets | 293 | - | 293 |
| Prepaid Expenses and Other Current Assets | 1,575 | - | 1,575 |
| **Total Current Assets** | $ 90,332 | $ (5,058) | $ 85,274 |
| **Other Assets** | | | |
| Net Property, Plant & Equipment | $ 182,056 | $ (54,272) (2) | $ 127,784 |
| Investment in Unconsolidated Affiliates | 16,013 | (16,013) (2) | - |
| Capitalized Financing Costs | 13,519 | (13,519) (3) | - |
| Other Assets | 3,343 | - | 3,343 |
| **Total Other Assets** | $ 214,931 | $ (83,804) | $ 131,127 |
| **Total Assets** | $ 305,262 | $ (88,861) | $ 216,401 |
| **Current Liabilities** | | | |
| Current Portion of Long-Term Debt | $ 695,304 | $ (695,304) (4) | $ - |
| Current Portion of Capital Lease | 84 | - | 84 |
| Accounts Payable | 9,963 | (2,958) (5) | 7,006 |
| Accrued Interest | 64,782 | (64,782) (4) | - |
| Accrued Expenses & Unearned Revenue | - | - | - |
| **Total Current Liabilities** | $ 770,134 | $ (763,044) | $ 7,090 |
| **Other Liabilities** | | | |
| New Secured Term Loans | - | 25,000 (6) | 25,000 |
| Capital Lease | 195 | - | 195 |
| Other Liabilities | - | - | - |
| **Total Other Liabilities** | $ 195 | $ 25,000 | $ 25,195 |
| **Total Liabilities** | $ 770,329 | $ (738,044) | $ 32,285 |
| **Minority Interest** | $ 1,090 | $ (1,090) | $ - |
| **Stockholder's Equity** | | | |
| Equity | (466,156) | 650,273 (7) | 184,116 |
| **Total Stockholder's Equity** | $ (466,156) | $ 650,273 | $ 184,116 |
| **Total Liabilites and Shareholder's Equity** | $ 305,262 | $ (88,861) | $ 216,401 |

*See accompanying Notes to the Unaudited Pro Forma Balance Sheet.*

**Notes to the Pro Forma Balance Sheet**

The unaudited pro forma balance sheet presented herein assumes that the Plan is effective as of March 31, 2010.

1.  Represents estimated payments of cash of $5.1 million relating to payment of administrative claims, including restructuring fees.

2.  Represents the estimated write-down of assets.

3.  Represents the write-off of costs associated with the issuance of the First Lien Credit Agreement Claims.

4.  Represents the termination of liabilities subject to compromise: the First Lien Credit Agreement Claims and Second Lien Credit Agreement Claims pursuant to the Plan as well as the corresponding write-off of accrued interest on the First Lien Credit Agreement Claims and Second Lien Credit Agreement Claims.

5.  Represents cash adjustments relating to payment of administrative claims, including restructuring fees, of $1.5 million and non-cash adjustments relating to the write-down of $1.5 million other accrued expenses.

6.  Represents the New Secured Term Loan maturing 2016 issued pursuant to the Plan.

7.  Represents the adjustment to reflect the new estimated fair value of equity as a result of the restructuring.

2. *Unaudited Projected Income Statement*

| INCOME STATEMENT | Projected Results for the Fiscal Years Ending December 31 | | | |
|---|---|---|---|---|
| ($'s in 000s) | 2009 | 2010 | 2011 | 2012 |
| **Gross Revenues** | | | | |
| Gross Ethanol | $ 363,241 | $ 410,462 | $ 432,631 | $ 438,038 |
| Distiller Grains | 65,114 | 69,197 | 74,606 | 75,180 |
| Total Gross Revenues | $ 428,355 | $ 479,660 | $ 507,236 | $ 513,218 |
| | | | | |
| **Raw Materials** | | | | |
| Corn | $ (292,855) | $ (307,563) | $ (329,945) | $ (332,486) |
| Ethanol Freight | (30,647) | (31,435) | (31,435) | (31,526) |
| Natural Gas | (26,819) | (33,805) | (38,605) | (41,643) |
| Miscellaneous Chemicals | (12,072) | (12,385) | (12,385) | (12,421) |
| Denaturant | (7,537) | (7,731) | (7,731) | (7,753) |
| Total Raw Materials | $ (369,930) | $ (392,919) | $ (420,101) | $ (425,830) |
| | | | | |
| **Other Cost of Goods Sold** | | | | |
| Production Department | $ (18,224) | $ (18,919) | $ (18,919) | $ (18,974) |
| Maintenance Department | (6,674) | (6,845) | (6,845) | (6,865) |
| Laboratory Department | (822) | (843) | (843) | (845) |
| Depreciation | (19,217) | (25,557) | (25,557) | (25,557) |
| Other | 1,507 | - | - | - |
| Total Other Cost of Goods Sold | $ (43,431) | $ (52,164) | $ (52,164) | $ (52,241) |
| | | | | |
| **Gross Profit** | $ 14,995 | $ 34,576 | $ 34,971 | $ 35,147 |
| | | | | |
| **Operating Expenses** | | | | |
| General & Administrative | $ (10,128) | $ (7,656) | $ (7,656) | $ (7,678) |
| Total Operating Expenses | $ (10,128) | $ (7,656) | $ (7,656) | $ (7,678) |
| | | | | |
| **Operating Income** | $ 4,867 | $ 26,920 | $ 27,315 | $ 27,469 |
| | | | | |
| **Adjusted EBITDA** | $ 28,101 | $ 52,773 | $ 53,168 | $ 53,322 |
| *% of Revenue* | *6.6%* | *11.0%* | *10.5%* | *10.4%* |
| *Per Gallon Produced* | *$ 0.14* | *$ 0.25* | *$ 0.25* | *$ 0.25* |
| | | | | |
| **Nonrecurring Income / (Expenses)** | | | | |
| Gains / (Losses) on Hedges | $ (2,319) | $ - | $ - | $ - |
| Restructuring Fees | (8,179) | (2,800) | - | - |
| Write-off of PP&E | (87) | - | - | - |
| Miscellaneous Income / (Expense) | (6,297) | - | - | - |
| Total Nonrecurring Income / (Expenses) | $ (16,882) | $ (2,800) | $ - | $ - |
| | | | | |
| **Interest & Financing Expenses** | | | | |
| Working Capital Facility | $ (72,291) | $ (188) | $ (250) | $ (251) |
| New Secured Term Loan | - | (2,292) | (3,042) | (3,050) |
| Capital Leases | - | (26) | (18) | (9) |
| Interest Income on Excess Cash | 204 | 876 | 1,482 | 2,047 |
| Total Interest & Financing Expenses | $ (72,087) | $ (1,630) | $ (1,827) | $ (1,263) |
| | | | | |
| Income Taxes | $ - | $ (9,671) | $ (10,960) | $ (11,269) |
| **Net Income** | $ (84,102) | $ 12,819 | $ 14,528 | $ 14,937 |

*See accompanying Notes to the Unaudited Projected Financial Statements.*

3.    *Unaudited Projected Balance Sheets*

| BALANCE SHEET | Projected Results for December 31 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| (*$'s in 000s*) | | 2009 | | 2010 | | 2011 | | 2012 |
| **Current Assets** | | | | | | | | |
| Cash & Cash Equivalents | $ | 41,079 | $ | 80,746 | $ | 117,622 | $ | 154,476 |
| Accounts Receivable | | 23,115 | | 24,411 | | 24,770 | | 25,497 |
| Inventory | | 16,893 | | 18,175 | | 18,480 | | 19,096 |
| Commodity Derivative Assets | | 293 | | 293 | | 293 | | 293 |
| Prepaid Expenses and Other Current Assets | | 1,598 | | 1,688 | | 1,712 | | 1,763 |
| **Total Current Assets** | $ | 82,978 | $ | 125,312 | $ | 162,876 | $ | 201,125 |
| **Other Assets** | | | | | | | | |
| Net Property, Plant & Equipment | $ | 187,769 | $ | 110,644 | $ | 87,792 | $ | 64,939 |
| Capitalized Financing Costs | | 13,519 | | - | | - | | - |
| Other Assets | | 3,392 | | 3,582 | | 3,635 | | 3,741 |
| **Total Other Assets** | $ | 220,693 | $ | 114,227 | $ | 91,426 | $ | 68,680 |
| **Total Assets** | $ | 303,671 | $ | 239,539 | $ | 254,303 | $ | 269,805 |
| **Current Liabilities** | | | | | | | | |
| Current Portion of Long-Term Debt | $ | 695,304 | $ | - | $ | - | $ | - |
| Current Portion of Capital Lease | | 84 | | 84 | | 84 | | 48 |
| Accounts Payable | | 10,403 | | 16,822 | | 17,103 | | 17,674 |
| Accrued Interest | | 64,782 | | - | | - | | - |
| Accrued Expenses & Unearned Revenue | | - | | 952 | | 966 | | 994 |
| **Total Current Liabilities** | $ | 770,574 | $ | 17,858 | $ | 18,153 | $ | 18,717 |
| **Other Liabilities** | | | | | | | | |
| Unearned Revenue | $ | - | $ | 1,665 | $ | 1,690 | $ | 1,740 |
| New Secured Term Loans | | - | | 25,000 | | 25,000 | | 25,000 |
| Capital Lease | | 216 | | 132 | | 48 | | - |
| Other Liabilities | | - | | - | | - | | - |
| **Total Other Liabilities** | $ | 216 | $ | 26,797 | $ | 26,738 | $ | 26,740 |
| **Total Liabilities** | $ | 770,790 | $ | 44,655 | $ | 44,891 | $ | 45,456 |
| **Minority Interest** | $ | 1,090 | $ | - | $ | - | $ | - |
| **Stockholder's Equity** | | | | | | | | |
| Equity | | (468,208) | | 194,884 | | 209,411 | | 224,349 |
| **Total Stockholder's Equity** | $ | (468,208) | $ | 194,884 | $ | 209,411 | $ | 224,349 |

*See accompanying Notes to the Unaudited Projected Financial Statements.*

4.    *Unaudited Projected Cash Flow Statements*

| CASH FLOW STATEMENT | Projected Results for Fiscal Years Ending December 31 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| ($'s in 000s) | | 2009 | | 2010 | | 2011 | | 2012 |
| **Cash from Operating Activities** | | | | | | | | |
| Net Income | $ | (84,102) | $ | 12,819 | $ | 14,528 | $ | 14,937 |
| Depreciation & Amortization | | 23,234 | | 25,853 | | 25,853 | | 25,853 |
| Change in Commodity and Derivative Assets | | 4,085 | | - | | - | | - |
| Equity in Earnings of Investments | | 6,652 | | - | | - | | - |
| Minority Interest | | (25) | | - | | - | | - |
| Increase / (Decrease) in Accrued Interest | | 56,733 | | - | | - | | - |
| Change in Working Capital | | 4,750 | | 2,413 | | (445) | | (902) |
| Total Cash from Operating Activities | $ | 11,331 | $ | 41,085 | $ | 39,936 | $ | 39,888 |
| **Cash from Investing Activities** | | | | | | | | |
| Purchase of Property, Plant and Equipment | $ | (1,690) | $ | (3,000) | $ | (3,000) | $ | (3,000) |
| Increase / (Decrease) in Unearned Revenue | | (1,547) | | 1,665 | | 24 | | 50 |
| Total Cash from Investing Activities | $ | (3,237) | $ | (1,335) | $ | (2,976) | $ | (2,950) |
| **Cash from Financing Activities** | | | | | | | | |
| Issuance of Long-Term Debt | $ | - | $ | - | $ | - | $ | - |
| Retirement of Long-Term Debt | $ | - | $ | - | $ | - | $ | - |
| Payments on Capital Lease Obligations | | (178) | | (84) | | (84) | | (84) |
| Total Cash from Financing Activities | $ | (178) | $ | (84) | $ | (84) | $ | (84) |
| Net Increase / (Decrease) in Cash | $ | 7,916 | $ | 39,667 | $ | 36,876 | $ | 36,854 |
| Beginning Cash Balance | $ | 33,163 | $ | 41,079 | $ | 80,746 | $ | 117,622 |
| Net Increase / (Decrease) in Cash | | 7,916 | | 39,667 | | 36,876 | | 36,854 |
| Ending Cash Balance | $ | 41,079 | $ | 80,746 | $ | 117,622 | $ | 154,476 |

*See accompanying Notes to the Unaudited Projected Financial Statements.*

**Notes to the Unaudited Projected Financial Statements**

The Debtors developed the Projections contained herein based on the following assumptions, among others:

(a)    General Economic and Market Conditions:  The Projections were prepared assuming that economic conditions in the markets served by the Debtors do not differ markedly over the next three years from current economic conditions. No amendment or change to the Renewable Fuel Standard program was assumed as enacted under the Energy Policy Act of 2005 or as revised by the Energy Independence and Security Act of 2007 (RFS2).

(b)    Ethanol Revenue: Ethanol revenue is generated from the sale of ethanol through fixed price and index-based contracts and through transactions at prevailing market prices. The projections assume that production capacities at the Debtors' Iowa Falls and Fairbanks plants remain at 105 million and 120 million gallons per year, respectively, adjusted for forced outages. Additionally, the projections assume that existing fixed price contracts will roll off as they expire through the end of fiscal year 2009; no financial hedging transactions / contracts have been factored into the remainder of the forecast. The sales price was projected assuming an average, run-rate EBITDA margin of 25 cents per gallon and by future prices of certain raw materials implied by forward price curves as of November 5, 2009.

(c)     Distillers Grains Revenue:  Distillers grains revenue is generated from the sale of dry distillers grains and wet distillers grains through fixed price contracts and through transactions at prevailing market prices. The Projections assume that the Debtors will produce 0.008 tons of distillers grains per bushel of corn consumed, which is consistent with the Debtors' distillers grain yield for the first six months of fiscal year 2009. Additionally, the Projections assume that existing fixed price contracts will roll off as they expire through the end of fiscal year 2009, and all transactions thereafter will occur at the implied market price. The implied market price was calculated as 77.6% of future CBOT corn prices implied by the forward price curve as of November 5, 2009. The assumed price as a percentage of CBOT corn price is consistent with actual distillers grains and corn prices for the first nine months of fiscal year 2009.

(d)     Corn Expense:  The Projections assume that the Debtors will consume one bushel of corn for every 2.80 gallons of denatured ethanol produced. The ethanol corn yield is consistent with the Debtors' actual denatured yield for the 12-month period ended September 30, 2009. Corn is purchased through fixed price contracts, as well as at prevailing market prices. The Projections assume that existing fixed price contracts will roll off as they expire through the end of fiscal year 2009, and all transactions thereafter will occur at the implied market price. Corn prices for the projection period were based on the CBOT corn forward price curve through 2011 as of November 5, 2009, and held constant thereafter. CBOT corn prices were adjusted for the Debtors' basis (which accounts for the Debtors' ability to source corn more cheaply from local sources than trading prices on CBOT) and storage cost on a per-gallon basis, as estimated by management, to arrive at the implied market price.

(e)     Natural Gas Expense:  The Projections assume that the Debtors will consume 0.028 MMBTU of natural gas for every gallon of ethanol produced. The natural gas consumption ratio is based on historical average rates. All transactions during the forecast period were assumed to occur at the implied market price. Natural gas prices for the projection period were based on the NYMEX natural gas forward price curve through 2011 as of November 5, 2009, and held constant thereafter. NYMEX gas prices were adjusted for the Debtors' basis and transportation costs on a per-gallon basis, as estimated by management, to arrive at the implied market rate.

(f)     Other Raw Material Expense:  Other raw material expense includes expenditures related to ethanol freight, miscellaneous chemicals and denaturant. These expenses were estimated using a constant cost-per-gallon ratio based on actual costs incurred for the first nine months of fiscal year 2009 and management's estimates.

(g)     Other Costs of Goods Sold:  Other costs of goods sold include, but are not limited to, production costs, maintenance costs, laboratory costs and depreciation. Each of these expenses was estimated using a constant cost-per-gallon ratio consistent with actual costs incurred for the first nine months of fiscal year 2009.

(h)     General and Administrative Expenses:  General and administrative ("G&A") expenses include, but are not limited to, corporate-level expenses such as salaries and benefits. G&A expense was estimated using a constant cost-per-gallon ratio based on management's estimates. Marketing fees will be paid to affiliates of the Debtors per the

Amended Management Agreement, Amended Ethanol Marketing Agreement and Amended DG Marketing Agreement. Furthermore, the projections assume the Amended Management Agreement, Amended Ethanol Marketing Agreement and Amended DG Marketing Agreement will remain in full-force during the projection period.

(j)     Interest Expense and Income:  Interest expense represents the interest associated with the New Secured Term Loan issued upon the Debtors' emergence from bankruptcy.  The Projections assume the New Secured Term Loan accrues interest at 12% per annum.  Interest expense does not reflect the cost of borrowings under an illustrative exit revolver (the "***Working Capital Facility***"), which is assumed to remain undrawn throughout the forecast period. However, an unused fee of 100 bps is reflected in the Projections. Cash held by Reorganized Renewables is assumed to earn interest at 1.5% per annum.

(k)     Taxes: The Projections assume a tax rate of 43% (35% federal, 8% state) associated with tax related obligations.

(l)     Depreciation: Assumed straight-line depreciation expense for PP&E based on a five-year useful life.

(m)     Working Capital:  Reorganized Renewables' working capital is composed of, among other items, accounts receivable, inventory, prepaid expenses, accounts payable, accrued expenses and unearned revenue.  The projections assume working capital days on hand remain consistent with actual results as of September 30, 2009.

(n)     Capital Expenditures:  The Projections include capital expenditures primarily associated with facility maintenance.  Overall, projected annual capital expenditures are approximately $3.0 million during the period covered by the Projections.

(o)     Working Capital Facility:  The Debtors are seeking to raise a $25 million Working Capital Facility to fund working capital needs. The Projections assume the anticipated cost of entering into a Working Capital Facility, which is expected to have standard market terms, although actual terms are subject to market conditions at the time of issuance.

Interest associated with this facility in 2009 in the projected financials represents the accrual of interest on pre-petition liabilities.

(p)     New Secured Term Loan: Pursuant to the Plan, the New Secured Term Loan maturing 2016 is issued to holders of the First Lien Credit Agreement Claims and pays either 12.0% per annum in cash or, 15.0% per annum in kind, at the option of Reorganized Renewables.

### D.     Valuation

In connection with certain matters relating to the Plan, the Debtors requested that Blackstone Advisory Services, L.P. ("***Blackstone***") prepare a valuation analysis of the Debtors' businesses. The valuation analysis was prepared by Blackstone based on the Projections.

In preparing its analysis, Blackstone has, among other things:

- reviewed certain operating and financial forecasts prepared by the Debtors, including the Projections;

- discussed with management the key assumptions related to the Projections;

- reviewed certain other financial and operating data of the Debtors;

- discussed with management the current operations and prospects of the Debtors;

- employed generally accepted valuation techniques, as described below; and

- considered such other analyses as Blackstone deemed appropriate and necessary under the circumstances.

Blackstone relied upon and assumed, without independent verification, the accuracy and completeness of the financial and other information provided to or discussed with it by the Debtors or obtained by it from public sources. Blackstone has not audited, reviewed, or compiled the accompanying information in accordance with generally accepted accounting principles, or otherwise. With respect to all projections furnished to it, Blackstone has relied on representations that these have been reasonably prepared on a basis reflecting the best currently available estimates and judgments of management of the Debtors as to the expected future performance of the Debtors. Blackstone has not assumed any responsibility for the independent verification of any such information, including, without limitation, the Projections, and has further relied upon the assurances of management of the Debtors that they are unaware of any facts that would make the information and Projections incomplete or misleading.

As referenced above, Blackstone has employed generally accepted valuation techniques in estimating the reorganization value of the Debtors. In preparing its valuation, Blackstone considered each of the following generally accepted valuation techniques:

(i)    Trading Comparables Analysis: Blackstone did not perform a valuation analysis based on the trading prices of the securities of comparable companies because there are no such comparables that are not already bankrupt or in financial distress. The trading prices for securities of financially distressed companies are erratic and do not accurately reflect the risk profile of healthy firms in the industry. Similarly, the equity securities of bankrupt companies are typically de-listed and therefore do not have observable trading prices.

(ii)    Discounted Cash Flow Analysis ("*DCF*"): A DCF analysis estimates the enterprise value of a business based upon the present value of the projected unlevered after-tax cash flows from the business, using selected discount rates. The discount rates are based on the estimated weighted average cost of capital determined by, among other things, reference to observed costs of capital for companies with reasonably similar characteristics, including, among other things, lines of business, risk factors, geography, size, and profitability to Reorganized Renewables ("***Comparable Companies***"). Added to the present

value of the unlevered free cash flows during the Projection period is an estimate of the present value of unlevered free cash flows beyond the Projection period based on the assumption that Reorganized Renewables will achieve a constant annual growth in future cash flows in perpetuity.

(iii)    Precedent Transactions Analysis:    The precedent transactions analysis is based on the enterprise values of Comparable Companies involved in merger and acquisition transactions, including acquisitions of companies in bankruptcy. Under this methodology, the enterprise value of each such company is determined by an analysis of the consideration paid and the debt assumed in the merger or acquisition transaction. In the ethanol industry, those enterprise values are commonly expressed as multiples of nameplate capacity or run rate production. The derived multiples are then applied to the Debtors' projected production rate of 225 million gallons per year to determine the Total Enterprise Value ("*TEV*") or value to a potential buyer.

Due to the fact that the results of a Precedent Transaction Analysis often reflect a control premium, or are impacted by a competitive dynamic due to multiple bidders, the valuation multiples implied by this valuation methodology may be greater than a company's inherent asset or operating value.

It should be noted that valuation conclusions cannot be based solely upon quantitative results. The reasons for, and circumstances surrounding, each acquisition transaction are specific to such acquisition, and there are inherent differences between the businesses, operations and prospects of each. Qualitative judgments must be made concerning the differences among the characteristics of these transactions and other factors and issues, which could affect a target company's value.

As a result of such analyses, reviews, discussions, considerations, and assumptions, Blackstone provided to the Debtors an estimate that the distributable value of Reorganized Renewables on a "reorganization value" basis is a range of approximately $191 million to $228 million, with a midpoint of $210 million, inclusive of excess cash of $24 million. The TEV of Reorganized Renewables on a "reorganization value" basis is a range of approximately $167 million to $204 million, with a midpoint of $186 million. Blackstone reduced the TEV estimate by the estimated pro forma net debt of Reorganized Renewables as of March 31, 2010 in order to calculate the implied reorganized equity value of Reorganized Renewables. Blackstone estimates that the equity value range of Reorganized Renewables is approximately $166 million to $203 million, with a midpoint estimate of $185 million.

The above estimated value is a hypothetical value of Reorganized Renewables derived through the application of various valuation methodologies. Blackstone's reorganization value estimate is based on economic, market, financial, regulatory and other conditions as they exist, and on the information made available to Blackstone as of November 23, 2009. It should be understood that, although subsequent developments may affect Blackstone's conclusions, Blackstone does not have any obligation to update, revise, or reaffirm its estimate.

The summary set forth above does not purport to be a complete description of the analyses performed by Blackstone. The preparation of a valuation estimate involves various determinations as to the most appropriate and relevant methods of financial analysis and the application of these methods in the particular circumstances and, therefore, such an estimate is not readily susceptible to summary description. The value of an operating business is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in factors affecting the financial results, financial condition and prospects of such a business. As a result, the estimate of implied equity value set forth herein is not necessarily indicative of actual outcomes, which may be significantly more or less favorable than those set forth herein. In addition, the estimate of implied equity value does not purport to be an appraisal, nor does it necessarily reflect the value that might be realized if assets were sold. Depending on the results of Reorganized Renewables' operations or changes in the financial markets, actual TEV may differ significantly from Blackstone's valuation analysis disclosed herein.

| (\$ in millions) | Mid-Point Value |
|---|---|
| Reorganized Renewables Total Enterprise Value | \$186 |
| Less Pro Forma Net Debt | \$(1) |
| Reorganized Renewables Equity Value | \$185 |

## VII. GENERAL INFORMATION

**A.    Description of Debtors**

*1.    Corporate Structure and Business*

Intermediate is a private holding company and the sole member of Renewables. As of June 30, 2009, the outstanding equity of Intermediate consisted entirely of privately-held membership interests.

Renewables is a privately held limited liability company and is a leading producer of ethanol. It owns and operates ethanol production facilities in Iowa Falls, Iowa and Fairbank, Iowa (collectively, the "***Plants***"). As of the date hereof, the outstanding equity of Renewables consisted entirely of privately-held membership interests.

For the fiscal year ending December 31, 2008, the Debtors, on a consolidated basis, generated approximately \$584 million in net revenue and reported liabilities of \$720 million.

**B.    Prepetition Capital Structure of the Debtors**

The capital structure of the Debtors consists primarily of equity and approximately \$768 million of secured and other indebtedness of Renewables, in each case as described below.