IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------x
:
In re                              :          Chapter 11
:
HAWKEYE RENEWABLES, LLC, *et al.,*   :          Case No. 09-14461 (KJC)
:
Debtors.          :          Jointly Administered
:          **Hearing Date: TBD**
:          **Objection Deadline: TBD**
---------------------------------------------------------x

### MOTION OF THE SECOND LIEN AGENT FOR AN ORDER DIRECTING THE APPOINTMENT OF AN OFFICIAL COMMITTEE OF UNSECURED CREDITORS, OR, ALTERNATIVELY, AN OFFICIAL COMMITTEE OF SECOND LIEN LENDERS

Wilmington Trust FSB, as agent (the "Second Lien Agent") under that certain Second Lien Credit Agreement (defined below), by and through its undersigned counsel, hereby files this motion (the "Motion") for entry of an Order directing the United States Trustee (the "US Trustee") to appoint an official committee of unsecured creditors (the "Unsecured Committee"), or, alternatively, an official committee of Second Lien Lenders (the "Second Lien Committee") in the above-captioned Chapter 11 cases of Hawkeye Renewables, LLC ("Renewables") and its parent Hawkeye Intermediate, LLC ("Intermediate" and, with Renewables, the "Debtors") pursuant to Section 1102(a) of Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). In support of this Motion, the Second Lien Agent respectfully represents as follows:

### PRELIMINARY STATEMENT

1.      The Bankruptcy Code carefully balances the powers of a debtor in possession to run a business in the ordinary course with the rights of creditors to appear and be heard in court to protect their interests. One of the fundamental "checks and balances" of the bankruptcy process is the Code's requirement for the appointment of an official committee of unsecured creditors, which is charged with specific statutory rights, duties and privileges to protect

unsecured creditor interests.

2. Unsecured creditors in these cases -- specifically the Second Lien Lenders -- have been deprived of this fundamental protection because the Office of the United States Trustee refused to appoint a creditors committee despite the interest of at least three suitable parties. Thus, unsecured creditors have no statutory representative to protect their collective interests in relation to the Debtors' proposed prepackaged plan of reorganization (the "Proposed Plan"), which provides unsecured creditors with a paltry recovery, hands over the keys to the First Lien Lenders and gives Thomas H. Lee -- the Debtors' equity holder and architect of the Debtors' leveraged buyout that caused the Debtors to incur the massive debt load to be restructured in this case -- a gratuitous release of all creditor claims without the consent of unsecured creditors.

3. The Court should act immediately to appoint a creditors committee. The Debtors are moving rapidly and aggressively to confirm the Proposed Plan, which was negotiated without substantial input of unsecured creditors, including the Second Lien Lenders. The confirmation hearing for the Proposed Plan is scheduled to begin in less than six weeks. Given the expedited nature of these cases, the Second Lien Agent seeks this Court's assistance to protect the interests of Second Lien Lenders, the largest constituency of unsecured creditors, and the integrity of the Chapter 11 process itself by providing the most critical "check and balance" that is customary in Chapter 11 cases of this magnitude.

4. Second Lien Lenders believe that the Plan is based upon an artificially depressed valuation of the Debtors -- following a trough year of a cyclical business -- that deprives the Second Lien Lenders of a fair and appropriate recovery. Without an official committee in place, the Debtors and the First Lien Lenders may be able to steamroll the Proposed Plan without the opposition of a statutory fiduciary.

5.     Section 1102 of the Bankruptcy Code requires the US Trustee to appoint an official committee where, as here, there are at least three creditors willing to serve.  On January 8, 2010, the US Trustee denied the request of at least three Second Lien Lenders to form a committee on the basis that there was an "insufficient response" of creditors willing to serve. But three person committees are common.

6.     Because appointment of a creditors committee is mandatory, the Court should immediately direct the appointment of a committee without further delay.  Alternatively, the Court should follow Judge Sontchi's decision in *In re CSS Medical, Inc.*, Case No. 09-12390 (CSS) by directing the appointment of a committee of second lien lenders.  In *CSS*, the debtor sought to confirm a prepackaged plan that turned over ownership to first lien creditors, while paying trade creditors 100% but denying second lien creditors a fair recovery.  Judge Sontchi subsequently appointed a second lien committee to protect second lien creditor interests.  The Second Lien Agent respectfully submits that the same result should occur here if the Court does not direct the appointment of an official committee of unsecured creditors.

## JURISDICTION

7.     This Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief requested herein are Section 1102(a) of the Bankruptcy Code and Rules 2020 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## BACKGROUND

8.     On December 21, 2009 (the "Petition Date"), the Debtors filed voluntary petitions for relief under the Bankruptcy Code.

9.     Pursuant to that certain Second Lien Credit Agreement dated as of June 30, 2006

(as amended, restated, supplemented or otherwise modified from time to time, the "Second Lien Credit Agreement"), among Intermediate, THL-Hawkeye Acquisition LLC (merged with and into Renewables), the predecessor agent as administrative and collateral agent and the lenders party thereto (the "Second Lien Lenders"), the Debtors owe approximately $167.3 million. The debt under the Second Lien Credit Agreement (the "Second Lien Debt") is secured by a lien on substantially all of the assets of the Debtors, including Cash Collateral (collectively, the "Collateral"); this lien is subordinate only to the lien granted to the First Lien Agent.[1]  Under the First Lien Credit Agreement, the Debtors owe approximately $544 million.

10.     On the Petition Date, the Debtors filed the Proposed Plan and related disclosure statement.  The hearing to consider the confirmation of the Proposed Plan and disclosure statement is currently scheduled for March 3, 2010.

11.     The Proposed Plan provides that the First Lien Lenders will swap the outstanding obligations under the Debtors' First Lien Credit Agreement for $25 million in new secured loans and 100% of the equity interests in the reorganized Debtors.  *See* Joint Prepackaged Plan of Reorganization of Hawkeye Renewables, LLC, Et Al. Under Chapter 11 of the Bankruptcy Code [Docket No. 4].

12.     In contrast, the Plan offers Second Lien Lenders certain "profit participation" interests providing a paltry 4.1% recovery, and no corporate governance rights.

13.     Also on the Petition Date, the Debtors filed the *Motion of the Debtors for an Order (I) Authorizing Payment of Prepetition Claims of Certain Critical Vendors and Service Providers and (II) Granting Administrative Expense Priority Status to All Undisputed*

---

[1]     The Debtors are also obligated under the First Lien Credit Agreement dated as of June 30, 2006 (as amended, restated, supplemented or otherwise modified from time to time, the "First Lien Credit Agreement"), among Intermediate, THL-Hawkeye Acquisition LLC (merged with and into Renewables), Credit Suisse, as administrative and collateral agent (the "First Lien Agent"), and the lenders party thereto (the "First Lien Lenders").

*Obligations Arising from Postpetition Delivery of Goods and Services Ordered Prepetition* (the

"Critical Vendor Motion") [Docket No. 13].  Under the Critical Vendor Motion, those creditors

deemed critical vendors (whose claims total approximately $2.5 million), will be paid cash at the

Debtors' discretion, leaving less than $1 million in general unsecured claims.  *See* First Day

Hearing Tr. 31:16-32:6, Dec. 22, 2009; Critical Vendor Motion ¶ 7.  The Court entered an order

approving the Critical Vendor Motion on December 22, 2009.  [Docket No. 43.]

   14. As set forth in the Debtors' proposed disclosure statement, the Debtors are valued

at a range of approximately $191 million to $228 million (the "Proposed Valuation").  *See*

Disclosure Statement For Debtors' Joint Prepackaged Plan of Reorganization under Chapter 11

of the Bankruptcy Code, dated  November 14, 2009 (the "Disclosure Statement") [Docket No.

5].  Assuming, *arguendo*, the Proposed Valuation is correct, the Second Lien Lenders are

deemed fully undersecured.  Although Second Lien Lenders dispute the Proposed Valuation,

they do not dispute that they are, to some extent, undersecured.  Accordingly, at least three

Second Lien Lenders submitted forms indicating their willingness to participate in an official

committee of unsecured creditors in the Debtors' bankruptcy cases.

   15. On January 8, 2010, the US Trustee then advised counsel for the Second Lien

Agent of its decision not to form a committee[2] and on the same day filed its *Statement That*

*Unsecured Creditors' Committee Has Not Been Appointed* (the "UST Statement"). [Docket No.

63] (stating that no unsecured creditors' committee has been appointed due to an "insufficient

response" to serve).

---

[2] Counsel to the US Trustee also indicated that the US Trustee likely would not grant a request to form a
committee of Second Lien Lenders.

**RELIEF REQUESTED**

16.     The Second Lien Agent respectfully requests the entry of an Order directing the US Trustee to appoint an official committee of unsecured creditors, or, alternatively, a committee of Second Lien Lenders pursuant to Section 1102(a) of the Bankruptcy Code and Bankruptcy Rules 2020 and 9014.

**BASIS FOR RELIEF**

**I.      The Bankruptcy Code Requires Appointment Of A Committee.**

17.     The US Trustee's decision not to appoint an official committee of unsecured creditors should be reversed.  Where there are three eligible creditors with unsecured claims willing to serve, Section 1102 of the Bankruptcy Code provides unequivocally that "the United States trustee **_shall_** appoint a committee of creditors holding unsecured claims."  *See* 11 U.S.C. § 1102(a)(1) (emphasis added); *see In re Texaco, Inc.,* 79 B.R. 560, 566 (Bankr. S.D.N.Y. 1987) ("The appointment of one committee of creditors holding unsecured claims against a Chapter 11 debtor *is mandated under 11 U.S.C. § 1102(a)(1) if there are creditors willing to serve*.") (emphasis added); *see also In re Haskell-Dawes, Inc.*, 188 B.R. 515, 518-19 (Bankr. E.D. Pa. 1995) ("As a general rule, a trustee in a Chapter 11 case is required to appoint a committee of creditors holding unsecured claims."); *cf. Westmoreland Human Opportunities, Inc. v. Walsh*, 327 B.R. 561, 573 (W.D. Pa. 2005) (noting "the committee's mandatory existence under the Bankruptcy Code" in discussing role of committee members); *In re ABC Auto. Prods. Corp.*, 210 B.R. 437, 440-41 (Bankr. E.D. Pa. 1997) ("Pursuant to § 1102 of the Code, the United States trustee is required to appoint a committee of creditors to serve as the official unsecured creditors' committee.").

18.     At least three Second Lien Lenders, who possess substantial and eligible deficiency claims under the Debtors' own purported valuation, have expressed willingness to

-6-

serve on an official creditors committee. Under these circumstances, the US Trustee must appoint a committee.

19. The Second Lien Lenders are eligible to serve particularly where, as here, they constitute the overwhelming majority of the pool of unsecured creditors. An undersecured creditor may serve on an official committee of unsecured creditors. *See In re Walat Farms, Inc.*, 64 B.R. 65, 68-69 (Bankr. E.D. Mich. 1986) ("[A] secured creditor whose claim exceeds the value of its collateral and holds, in part, an unsecured claim, may be appointed to the unsecured creditors' committee under § 1102."); *In re Markunes*, 86 B.R. 933, 936 (Bankr. S.D. Ohio 1988) ("Movant has an unsecured claim to the extent she is undersecured. As a holder of an unsecured claim she was eligible to serve on the creditor's committee pursuant to Section 1102 of the Bankruptcy Code.").

20. The deficiency claims of the Second Lien Lenders are the most significant unsecured claims that are impaired under the Plan. Additionally, the Plan is on a fast track based upon a Proposed Valuation that, left unchallenged, will force the Second Lien Lenders to take massive financial losses through a highly diluted profit participation interest in the reorganized Debtors and by an involuntary release of the Second Lien Lenders' claims against affiliates of Thomas H. Lee.

21. Accordingly, the Court should order the appointment of an Official Committee of Unsecured Creditors, and Second Lien Lenders should be allowed to serve thereon.

**II.    Alternatively, The Court Should Appoint
         A Committee of Second Lien Creditors.**

22. Though usually invoked when an official committee of unsecured creditors already has been appointed, Section 1102(a)(2) of the Bankruptcy Code provides that "on request of a party in interest, the court may order the appointment of additional committees of creditors .

. . if necessary to assure adequate representation of creditors . . . ." 11 U.S.C. § 1102(a)(2).

Here, Section 1102(a)(2) takes on a slightly different meaning as the "additional committee" --

here, a second lien committee -- will be the sole official body to keep to be able to represent

parties in interest other than the Debtors and First Lien Lenders.[3]

       23.     The Bankruptcy Code does not define what constitutes "adequate representation"

under Section 1102.  Instead, courts have determined "adequate representation" on a case-by-

case basis based upon the facts and equities of the situation.  *See Enron Corp.*, 279 B.R. at

685.  Courts have generally applied a number of factors in analyzing the adequacy of a

committee's representation, including:

        (a) the ability of the committee to function;
        (b) the nature of the case;
        (c) the standing and desires of the various constituencies;
        (d) the cost associated with the appointment;
        (e) the timing of the application;
        (f) the potential for added complexity; and
        (g) the presence of other avenues for creditor participation.

*See In re Garden Ridge Corp.*, No. 04-10324 (DDS), 2005 Bankr. LEXIS 323, at *6 (Bankr. D.

Del. Mar. 2, 2005) (citing *Enron Corp.*, 279 B.R. at 685); *see also In re Dana Corp.*, 344 B.R.

35, 38 (Bankr. S.D.N.Y. 2006) ("No one factor is dispositive, and the amount of due

consideration given to each depends on the circumstances of the particular chapter 11 case.")

---

[3]      The Court's decision under Section 1102(a)(2) involves *de novo* consideration of the issue and is not
controlled by any prior determination of the UST.  *In re Enron Corp.*, 279 B.R. 671, 684 (Bankr. S.D.N.Y.
2002) (holding that the United States Trustee's decision is subject to de novo review, and "the court must
arrive at its own judgment") (citations omitted); *In re Oneida Ltd.*, No. 06-10489 (ALG), 2006 Bankr.
LEXIS 780, at *3 (Bankr. S.D.N.Y. May 4, 2006) (same).  Courts have held that the bankruptcy court has
authority to appoint a separate committee without a prior request to the U.S. Trustee.  *See In re McLean
Industries, Inc.*, 70 B.R. 852, 856 (Bankr. S.D.N.Y. 1987) ("The legislative history belies the U.S.
Trustee's and the Committee's claim that Congress sought to limit the Court's role to a review of a
determination by a U.S. trustee."); *cf. In re Sharon Steel Corp.*, 100 B.R. 767, 773 (Bankr. W.D. Pa. 1989)
(citing *McLean* favorably in determining that the U.S. Trustee could not appoint a committee that
undermined a previous finding of adequate representation by the Court and noting that "[i]n *McLean*, the
court addressed the issue of whether a motion to the court to appoint a separate committee first must be
preceded by a request to the U.S. Trustee. In concluding that a motion could be made directly to the
bankruptcy court, the court relied upon the legislative history of the 1986 Act").

(citation omitted). In appropriate circumstances Courts have found that these factors may support the appointment of a committee to represent the interests of secured creditors. *See*, *e.g.*, *In re Fidelity Am. Mortgage Co.*, No. 81-00386G, 1981 Bankr. LEXIS 3272, at *2 (Bankr. E.D. Pa. July 29, 1981) (finding the appointment of a mortgage secured noteholders' creditors' committee necessary, where an official committee of unsecured creditors already existed, to ensure adequate representation of their interests); *In re New Life Fellowship, Inc.*, 202 B.R. 994, 995 (Bankr. W.D. Okla. 1996) (appointment by the United States Trustee of an additional committee of bondholders, who alleged secured creditor status, even though indenture trustee serving on the official committee of unsecured creditors); *In re Cumberland Farms, Inc.*, 142 B.R. 593, 594 (Bankr. D. Mass. 1992) (appointment by the United States Trustee of a committee of lenders holding mortgages on many of the debtors' real estate properties); *In re Diversified Capital Corp.*, 89 B.R. 826, 831 (Bankr. C.D. Cal. 1988) (appointing a committee of secured creditors to oversee the debtors' compliance with a confirmed plan of reorganization); *In re Emons Indus.*, 50 B.R. 692, 693 (Bankr. S.D.N.Y. 1985) (appointment by the United States Trustee of an official committee of secured creditors "in order to comply with the dictates of the [Bankruptcy] Code relating to representativeness"); *In re Beker Indus.*, 55 B.R. 945 (Bankr. S.D.N.Y. 1985) (directing appointment of separate official committee of debenture holders where the unsecured creditors' committee refused to admit the debenture holders on grounds that they held security).

24. As set forth below, these factors support the appointment of a committee of Second Lien Lenders in this case, particularly in light of the fact that no other official committee has been appointed.

### A. An Official Committee Is Necessary To Adequately Represent The Interests of The Second Lien Lenders.

25.     The important role of official committees in Chapter 11 cases arose from a major shift in bankruptcy law that spared the bankruptcy court from day to day oversight of the affairs of a debtor and, instead, relegated such functions to the United States Trustee, court appointed trustees and, in large part, to an official committee. *See In re AKF Foods, Inc.*, 36 B.R. 288, 289-90 (Bankr. E.D.N.Y. 1984) (discussing Congress's intent in creating legislation mandating the appointment of a committee of unsecured creditors). Without any official committee, these Chapter 11 cases lack the necessary "watchdog" to prevent overreaching by the Debtors and the First Lien Lenders.

26.     The integrity of this reorganization requires an official committee to provide the "checks and balances" necessary to prevent even the appearance of impropriety or self-dealing as part of this restructuring. *See In re Oneida Ltd.*, 2006 Bankr. LEXIS 780 at *10-11 (directing the United States Trustee to appoint an official equity committee where no official committee of unsecured creditors was initially appointed and "due regards for appearances" warranted such appointment, "if only to dispel any implication that . . . a group of creditors took control of the Board of Directors in the first stage of a two-stage restructuring, neutralized the general unsecured creditors and then took for itself the value of the remaining equity").

27.     The Debtors are using the Chapter 11 proceedings as a vehicle to eliminate approximately $167.3 million of second lien debt with only a nominal recovery to the current holders. The Second Lien Lenders are the only meaningfully impaired class in these cases (other than old equity, who under the Proposed Plan is slated to receive valuable releases for no consideration at all). An official committee of unsecured creditors, if one were to be appointed without Second Lien Lender membership, would be largely "superfluous" because the Debtors'

cash payments to the majority of its trade creditors under the critical vendor program have preempted the objections that other unsecured creditors might have to the Plan. *See In re Oneida Ltd.,* 2006 Bankr. LEXIS 780 at *8 (finding that the "usual checks and balances" undertaken by an unsecured creditors' committee were not present because the plan provided for payment in full of all unsecured claims). The appointment of an unsecured creditors committee, whose members include second lien lenders, or a Second Lien Committee, is imperative to assure the adequate representation of the Second Lien Lenders so there is an official body in place with the incentive and the means to determine whether the valuation underlying the Plan is fair.

28.     Second Lien Lenders dispute the Proposed Valuation. To date, the Debtors have not yet provided sufficient support for this valuation and this fundamental issue must be investigated and fully vetted before any plan is confirmed that wipes out virtually all of the claims of the Second Lien Lenders and grants the Debtors, their management, the First Lien Lenders and the pre-Petition Date equity sponsors sweeping non-consensual releases (which is another issue that is the subject of investigation). The Proposed Plan cynically and strategically exploits the current economic environment to provide the First Lien Lenders with substantially all the value and upside from the Debtors' businesses from the expected cyclical rebound at the expense of the Second Lien Lenders.

**B.      An Official Committee Will Not Impose Any
         Incremental Costs to the Chapter 11 Process.**

29.     Because no official committee has been appointed in these cases, the proposed committee (whether under the banner of a general unsecured or solely of second lien holders) would be the only official committee. Accordingly, there would be no incremental costs to the typical expenses of an official committee of unsecured creditors, which appointment is *mandated* under the Bankruptcy Code. *See* 11 U.S.C. § 1102(a)(1) ("the United States trustee

shall appoint a committee of creditors holding unsecured claims") (emphasis added). In fact, the Final Cash Collateral Order provides for the payment of the fees of an official unsecured committee, including being included in the post-default "carveout" of $750,000. There would be no duplication of efforts because the Second Lien Committee would be the only official body of creditors in these cases. *See In re Dana Corp.*, 344 B.R. at 40 (denying appointment of *additional* committee of asbestos claimants because such would lead to duplicative efforts) (emphasis added). Moreover, these cases are proceeding at an expedited pace and, therefore, the expense at issue would be considerably less than the costs of a typical large and prolonged Chapter 11 case.

## C. The Timing and Nature of These Cases Strongly Militate In Favor of a Second Lien Committee.

30.     Timing in this case is crucial. The Debtors commenced these purported "pre-packaged" cases and are rushing to have the Proposed Plan confirmed, while insufficient information necessary to make a prudent assessment as to the value of the Company has not been provided to date.

31.     The Second Lien Lenders' task is daunting, not only because valuation contests are complicated and time consuming, but also because the Plan proponents are supported by an armada of estate funded professionals whose mission is to cram the Plan down over the Second Lien Lenders' objection – while limiting the resources for the Second Lien Lenders to properly contest the Proposed Plan. This strategy is made clear by the final cash collateral order. The estate will be paying for numerous professionals for the Debtors and the First Lien Agent -- both of whom are pushing the Plan forward as quickly as possible, while the costs of the Second Lien Agent are not. Thus, the First Lien Lenders benefit, to the detriment of all others.

32.     The appointment of an official committee will not result in a delay in these

Chapter 11 cases.  The Second Lien Agent has timely and quickly moved for this relief in order to participate in these expedited proceedings, and has no reason to believe that an official committee that is comprised in whole or part by Second Lien Lenders would prevent the Debtors from accomplishing an equitable reorganization as rapidly as possible consistent with the integrity of the process, equity and law.  In addition, the Second Lien Agent understands that the Second Lien Lenders who sought to be members of the unsecured creditors committee are familiar with the cases, and there would not be any delay in such parties taking part in these cases.  Moreover, the Second Lien Agent has initiated discovery with the primary parties in these cases and will cooperate with an official committee so it can seamlessly continue the current investigation.

> **D.**     **There is No Equitable Alternative Available to**
> **Assure Adequate Representation of Second Lien Lenders.**

33.     The Second Lien Agent cannot and should not be forced to bear the significant burden of performing the function of a statutory watchdog like an official committee of creditors. The cost of protecting the interests of this impaired class, as a whole, cannot and should not be shouldered by the agent or individual members of the class.

34.     Although Second Lien Lenders are sophisticated investors who are capable of retaining professionals in connection with these cases, neither of those facts are disqualifying for appointment of an official Second Lien Committee.  Even where a party can fund their own representation, courts still appoint official committees to represent the larger class of claim/interest holders and to provide the "checks and balances" essential to the fairness of the Chapter 11 process.  *See*, *e.g.*, *Exide Techs. v. State of Wis. Inv. Bd.*, No. 02-1572-SLR, 2002 U.S. Dist. LEXIS 27210, at *6-7 (D. Del. Dec. 23, 2002) (affirming bankruptcy court's decision to appoint an equity committee where, in part, the equity holder requesting such appointment

would be capable of representing itself in the bankruptcy proceeding, but concluding that "the Chapter 11 process would benefit from having an official committee of equity holders"); *see also In re SemCrude, L.P.*, No. 08-11525 (BLS), Docket No. 1774, Oct. 15, 2008 (appointing an official committee of oil and gas producers and suppliers notwithstanding the existence of several ad hoc groups of oil and gas producers who had been active and vigilant since the outset of the case without official committee status). And, of course, "sophistication" is no bar to official committee participation.

35.     Most recently, this Court appointed an official second lien committee when an official unsecured committee was not formed. In *In re CSS Medical, Inc.*, Case No. 09-12390 (CSS), a pre-packaged plan was submitted, in concert with a critical vendor order that paid a substantial number of vendors in full in cash, and left second lien holders as the sole constituency motivated to challenge the questionable valuation methodology underlying the plan. *See Joint Chapter 11 Plan of Reorganization for CCS Medical Inc. and its Affiliated Debtors* [Docket No. 66]. When the second lien holders declined to assent to the UST's request that they waive their liens in order to serve on the committee, no committee of unsecured creditors was appointed, and the Court, at first, denied the second lien holders' motion to direct the appointment of a committee of second lien holders. *See Order Denying Motion of the Second Lien Group for Order Directing the Appointment of an Official Committee of Second Lien Lenders Pursuant to Bankruptcy Code § 1102(a)(2)*, Sept. 1, 2009 (Docket No. 238). However, Judge Sontchi ultimately appointed a second lien committee; *Order Vacating Motion of the Second Lien Group for Order Directing the Appointment of an Official Committee of Second Lien Lenders Pursuant to Bankruptcy Code § 1102(A)(2); and Directing the Appointment of Such Committee*, CSS Medical, Case No. 09-12390 (Bankr. D. Del. Nov. 23, 2009) (Docket No.

594), despite the concerns of the UST, *see Order Concerning Acting United States Trustee's Motion for Reconsideration and for Clarification of the Order Vacating Motion of the Second Lien Group for Order Directing the Appointment of an Official Committee of Second Lien Lenders and Directing the Appointment of Such Committee (Docket No. 594)*, dated January 11, 2010 [Docket No. 677] (reiterating the Court's direction to the US Trustee to appoint an official committee of second lien holders).

36.     Accordingly, if the Court does not direct the appointment of an Official Committee of Unsecured Creditors, it should follow *CSS* and appoint an Official Committee of Second Lien Lenders.

## NO PRIOR REQUEST

37.     No prior request for the relief sought herein has been made by the Second Lien Group in this or any other court.

## NOTICE

38.     Notice of this Motion is being provided to: (a) counsel to the Debtors; (b) the Office of the United States Trustee; (c) counsel to the First Lien Agent; and (d) all other persons that have formally appeared and requested service in these cases.  In light of the nature of the relief requested, the Second Lien Agent respectfully submits that no further notice is necessary.

## CONCLUSION

For the reasons set forth herein, the Second Lien Agent respectfully requests that the Court enter an Order, substantially in the form attached hereto (a) directing the US Trustee to promptly appoint an official committee of unsecured creditors or, alternatively, an official committee of Second Lien Lenders, as described in this Motion, and (b) granting such other and further relief as it deems just and proper.

Dated: January 26, 2010
       Wilmington, Delaware

Respectfully submitted,

BIFFERATO GENTILOTTI LLC

/s/ Garvan F. McDaniel
Garvan F. McDaniel, Esq. (De ID. No. 4167)
800 N. King Street, Plaza Level
Wilmington, Delaware 19801
Telephone: (302) 429-1900
Facsimile: (302) 429-8600

-and-

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
Andrew K. Glenn, Esq.
David Mark, Esq.
Alan Lungen, Esq.
1633 Broadway
New York, New York 10019
Telephone: (212) 506-1700
Facsimile: (212) 506-1800

*Counsel for Wilmington Trust FSB*