UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| *In re* | : | Chapter 11 |
| HAWKEYE RENEWABLES, LLC, *et al.*,[1] | : | |
| | | Case No. 09-14461 (KJC) |
| Debtors. | : | (Jointly Administered) |

Hearing Date: February 9, 2010 at 2:00 P.M.

**OBJECTION OF THE ACTING UNITED STATES TRUSTEE TO THE MOTION OF THE SECOND LIEN AGENT FOR AN ORDER DIRECTING THE APPOINTMENT OF AN OFFICIAL COMMITTEE OF UNSECURED CREDITORS OR, ALTERNATIVELY, AN OFFICIAL COMMITTEE OF SECOND LIEN LENDERS
(DOCKET ENTRY # 110)**

In support of her objection to the motion of the Second Lien Agent for an order directing the appointment of an official committee of unsecured creditors or, alternatively, an official committee of second lien lenders (the "Motion"), Roberta A. DeAngelis, Acting United States Trustee for Region 3 ("U.S. Trustee"), by and through her counsel, avers:

**PRELIMINARY STATEMENT**

The Motion should be denied for the following reasons:

Initially, the U.S. Trustee acted within her discretion when she determined not to form an official committee of unsecured creditors. At the time the U.S. Trustee considered the issue, the U.S. Trustee had received responses to its standard questionnaire from four entities. Three of the four candidates responded that they were willing to serve on an official committee, and all three held second lien debt. Based upon the responses received, the U.S. Trustee appropriately decided that conflict of interest issues related to first lien debt and equity positions precluded formation of an

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Hawkeye Renewables, LLC (3162) and Hawkeye Intermediate, LLC (5336). The Debtors' corporate office and service address is: 224 S. Bell Avenue, Ames, Iowa 50010.

official committee of unsecured creditors.

Further, this Court should not direct the appointment of an official committee of second lien lenders, as the requested committee is not necessary to ensure that the second lien lenders are adequately represented. First, appointment of an official committee will not serve any purpose in these prepackaged cases, where the primary contested issue is whether the Debtors will succeed in cramming down the second lien lenders' position. Second, given that 11 U.S.C. § 506(b) and the applicable intercreditor agreement preclude, *inter alia*, payment of the second lien lenders' attorney fees and costs, it would be wholly inappropriate for this Court to endorse an "end-run" around such limitations by means of an official committee. Third, the three second lien entities that have expressed an interest in serving on an official committee together comprise nearly the entire rejecting second lien class. Given that all three second lien committee candidates have conflicts of interest stemming from first lien debt holdings, it is likely impossible to form a representative committee of "pure" second lien holders in these cases. Fourth, the second lien lenders are sophisticated entities that are effectively represented by the Second Lien Agent and are capable of representing their interests in the absence of reimbursement from the Debtors' estates. Alternatively, for these same reasons, this Court should not direct the appointment of the requested committee even if it concludes that there is a need for representation of second lien lenders.

## **INTRODUCTION**

1. This Court has jurisdiction to hear and determine the Motion.

2. Under 11 U.S.C. § 1102(a)(1), with the exception of "small business" cases, the U.S. Trustee is obligated to appoint an official committee of unsecured creditors in a chapter 11 case and has the discretion to appoint additional committees of creditors or of equity security holders "as the

[U.S. Trustee] deems appropriate."

3. Under 11 U.S.C. § 307, the U.S. Trustee has standing to be heard on the issues raised by the Motion.

**GROUNDS/BASIS FOR RELIEF**

**A. The U.S. Trustee Did Not Abuse Her Discretion by Deciding Not to Form an Official Committee of Unsecured Creditors**

4. On December 23, 2009, the office of the U.S. Trustee solicited interest in serving on an official committee of unsecured creditors pursuant to 11 U.S.C. § 1102(a)(1) by mailing a letter to the top thirty unsecured creditors of the Debtors' estates (as identified by the Debtors). While the Debtors' "top thirty" list did not include any second lien creditors, the U.S. Trustee forwarded the questionnaire to counsel to the second lien agent at counsel's request.

5. On or about January 4, the U.S. Trustee received four questionnaires. One of the responses was received from a trade creditor who did not expressly indicate that it was willing to serve on an official committee. The other three responses were received from second lien creditors who reportedly held more than $90 million of approximately $167 million in second lien debt. Candidate #1 indicated that it also held *first lien* debt. Candidate #2 indicated in its response to the questionnaire that (i) it indirectly owned equity in Debtor Hawkeye Renewables, LLC and (ii) it was affiliated with other creditors and/or equity security holders of the Debtors.

6. On January 8, 2010, the U.S. Trustee filed a statement indicating that an official committee of unsecured creditors had not been formed due to an insufficient response.

7. 11 U.S.C. § 1102(a)(1) provides, ". . . as soon as practicable after the order for relief under chapter 11 of this title, the United States trustee shall appoint a committee of creditors holding unsecured claims . . . ." The U.S. Trustee's selection of committee members, which necessarily

3

includes decisions with respect to a candidate's ability to serve as a fiduciary, is committed to the U.S. Trustee's sound discretion under 11 U.S.C. § 1102(a)(1). *See In re Columbia Gas System, Inc.*, 133 B.R. 174, 175-76 (Bankr. D. Del. 1991). *Cf. Victor v. Edison Bros. Stores, Inc. (In re Edison Bros. Stores, Inc.)*, No. 96-177, 1996 WL 534853 (D. Del. Sept. 17, 1996) ("Since the statute explicitly provides the bankruptcy court with discretion in this matter, this court will review the bankruptcy court's decision for abuse of discretion."). The "abuse of discretion" standard is deferential and creates a high hurdle; a reviewing court will not substitute its judgment for that of the U.S. Trustee. *See In re Doehler-Jarvis, Inc.*, No. 97-953, 1997 WL 827396 at *2 (D. Del. October 7, 1997) (citing *Columbia Gas System, Inc.,* 133 B.R. at 175). An "abuse of discretion" "will be found if [a decision-maker] acted in an irrational, arbitrary, or capricious manner, 'clearly contrary to reason and not justified by the evidence.'" *In re Pierce*, 237 B.R. 758, 754 (Bankr. E.D. Cal. 1999) (brackets in original, quoting NORTON BANKRUPTCY LAW AND PRACTICE 2D, § 148:37). "A decision is not 'arbitrary and capricious' unless it is based on an erroneous conclusion of law, a record devoid of evidence on which the decision maker could rationally have based its decision, or it is otherwise patently unreasonable, arbitrary or fanciful." *In re Barney's, Inc.*, 197 B.R. 431, 439 (Bankr. S.D.N.Y. 1996).

8.      In evaluating expressions of interest in serving on an official committee, the U.S. Trustee assesses whether candidates have conflicts of interest which may interfere with the discharge of fiduciary obligations owed by both the committee member and the official committee to the class of creditors represented by the committee. *See In re Barney's, Inc.*, 197 B.R. at 442 ("A creditor possessing a conflict of interest giving rise to a breach of [a fiduciary] duty cannot serve on [a] statutory committee.") (citation omitted, bracketed text added); *see also United Steelworkers of*

*America v. Lampl (In re Mesta Machine Co.)*, 67 B.R. 151, 156-57 (Bankr. W.D. Pa. 1986) (discussing fiduciary duties of committee members). To fulfill such duties, members of an official committee must be free to explore all possibilities to secure the best possible outcome for their constituency. *See id.* (citing *Woods v. City Nat'l Bank*, 312 U.S. 262 (1941)).

9. The U.S. Trustee correctly determined, based upon the questionnaire responses received, that two of the three candidates could not be seated due to conflicts of interest.

   B. **This Court Should Not Direct the Appointment of an Official Committee of Second Lien Lenders**

10. This Court should not direct the appointment of an official committee of second lien lenders pursuant to 11 U.S.C. § 1102(a)(2), which provides that, "[o]n request of a party in interest, the court may order the appointment of additional committees of creditors . . . if necessary to assure adequate representation of creditors . . . ."

11. The decision to direct the appointment of an official committee under 11 U.S.C. § 1102(a)(2) involves two separate inquiries. The initial question is whether an additional committee is necessary to assure adequate representation. If the answer to this question is yes, this Court must decide whether it will exercise its discretion and direct the appointment of the committee. *See In re Enron Corp.*, 279 B.R. 671, 685 (Bankr. S.D.N.Y. 2002).

12. Courts exploring the meaning of adequate representation under 11 U.S.C. § 1102(a) have employed a variety of factors in their evaluations, including the nature of the case, the tasks that the proposed committee is to perform, the ability to participate in the case without an official committee and the timing of the request. *See id*.

13. Directing the appointment of an official committee in addition to the unsecured creditors' committee is an "extraordinary remedy." *Enron*, 279 B.R. at 685.

14. The Second Lien Agent primarily argues that, because these cases are pre-packaged cases on an expedited schedule involving a potential valuation contest, the second lien lenders should have their own committee. Mot. ¶¶ 22-35. Those same facts actually warrant denial of the Second Lien Agent's request. The second lien lenders are out-of-the-money creditors under a plan that has been voted on. Appointment of an official committee for the purpose of testing the Debtors' planned cram-down is not warranted. Further, an official committee is not necessary to ensure "adequate representation." If these cases are a variation on the two-party dispute theme (that is, first lien lenders versus second lien lenders), why should first lien lenders pay the litigation costs of their adversaries in a circumstance where the Debtors' valuation indicates that the junior lien position is out of the money by approximately by at least $352 million ($580 million (the amount of the first lien debt) minus $228 million (the top end of the Debtors' valuation))? *Cf. In re Williams Communications Group, Inc.*, 281 B.R. 216, 220 (Bankr. S.D.N.Y. 2002) ("When a debtor appears to be hopelessly insolvent, an equity committee is not generally warranted 'because neither the debtor nor the creditors should have to bear the expense of negotiating over the terms of what is in essence a gift.'" (citation omitted)).

15. Second, the Second Lien Agent is trying to circumvent restrictions on paying post-petition professional expenses found in both 11 U.S.C. § 506(b) and the applicable intercreditor agreement between the first and second lien lenders. 11 U.S.C. § 506(b) provides that only oversecured creditors are entitled to collect post-petition interest and attorney fees/costs under the credit agreement or applicable state statute. In addition to Code section 506(b)'s restriction, the second lien lenders negotiated away many of their rights as secured creditors (including the right to claim post-petition interest and attorney fees/costs as adequate protection) under the intercreditor

agreement. The provisions of the intercreditor agreement were vetted in connection with this Court's consideration of cash collateral/financing issues recently and need not be repeated here.

16. Third, after the Second Lien Agent announced its intention to file the Motion, counsel for the U.S. Trustee obtained copies of the ballots submitted by the three second lien committee candidates. Collectively, the three candidates (through various entities) represent more than ninety percent (in both number and dollar amount) of the second lien opposition to the plan; the candidates appear to have cast ten of the reported eleven ballots in the second lien class that rejected the proposed plan and substantially the entire amount of rejecting debt (approximately $84 million). From those ballots, the U.S. Trustee discovered that, at the time balloting was conducted on the Debtors' prepackaged plan, Candidate #3 held $4.5 million of the *first lien* debt, a figure that was nearly 90% of the face amount of second lien debt which it held. Candidate #1 voted a *first lien* position of approximately $35 million. Additionally, ballots submitted by the creditor-affiliates of Candidate #2 indicate that they collectively held approximately $115 million of *first lien* debt and that *the collective position was voted in favor of the Debtors' plan.*[2]

17. Accordingly, three facts – (i) the three second lien candidates that expressed interest in serving on an official committee to date represent substantially all of the second lien lenders which cast dissenting ballots; (ii) per the plan ballots, such candidates directly held (or are affiliated with entities that held) positions in the first lien debt, and (iii) the value of these first lien positions dwarf the value of the second lien positions – should lead this Court to ask whether it is possible to form a representative second lien lenders' committee; the three second lien candidates that have expressed interest in serving on an official committee are unfit to represent second lien lenders, let

---

[2] The other two second lien candidates (Candidate #s 1, 3) cast rejecting first lien ballots.

7

alone unsecured creditors, assuming that they and/or their affiliates continue to hold the first lien positions and the indirect equity investment detailed above.

18. In support of the Motion, the Second Lien Agent cites a recent decision by this Court regarding the appointment of an official committee of second lien lenders in *In re CCS Medical, Inc.*, No. 09-12390 (CSS). The judge overseeing the *CCS Medical* matter elected not to memorialize the ruling and, therefore, it has no intended precedential and/or persuasive effect. Moreover, the judge overseeing the *CCS Medical* matter vacated the order directing the appointment of a second lien committee on February 2, 2010. Accordingly, the U.S. Trustee objects to this Court's consideration of the *CCS Medical* decision. At bottom, the *CCS Medical* ruling is factually inapposite; *CCS Medical* did not involve prepackaged cases where the rejecting second lien population was riddled with conflicts of interest, as is the case here.

19. Fourth, the second lien lenders are sophisticated, well-heeled entities that are able to represent their interests in the absence of reimbursement from the Debtors' estates. The second lien lenders have demonstrated this ability through the Second Lien Agent's appearances thus far in these cases. Under 11 U.S.C. § 1109(b), all creditors are parties in interest and have standing to raise and appear and be heard on any issue. *In re Drexel Burnham Lambert Group, Inc.*, 118 B.R. 209, 212 (Bankr. S.D.N.Y. 1990). Additionally, 11 U.S.C. §§ 503(b)(3)(D), 503(b)(4) provide an avenue for the second lien lenders and/or the Second Lien Agent to recover qualifying professional representation costs in the event a "substantial contribution" is made in the cases. *See Lebron v Mechem Financial, Inc.*, 27 F.3d 937 (3d Cir. 1994); *see also In re Johns-Manville Corp.*, 68 B.R. 155, 164 (S.D.N.Y. 1986).

## **CONCLUSION**

WHEREFORE the U.S. Trustee requests that this Court enter an order denying the Motion.

        Respectfully submitted,

        **ROBERTA A. DeANGELIS**
        **ACTING UNITED STATES TRUSTEE**


        **BY:** /s/ Joseph J. McMahon, Jr.
            Joseph J. McMahon, Jr., Esquire (# 4819)
            Trial Attorney
            United States Department of Justice
            Office of the United States Trustee
            J. Caleb Boggs Federal Building
            844 King Street, Room 2207, Lockbox 35
            Wilmington, DE 19801
            (302) 573-6491
            (302) 573-6497 (Fax)

Date: February 4, 2010