# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

---

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | Case No. 09-14461 (KJC) |
| HAWKEYE RENEWABLES, LLC, *et al.*, | : | Jointly Administered |
| | : | **Re: Docket Nos. 4 and 5** |
| Debtors. | : | **Hearing Date: March 18, 2010 at 10:00 a.m. (ET)** |

---

## OBJECTION OF WILMINGTON TRUST FSB, AS SECOND LIEN AGENT, TO (I) DISCLOSURE STATEMENT AND (II) JOINT PREPACKAGED PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

Wilmington Trust FSB, as agent (the "Second Lien Agent") under that certain Second Lien Credit Agreement (defined below), by and through its undersigned counsel, hereby files this objection (the "Objection") to the approval of each of the Debtors' (i) Disclosure Statement (the "Disclosure Statement") and (ii) Joint Prepackaged Chapter 11 Plan (the "Proposed Plan") in the above-captioned Chapter 11 cases of Hawkeye Renewables, LLC ("Renewables") and its parent Hawkeye Intermediate, LLC ("Intermediate" and, with Renewables, the "Debtors"). In support of this Objection, the Second Lien Agent respectfully represents as follows:

## PRELIMINARY STATEMENT

The Debtors' Chapter 11 filings come on the heels of a severe downturn in the ethanol business caused in large part by a short-term spike in the cost of corn. However, corn prices have since normalized and the Debtors are well-positioned to enjoy a dramatic turnaround based on a market rebound in this commodity-driven business. Unfortunately, the valuation supporting the Proposed Plan hinges on stale projections -- from November of 2009 -- that overstate the price of corn (the Debtors' most significant variable expense) and dramatically understate revenues by assuming unreasonably low ethanol prices. Based on this flawed valuation, the

Proposed Plan would hand the business over to the Debtors' First Lien Lenders. Section 1129(b) of the Bankruptcy Code precludes this result, and the Proposed Plan cannot be confirmed.

The Second Lien Agent has hired Oppenheimer & Company to perform an adjusted valuation for the Debtors' business. The primary drivers for the adjusted valuation are changes to the projected prices of corn and ethanol. Oppenheimer used updated projections for the price of corn *published by the U.S. Department of Agriculture* in February of 2010 and updated projections for the price of ethanol recently *published by the Department of Energy*. In <u>In re Mirant Corp.</u>, the Bankruptcy Court conducted a lengthy valuation hearing under similar circumstances and ordered the Debtors -- wholesale power producers -- to update their projections to correct stale assumptions for commodity prices (coal and oil) and electricity. After the Court ordered these adjustments, the Debtors' valuation increased by billions of dollars.

Equity, the absolute priority rule and common sense require the same result here. Oppenheimer's reasonable valuation adjustments clearly and convincingly require that the Second Lien Lenders receive a significant portion of the reorganized equity. Because the Proposed Plan denies the Second Lien Lenders their rightful recovery, the absolute priority rule precludes confirmation of the Proposed Plan, which, if confirmed, will provide the First Lien Lenders with a windfall recovery far in excess of the face amount of their claims and the Second Lien Lenders with paltry non-voting participation interests.

The Proposed Plan also is unconfirmable because it grants third-party releases to various parties -- specifically the T.H. Lee Entities, the Debtors' equity sponsor -- without the Second Lien Lenders' consent and for no consideration. The Third Circuit and courts in this District consistently have refused to confirm plans of reorganization with such impermissible releases.

T.H. Lee Entities stand to receive reimbursement of fees, and millions of dollars in management and marketing contracts with the Debtors. These arrangements similarly violate the absolute priority rule.

The Proposed Plan is based on a flawed prepetition solicitation of the Disclosure Statement, which similarly precludes confirmation. As more fully set forth below, the Disclosure Statement fails to provide adequate information with regard to key aspects of the Plan, including, but not limited to, the flawed and outdated valuation, the omission of key assets from the valuation, the basis for the proposed releases and the reasons and consideration for valuable management and marketing agreements to be granted to the T.H. Lee Entities.

For all of the reasons set forth herein, the Court should deny confirmation of the Proposed Plan and approval of the Disclosure Statement.

## BACKGROUND

**A.     The Debtors' Businesses.**

1.      The Debtors own and operate two ethanol production facilities in Iowa. Collectively, the two plants have the capacity to produce 225 million gallons of ethanol annually. The Debtors have represented that they are "a leading producer of ethanol in the United States based on production capacity." *Declaration of Timothy B. Callahan in Support of the Debtors' Chapter 11 Petitions and Requests for First Day Relief, dated December 21, 2009* (the "Callahan Declaration") ¶ 6.

2.      Renewables was established in 2003, and is a wholly-owned subsidiary of Intermediate. Callahan Declaration ¶¶ 6, 9.. Intermediate is a wholly-owned subsidiary of Hawkeye Energy Holdings, LLC ("HEH"). Callahan Declaration ¶ 9. The principal owners of HEH are certain affiliates of Thomas H. Lee Partners, L.P (collectively, the "T.H. Lee Entities"). Id.

**B.      The Leveraged Buyout.**

3.      In June 2006, certain T.H. Lee Entities purchased approximately 80% of the equity of the Debtors in a transaction that valued the Debtors at approximately $1 billion.[1] The T.H. Lee Entities paid approximately $736 million, approximately $346 million of which consisted of borrowings under a credit facility by a T.H. Lee Entity that was merged into Renewables, which was in addition to funds that were borrowed to refinance existing debt and transaction fees (collectively, the "Lee LBO").  Id.  *The Proposed Plan would release all claims against the T.H. Lee Entities, including those related to the Lee LBO*.

4.      The debt was financed through the credit facilities described below that were and remain secured by substantially all of the Debtors' assets (the "Collateral"):

(i) First Lien Debt.  The First Lien Credit Agreement, dated as of June 30, 2006 (as amended, restated, supplemented or otherwise modified from time to time, the "First Lien Credit Agreement"), was entered into among Intermediate, THL-Hawkeye Acquisition LLC (which merged with and into Renewables), and the lenders party thereto (the "First Lien Lenders", referred to collectively with the First Lien Agent as the "First Lien Secured Parties").  As of the Petition Date, indebtedness under the First Lien Credit Agreement was approximately (a) $533.5 million on the term and revolving loans and (b) $11.2 million in obligations arising from the termination of certain hedging agreements, plus accrued interest.

(ii) Second Lien Debt.  The Second Lien Credit Agreement dated as of June 30, 2006 (as amended, restated, supplemented or otherwise modified from time to time, the "Second Lien Credit Agreement"), was entered into among Intermediate, THL-Hawkeye Acquisition LLC, and the lenders party thereto (the "Second Lien Lenders", referred to collectively with the Second

---

[1]    Hawkeye Holdings Inc., Form S-1, Amendment No. 3, filed with the Securities and Exchange Commission on September 5, 2006.

4

Lien Agent as the "Second Lien Secured Parties"). As of the Petition Date, the outstanding Second Lien Debt was $150 million plus accrued interest. The Second Lien Debt is secured by a lien on the Collateral junior only to the lien granted to the First Lien Agent.

5. Credit Suisse AG, Cayman Islands Branch ("CS") was the initial administrative agent for each of the foregoing facilities. On or about April 17, 2009, Wilmington Trust FSB succeeded CS as Second Lien Agent under the Second Lien Credit Agreement.[2] CS remains the administrative agent for the First Lien Credit Agreement.

### C. The Debtors' Affiliates Controlled by the TH Lee Entities.

6. The Debtors are members of a corporate family that includes a number of non-debtor entities with whom they have significant contractual and other substantial financial relationships. These entities, each of which is owned directly or indirectly by HEH and is under the control of the T.H. Lee Entities, include the following:

(i) Hawkeye Gold, LLC ("Gold"): HEH owns 100% of the equity interests in Gold. Callahan Declaration, Ex. 1. Through a series of agreements, several of which are being amended in connection with the Proposed Plan, Gold is responsible for marketing and selling all of the Debtors' ethanol and distiller's grains output. The revenues derived by Gold from the Debtors is not known at this time; however, they are the subject of continuing discovery.

(ii) Hawkeye Growth Holdings, LLC and subsidiaries (collectively, "Growth"): Renewables owns approximately 30% of the equity interests in Growth, the remainder is owned by Growth Intermediate, LLC (approximately 68.5%), which in turn is 100% owned by HEH (as noted above, T.H. Lee Entities owns the vast majority of HEH). See Callahan Declaration, Ex.

---

[2] The relationship between the First Lien Lenders and the Second Lien Lenders are governed by an Intercreditor Agreement, dated as of June 30, 2006 among THL Hawkeye Acquisition LLC (to be merged with and into Hawkeye Renewables, LLC), Hawkeye Intermediate, LLC, certain T.H. Lee Entities and CS as both first lien and second lien agent.

5

1. The remainder (1.5%) of Growth is owned by other T.H. Lee Entities. Id. Growth is also a large-scale ethanol producer, owning two additional plants in Iowa.

7.      Upon information and belief, Gold also markets all of Growth's ethanol and distiller's grains outputs.

**D.      The Chapter 11 Filings And The Proposed Plan.**

8.      On December 21, 2009 (the "Petition Date"), Renewables and Intermediate filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), the "prepackaged" Proposed Plan and the Disclosure Statement.

9.      In November 2009, the Debtors, certain T.H. Lee Entities and certain of the First Lien Lenders executed a Plan Support Agreement for the Proposed Plan, which was negotiated without any meaningful input from the Second Lien Lenders. The Proposed Plan provides for the First Lien Lenders to receive (i) 100% of the equity of the reorganized Debtors, (ii) $25 million in new secured debt and (iii) certain non-voting participation interests if the Second Lien Lenders, as a class, voted in favor of the Proposed Plan. Proposed Plan § 4.3. The Proposed Plan includes a modified "death trap" provision: the Second Lien Lenders would have received non-voting participation interests allegedly representing a 7.7% recovery if the Second Lien Lenders voted for the Proposed Plan and non-voting participation interests of 4.4% if they voted to reject the Proposed Plan (which occurred here). Disclosure Statement at 6-7. Existing equity interests will be extinguished, but T.H. Lee Entities will receive significant economic benefits following confirmation along with releases as described herein.

**E.      The Remaining Creditors.**

10.     The Disclosure Statement provides that as of October 31, 2008, the Debtors had approximately $9.2 million in general unsecured claims (other than deficiency claims). Disclosure Statement at 27. However, pursuant to that certain *Order (I) Authorizing Payment of*

*Prepetition Claims of Certain Critical Vendors and Service Providers and (II) Granting Administrative Expense Priority Status to All Undisputed Obligations Arising from the Postpetition Delivery of Goods and Services Ordered Prepetition,* entered on or about December 22, 2009, which authorized the Debtors to pay up to $2.75 million in certain unsecured claims in full, substantially all of the Debtors' general unsecured claims -- other than the purported deficiency claims of the Second Lien Lenders[3] -- have now been paid in full, with approximately $1 million remaining. Under the Proposed Plan, Classes 5A and 5B (General Unsecured Claims) get no recovery. Proposed Plan § 4.5.

**F.     The Debtors' Flawed Plan Valuation.**

11.     The Disclosure Statement describes a valuation prepared by The Blackstone Group (the "Blackstone Valuation").[4] The Blackstone Valuation concludes that the enterprise value for the Debtors is in the range of $191 million to $228 million, with a midpoint of $220 million, inclusive of excess cash of $24 million. Disclosure Statement at 24. As described more fully below, the Second Lien Agent will prove at trial that the Blackstone Valuation grossly understates the Debtors' enterprise value, which precludes confirmation of the Proposed Plan.

**I.**

**OBJECTIONS TO THE DISCLOSURE STATEMENT**

**A.     The Disclosure Statement Should Not Be
Approved Because It Lacks Adequate Information.**

12.     The Disclosure Statement fails to provide the information necessary for holders of claims to make an *informed* judgment about the Proposed Plan as required by Section 1125 of

---

[3]     Pursuant to the Blackstone Valuation, which is being contested, the Second Lien Lenders are completely undersecured.

[4]     Blackstone has also prepared an updated valuation report that provides additional detail but does not materially change the conclusions of the Blackstone Valuation. The First Lien Agent has also retained an expert valuation witness, and may also submit expert testimony at the Confirmation Hearing.

7

the Bankruptcy Code. Section 1125 requires disclosure of "adequate information," which includes:

> information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class <u>to make an informed judgment about the plan</u> . . . .

11 U.S.C. § 1125(a)(1) (emphasis added); <u>see</u>, <u>e.g.</u>, <u>In re Fierman</u>, 21 B.R. 314, 315 (Bankr. E.D. Pa. 1982); <u>see</u> generally <u>General Elec. Credit Corp. v. Nardulli & Sons</u>, 836 F.2d 184, 188 (3d Cir. 1988).

13. The legislative history of section 1125 reveals that this broad-based standard was designed to permit a case-by-case determination of whether a particular disclosure statement contains adequate information. S. Rep. No. 989, 95th Cong., 2d Sess. 121 (1978), <u>reprinted in</u> 1978 U.S.C.C.A.N. 5787, 5907; <u>see, e.g.</u>, <u>In re Ferretti</u>, 128 B.R. 16, 18 (Bankr. D.N.H. 1991). Here, the Disclosure Statement falls short of satisfying this requirement. The Disclosure Statement lacks very basic information about substantive issues regarding insider relationships and the value and impact of the Debtors' assets. These points include the following.

**(i)** **<u>The Third-Party Releases</u>.**

14. The Disclosure Statement fails to describe adequately the valuable releases that are being granted to certain insider parties. <u>See</u> Disclosure Statement at 41. As described below, a party cannot receive third-party releases in a plan of reorganization without consent, adequate consideration or other special circumstances. <u>See</u> ¶¶ 32-38 *infra*. Here, the Debtors' equity sponsor and its affiliates, the T.H. Lee Entities, are slated to receive valuable releases from virtually every other party -- including the Second Lien Lenders. However, the Disclosure Statement fails to describe the consideration that the T.H. Lee Entities are providing for such

releases (because there is none) or why, as a matter of law, the T.H. Lee Entities are eligible for them, particularly in light of the fact that the debts incurred through the Lee LBO are the only material obligations being restructuring through the Proposed Plan. See Disclosure Statement at 41.

15.     The Disclosure Statements fails to articulate the legal and factual basis of the releases and other economic benefits being delivered to other affiliates and management of the Debtors. The T.H. Lee Entities, including Gold, have received substantial revenues from the Debtors, including through the pre- amended management and marketing agreements, but there is no meaningful discussion of such revenues and the basis of a continuing relationship with Gold. All of the Debtors' claims against officers and directors, including in connection with the Lee LBO, will be released if the Proposed Plan is confirmed.

16.     The Disclosure Statement does note that T.H. Lee Entities have purportedly waived accrued and unpaid management fees and/or other Claims against the Debtors; however, the Disclosure Statement does not identify the purported amounts due or the scope of such Claims; moreover, under the Proposed Plan, such claims would receive no distribution at all. See Disclosure Statement at 41.

**(ii)    The Necessity Of the Amendments to the Marketing
         Agreement and Common Control Of Gold and Growth.**

17.     Prior to the Petition Date, Renewables and Gold amended certain agreements between them for the marketing and sale of Renewables production.[5] The Disclosure Statement does not provide an adequate description of the changes and why they were necessary. Nor is there a summary description of how payments to Gold, an entity controlled by the T.H. Lee Entities, have been, or will be, calculated. Furthermore, while "any and all" agreements

9

between the Debtors and the T.H. Lee Entities are being terminated pursuant to the Proposed Plan (Proposed Plan § 8.2), the Proposed Plan authorizes the reorganized Debtors to perform under the Amended Marketing Agreements and the Amended Services Agreement. Proposed Plan § 5.5

18. Moreover, the Disclosure Statement notes that the Amended Marketing Agreements and the Amended Services Agreement were purportedly negotiated by the First Lien Steering Committee on behalf of Reorganized Renewables. Disclosure Statement at 39.[6] However, the First Lien Lenders are set to obtain a windfall as a result of the depressed valuation submitted by the Debtors, and the Amended Marketing Agreements and the Amended Services Agreement (described herein) very well could have been the *quid pro quo* for turning over ownership to the First Lien Lenders. Accordingly, these transactions require greater scrutiny and full disclosure, including comparing the amended agreements to market terms.

    **(iii)**    **HEH Will Continue To Provide Management Services To The Reorganized Debtors After The Effective Date.**

19. Under the Proposed Plan, equity is wiped out, yet HEH still retains an economic interest in the reorganized Debtors through its receipt of fees via a management agreement with the Debtors, and the ability to control the reorganized Debtors' management. The Amended Services Agreement, dated November 24, 2009, attached to the Disclosure Statement (the "Amended Services Agreement"), provides that "HEH shall provide the Services through those members of its staff and administrative personnel and other HEH employees determined by the Parties to be necessary or appropriate for the provision of the Services (collectively, the "HEH Employees")." Amended Services Agreement § 2. The agreement identifies the HEH

---

[5]   See Amended DG Marketing Agreement and Amended Ethanol Marketing Agreement (the "Amended Marketing Agreements" annexed to the Disclosure Statement.

[6]   The Debtors also assert that the pre-amended agreements were arms-length. Id.

Employees to include, the Chief Executive Officer, the President, Chief Financial Officer, and other senior management among others.  Id..  In addition, the agreement provides that "HEH shall have the sole authority to hire, fire, or otherwise discipline the HEH Employees."  Id.

20. The Disclosure Statement fails to articulate a basis for this continued relationship and the amendment to the management agreement.  Although the Amended Services Agreement provides that service fees to be paid to HEH are approximately $2.2 million per year, plus a potential bonus, id. § 5, there is no appropriate description explaining why this agreement is necessary; or why senior management of the reorganized Debtors will still be employed by HEH.  The omission of this information leads to the conclusion that HEH will receive a distribution from the Debtors in violation of the absolute priority rule and continue to control the reorganized Debtors.  Accordingly, adequate information must be provided regarding the foregoing relationship.

**(iv)** **The Disclosure Statement Fails To Describe And Value Key Assets.**

21. Although the Disclosure Statement sets forth the Blackstone Valuation as the touchstone of the Debtors value, it fails to provide adequate information on certain other assets held by the Debtors, each of which may have substantial value.  Such assets include:

(i) *Ownership in Growth*:  Renewables has an approximate 30% ownership stake in Growth, Callahan Declaration, Ex. 1 -- a substantial ethanol producer in its own right.  However, there is no adequate description of the value of such equity interest standing alone or as part of the Blackstone Valuation.

(ii) *Ownership in D&W Railroad*:  upon information and belief, the Debtors also own a portion of the D&W Railroad, a short track system used to transport goods to and from the Debtors' facilities.

Accordingly, as each of the foregoing assets may have substantial value, the Debtors must provide an adequate description of the assets and their value.

## II.

## OBJECTIONS TO THE PROPOSED PLAN

**A.   The Proposed Plan Violates The Absolute Priority Rule.**

22.   The Proposed Plan rises -- and ultimately falls -- based on the Blackstone Valuation, which understates the Debtors' enterprise value by hundreds of millions of dollars. Because the Proposed Plan does not offer a recovery to the Second Lien Lenders that is equal to their allocable share of the Debtors' correct valuation, the Proposed Plan cannot be confirmed because it is not "fair and equitable" as required by Section 1129(b)(1) of the Bankruptcy Code.

23.   Section 1129(b)(1) provides, in pertinent part, that:

> if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

11 U.S.C. § 1129(b).  Here, the Proposed Plan is not fair and equitable with respect to the Second Lien Lenders because the First Lien Lenders, who are to receive 100% of the reorganized equity under the Proposed Plan, will receive more than 100% of the allowed amount of their claims because the Debtors' enterprise value is substantially higher than the Blackstone Valuation.

24.   Section 1129(b) of the Bankruptcy Code -- which codifies the absolute priority rule -- provides that a court may still confirm a plan of reorganization despite rejection by a class of creditors if "the plan does not offer a junior claimant any property before each unsecured claims receives full satisfaction its allowed claim." In re Exide Techs., 303 B.R. 48, 61 (Bankr.

D. Del. 2003) (Carey, J.). Additionally, "a corollary of the absolute priority rule is that a senior class cannot receive more than full compensation for its claims." Id. (citation omitted). Thus, a plan violates Section 1129(b)(1) where, as here, it provides that a senior class will receive reorganized equity with a value exceeding the class's claims. Id. This Court dealt with this very issue in Exide. There, this Court analyzed the enterprise valuation expert reports submitted by the debtors and the creditors committee. This Court "consider[ed] the various methods employed by the experts and their resultant valuations, the competing incentives of the parties to either overvalue or undervalue the company, and the extensive divergent evidence offered in support of valuation." Id. at 66. This Court determined that the multiples and other variables used by the expert for the creditors' committee in calculating enterprise value were more reliable and concluded that the debtors' enterprise valuation was far closer to the valuation range submitted by the expert for the creditors' committee. Id. Accordingly, the Court refused to confirm the debtors' plan. Id. at 80.

25. Similarly, here, the Second Lien Agent will prove at trial that the First Lien Lenders will receive more than 100% of the allowed amount of their claims at the expense of Second Lien Lenders, who are entitled to 100% of any residual value after the recovery to the First Lien Lenders.

26. F. John Stark III and Brian Kotter of Oppenheimer & Co., Inc. have prepared an expert report on behalf of the Second Lien Agent demonstrating the serious shortcomings of the Blackstone Report (the "Oppenheimer Report").

27. The Blackstone Valuation concludes that the mid-point of the total enterprise value (including cash on hand) is $220 million, which purportedly leaves a deficit of approximately $370 million for First Lien Lenders. The specific valuation issues will be

13

presented to the Court when the parties have the opportunity to present comprehensive expert testimony. The discounted cash flow analysis in the Blackstone Valuation is fundamentally flawed based on the projections on which it is based. Certain of the flaws include, but are not limited to:

- The use of corn projections (one of the primary expenses in making ethanol) that are higher than those forecasted by the United States Department of Agriculture – *and higher than the bids the Debtor is publishing on its own website*;

- The use of projections for the price of ethanol to levels generally below that forecasted by the United States Department of Energy.[7]

- The assumption of a static margins to establish future ethanol prices rather than based on projected market prices for ethanol;

- The utilization of a rate for the weighted average cost of capital that is too high;

28. Normalizing these factors, among others, to appropriate market data and practice dictates a substantially higher valuation and a substantially larger distribution to the Second Lien Lenders.

29. In re Mirant Corp., 334 B.R. 800 (Bankr. N.D. Tex. 2005) is directly on point. Mirant was an energy company that entered bankruptcy after an overbuilding of generation facilities and a downturn in the energy market. Mirant, 334 B.R. at 806. In connection with the valuation proceedings for confirmation, the court concluded that it could not "accept unchanged any of the values for Mirant Group that have been placed into evidence" in light of the market rebound that occurred after the Chapter 11 filing, id. at 824, and ordered material adjustments to the valuations, including the weighted cost of capital and updated projected commodity prices. Following these recalculations, the debtors' valuation increased by billions of dollars, which resulted in full payment to creditors and a distribution to equity.

---

[7] These values are prior to the determination of value of Renewables' ownership interest in Growth and the D&W Railroad. Each of which may provide substantial additional value to the Debtors' estates.

30.     The same result should occur here.  The Debtors' business -- and the ethanol markets generally -- have rebounded in recent months as validated by the commodity and energy pricing projections produced by the U.S. Government, not the Second Lien Agent, the Second Lien Lenders or Oppenheimer.

**B.    Any Amounts Paid To The T.H. Lee Entities Violate The Absolute Priority Rule.**

31.     In addition to the third-party releases the T.H. Lee Entities are receiving under the Proposed Plan, these parties are also receiving additional recoveries on account of their equity ownership and control of the Debtors.  As described above, the T.H. Lee Entities will receive the Amended Marketing Agreements, and through the Amended Services Agreement, over $2 million per year and the ability to control management of the reorganized Debtors.  In addition, the Proposed Plan provides that reorganized Renewables shall pay up to $150,000 of the T.H. Lee Entities' legal expenses in connection with the Debtors' cases.  There is no basis for payment of fees to a junior constituent whose interests are being wiped out.  These payments violate the absolute priority rule and preclude confirmation of the Proposed Plan.[8]

**C.    The Plan Contains Impermissible Non-Consensual Third Party Releases.**

32.     The Proposed Plan cannot be confirmed because it includes third-party releases (the "Releases") in blatant contravention of Third Circuit law.  The Proposed Plan provides the Releases to certain parties who have given no consideration for such releases nor have provided

---

[8] In seeking Court approval of these contractual agreements as part of their Proposed Plan, the Debtors are attempting to distribute value to the TH Lee Entities in consideration of old equity interests in violation of the absolute priority rule.  See Bank of Am. Nat'l Trust & Savings Assoc. v. 203 N. LaSalle St. Partnership, 526 U.S. 434 (1999).  There is no indication from the Disclosure Statement that the Debtors sought competitive bids for the contracts nor is there any evidence to support whether the value of these contracts accurately reflect prevailing market rates.  Without such open competition, the Debtors cannot avail themselves of the "new value" exception to the absolute priority rule to justify these payments to purportedly out-of-the-money affiliates.  Id. at 457.  Accordingly, the Proposed Plan violates the absolute priority rule and cannot be confirmed.

adequate reason in the Disclosure Statement or Plan to demonstrate such parties are eligible for such releases.

33. Section 11.4 of the Plan provides, in part:

> As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party[9] and any person seeking to exercise the rights of the Debtors' estates . . . . shall be deemed to unconditionally, forever release, waive, and discharge each other Released Party, from any Claims, obligations . . . .

Proposed Plan § 11.4 (the "Release").

34. The Release includes releases by the Second Lien Lenders and other creditors even if such creditors did not vote in favor of the plan. The Released Parties include a number of non-debtor entities, including the Debtors' First Lien Lenders and the T.H. Lee Entities -- the ultimate equity sponsors of the Debtors, that have, and will continue after the effective date of the Proposed Plan, deep ties with the Debtors through various contractual and joint venture interests.

35. Non-consensual third-party releases are only permitted in limited circumstances not relevant here. At a minimum, to approve such releases, a court must make "adequate findings of fairness, necessity to reorganization and reasonable consideration." United Artists

---

[9] "Released Party" is defined as (i) in their capacity as such, each current and former member of the board of managers of Intermediate and Renewables, (ii) each current officer of Intermediate and Renewables, (iii) Hawkeye Energy Holdings, LLC, as the sole member of Intermediate, (iv) Hawkeye Gold, LLC, (v) each direct and indirect member of Hawkeye Energy Holdings, LLC, including, without limitation, Putnam Investment Holdings, LLC, Putnam Investments Employees' Securities Company III LLC, THL Coinvestment Partners, L.P., THL Equity Advisors VI, LLC, THL Hawkeye Acquisition Partners, THL Hawkeye Acquisition Partners II, THL Hawkeye Acquisition Partners III, THL Hawkeye Blocker Corp., THL Hawkeye Blocker II Corp., THL Hawkeye Blocker III Corp., THL Hawkeye Blocker IV Corp., THL Hawkeye Blocker V Corp., THL Hawkeye Coinvest Partners, L.P., THL Hawkeye Equity Investors, L.P., Thomas H. Lee Equity Fund VI, L.P., Thomas H. Lee Parallel Fund VI, L.P., Thomas H. Lee Parallel (DT) Fund VI, L.P., (vi) each entity or person providing management services to a Debtor, including THL Managers VI, LLC, (vii) Thomas H. Lee Partners, L.P., (viii) the First Lien Agent, in its capacity as such, (ix) all holders of Claims who receive distributions under the Plan, and (x) with respect to each of the foregoing, each of their respective direct or indirect subsidiaries, current and former affiliates, current and former officers, directors, managers, members, partners, shareholders, employees,

Theatre Co. v. Walton, 315 F.3d 217, 227 (3d Cir. 2003); see also In re Exide Technologies, 303 B.R. 48, 72 (Bankr. D. Del. 2003) ("non-consensual releases by a non-debtor of other non-debtor third parties are to be granted only in 'extraordinary cases'").

36. Here, the Debtors have not made an adequate showing why non-consensual third-party releases would be fair, why they are necessary for the Plan or the "reasonable consideration" received for them. Accordingly, under no circumstances should undersecured or unsecured creditors (who have no official representation) who vote against or are deemed to reject the Plan be considered bound by a release of non-debtor third parties.

37. The T.H. Lee Entities have received substantial consideration from the Debtors in the form of various payments, the Amended Services Agreement and the Amended Marketing Agreements entered in connection with this restructuring, between Renewables and Gold, a company controlled by the TH Lee Entities that receives substantial income from the Debtors.[10]

38. Moreover, the Release purports to release the Debtors from "any and all Claims, obligations, suits judgments, damages, demands, debts, rights, causes of action, and liabilities whatsoever," which potentially includes claims that are non-dischargeable under binding Third Circuit law. See, e.g., In re Frenville Co., 744 F.2d 332 (3d Cir. 1984). The Plan cannot be confirmed with this provision.

**D. The Plan Has Not Been Proposed In Good Faith In Violation Of Section 1129(a)(3) Of The Bankruptcy Code**

39. Based on the Debtors' valuation and materially misleading projections, the Debtors and First Lien Agent apparently have purposefully undervalued the Debtors' assets and business to eliminate or reduce any recovery to the Second Lien Lenders and increase the

---

agents, representatives, financial advisors, professionals, accountants and attorneys, and each of their predecessors, successors, and assigns.

[10] This relationship is subject to further understanding in connection with ongoing discovery.

recoveries to the First Lien Agents by concealing value now which will be realized after the Debtors' emergence from bankruptcy. Moreover, the T.H. Lee Entities are taking actions to maintain its control over the Debtors after the Effective Date, and are apparently forcing the Debtors to enrich the T.H. Lee Entities and provide valuable releases and fees for no appropriate reason. In light of this conduct and the glaring deficiencies in disclosure, the Second Lien Agent questions whether the Debtors filed the Plan in good faith as required by Bankruptcy Code § 1129(a)(3), and accordingly, should not be approved on that basis.

## III.

### THE PLAN SUPPLEMENT CONTAINS MATERIAL INFORMATION AND HAS NOT YET BEEN FILED

40. Certain critical documents are to be included in the Plan Supplement. The Proposed Plan provides that the Plan Supplement does not have to be filed until as late as five (5) days before the Confirmation Hearing. Proposed Plan at 7. The Second Lien Agent hereby requests that such documents be provided immediately. Accordingly, the Second Lien Agent reserves all rights with regards to such Plan Supplement documents.

41. In addition, there is an amorphous reference to an Exit Facility, which may be entered into after the Effective Date and the confirmation of the Proposed Plan "shall be deemed approval of the Exit Facility." Proposed Plan § 5.1. However, neither the Proposed Plan or the Disclosure Statement describes what the principal or basic terms of such facility may be, nor whom the lenders under such facility may be (which may very well be the First Lien Agent and/or the First Lien Lenders). The Debtor cannot ask for the Court's imprimatur on what may be a substantial transaction without its review. Thus, such prospective Exit Facility should not be approved by the Court.

## RESERVATION OF RIGHTS

42. The Second Lien Agent hereby reserves its rights to supplement this Objection to object to confirmation of the Plan on any other basis. Moreover, discovery in these cases is not yet complete, accordingly, additional information may come to the Second Lien Agent's attention prior to the conclusion of the Confirmation Hearing that may be relevant and be the basis for further objection.

## CONCLUSION

For the foregoing reasons, the Second Lien Agent respectfully requests that this Court deny the confirmation of the Proposed Plan.

Dated: February 24, 2010
       Wilmington, Delaware

                Respectfully submitted,

                BIFFERATO GENTILOTTI LLC

                _/s/ Garvan F. McDaniel_____
                Garvan F. McDaniel (DE No. 4167)
                800 N. King Street, Plaza Level
                Wilmington, Delaware 19801
                Telephone: (302) 429-1900
                Facsimile: (302) 429-8600

                        -and-

                KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
                Andrew K. Glenn, Esq.
                David Mark, Esq.
                Alan Lungen, Esq.
                1633 Broadway
                New York, NY 10019
                Phone: (212) 506-1700
                Fax: (212) 506-1800

                *Counsel for Wilmington Trust FSB*