## Exhibit B

# THIRD AMENDED AND RESTATED
# LIMITED LIABILITY COMPANY AGREEMENT

dated as of

~~April~~May __, 2010

of

## HAWKEYE RENEWABLES, LLC

A Delaware Limited Liability Company

## **TABLE OF CONTENTS**

ARTICLE I DEFINITIONS ................................................................................................1
    Section 1.1    Certain Definitions ..............................................................................1
    Section 1.2    Construction of Terms; Captions. ....................................................11

ARTICLE II FORMATION OF COMPANY .....................................................................12
    Section 2.1    Organization....................................................................................12
    Section 2.2    Agreement; Effect of Inconsistencies with Act ...........................12
    Section 2.3    Effective Date and Term ...........................................................~~12~~13
    Section 2.4    Name .........................................................................................~~12~~13
    Section 2.5    Registered Agent and Office...........................................................13
    Section 2.6    Principal Executive Office ..............................................................13
    Section 2.7    Foreign Qualification .....................................................................13

ARTICLE III BUSINESS OF COMPANY..........................................................................13
    Section 3.1    Permitted Businesses .......................................................................13
    Section 3.2    Fiscal Year ................................................................................~~13~~14

ARTICLE IV MEMBERS AND UNITS .........................................................................~~13~~14
    Section 4.1    Members ....................................................................................~~13~~14
    Section 4.2    Classes of Membership Interests ....................................................14
    Section 4.3    Issuances of Additional Securities ............................................~~15~~16
    Section 4.4    Limitation on Issuance of Non-Voting Equity Securities....................~~16~~17
    Section 4.5    Preemptive Rights ...................................................................~~16~~17
    Section 4.6    Fully Paid and Non-Assessable Nature of Units................................~~17~~18
    Section 4.7    Splits and Combinations ...........................................................~~17~~18
    Section 4.8    Withholding .....................................................................................18
    Section 4.9    Members Not Agents of Company .............................................~~18~~19
    Section 4.10    Members Have No Exclusive Duty to Company or to Other
                          Members; No Fiduciary Duty ...................................................~~18~~19
    Section 4.11    Rights of Members..........................................................................19
    Section 4.12    Liability of Members .................................................................~~19~~20
    Section 4.13    No Expulsion or Withdrawal ...........................................................20
    Section 4.14    Approval by Members of Certain Actions..................................~~20~~21
    Section 4.15    Meetings of Members ......................................................................21
    Section 4.16    Management by Members................................................................~~23~~24
    Section 4.17    Fiduciary Duties ........................................................................~~23~~24

ARTICLE V MANAGEMENT OF THE COMPANY .......................................................24
    Section 5.1    The Board........................................................................................24
    Section 5.2    Annual Budgets...............................................................................25
    Section 5.3    Meetings of the Board; Written Consents....................................~~25~~26
    Section 5.4    Officers ...........................................................................................27

ARTICLE VI EXCULPATION AND INDEMNIFICATION.................................................2829
    Section 6.1    Exculpation of Members, Board and Officers ....................................2829
    Section 6.2    Indemnification ...................................................................................2829
    Section 6.3    Indemnification When Successful on Merits or Otherwise .................2930
    Section 6.4    Payment of Expenses in Advance of Disposition of Action.................2930
    Section 6.5    Non-Exclusivity of Article ..................................................................2930
    Section 6.6    Insurance .............................................................................................3031
    Section 6.7    Authorization for Indemnification ......................................................3031
    Section 6.8    Good Faith Defined..............................................................................3031
    Section 6.9    Indemnification by a Court ..................................................................3031
    Section 6.10    Certain Definitions ..............................................................................3132
    Section 6.11    Survival of Indemnification and Advancement of Expenses.................3132
    Section 6.12    Certain Indemnification Rights............................................................3132

ARTICLE VII ACCOUNTS AND RECORDS ...........................................................................32
    Section 7.1    Records to be Maintained ....................................................................32
    Section 7.2    Access to Records ................................................................................3233
    Section 7.3    Annual Audit........................................................................................3233
    Section 7.4    Reports to Class A Members 32, Class B Members and Class C
                Members ..............................................................................................33
    Section 7.5    Conference Calls ..................................................................................3334

ARTICLE VIII CONTRIBUTIONS AND CAPITAL ACCOUNTS ......................................3334
    Section 8.1    Capital Account ...................................................................................3334
    Section 8.2    Adjustments to Capital Account ..........................................................3334
    Section 8.3    Member Information .............................................................................3435
    Section 8.4    Capital Contributions ..........................................................................3435
    Section 8.5    Sale or Exchange of Units....................................................................3435
    Section 8.6    Interest and Preferential Rights............................................................3435
    Section 8.7    Compliance with Section 704(b) of the Code.......................................3435

ARTICLE IX DISTRIBUTIONS AND ALLOCATIONS ......................................................3435
    Section 9.1    Distributions ........................................................................................3435
    Section 9.2    Distributions upon Merger, Sale or Similar Transaction .....................3637
    Section 9.3    Allocations of Profits and Losses ........................................................3637
    Section 9.4    Allocations between Transferor and Transferee ..................................3638

ARTICLE X TAXES ...................................................................................................................3738
    Section 10.1    Methods of Elections ...........................................................................3738
    Section 10.2    Taxes of Taxing Jurisdictions .............................................................3738
    Section 10.3    Tax Matters Partner.............................................................................3739
    Section 10.4    Tax Returns..........................................................................................3839

ARTICLE XI DISPOSITION OF A MEMBER'S UNITS; REGISTRATION RIGHTS ........3839
    Section 11.1    Transfers Generally..............................................................................3839
    Section 11.2    Restrictions on Transfer of Units ........................................................3839
    Section 11.3    Registration and Transfer of Units.......................................................4041

Section 11.4    The Board and Employment Agreements................................................40̶42
Section 11.5    Tag-Along Rights................................................................................40̶42
Section 11.6    Drag-Along Rights..............................................................................42̶44
Section 11.7    Permitted Transfers............................................................................44̶45
Section 11.8    Piggyback Registration Rights............................................................44̶46
Section 11.9    Indemnification of Record Holders in Connection with
                 Registration.......................................................................................45̶47
Section 11.10   Indemnification of Company in Connection with Registration............46̶47
Section 11.11   Notices.............................................................................................46̶48
Section 11.12   Internal Restructure...........................................................................46̶48

ARTICLE XII ADMISSION OF ADDITIONAL MEMBERS ....................................48̶50
Section 12.1    Additional Members..........................................................................48̶50

ARTICLE XIII DISSOLUTION AND WINDING UP.................................................48̶50
Section 13.1    Term and Dissolution........................................................................48̶50
Section 13.2    Distribution of Assets on Dissolution.................................................49̶50
Section 13.3    Reasonable Time..............................................................................49̶51
Section 13.4    Cancellation of Certificate of Formation.............................................49̶51
Section 13.5    Return of Contributions.....................................................................49̶51
Section 13.6    Capital Account Restoration..............................................................49̶51
Section 13.7    Effect of Dissolution.........................................................................49̶51

ARTICLE XIV AMENDMENT...................................................................................49̶51
Section 14.1    Amendments.....................................................................................49̶51

ARTICLE XV MISCELLANEOUS PROVISIONS.......................................................52̶54
Section 15.1    Entire Agreement..............................................................................52̶54
Section 15.2    Rights of Creditors and Third Parties.................................................52̶54
Section 15.3    Waiver of Right to Partition...............................................................52̶54
Section 15.4    Confidentiality..................................................................................52̶54
Section 15.5    Governing Law; Venue; Waiver of Jury Trial......................................53̶55
Section 15.6    Notices.............................................................................................54̶56
Section 15.7    Waivers.............................................................................................54̶56
Section 15.8    Rights and Remedies Cumulative.......................................................54̶56
Section 15.9    Heirs, Successors and Assigns...........................................................54̶56
Section 15.10   Counterparts......................................................................................54̶56

SCHEDULES AND EXHIBITS

Schedule I.............Members and Record Ownership

Exhibit A .............Other Allocation Provisions

Exhibit B ..............Director Compensation

Exhibit C ..............Form of Joinder

Exhibit D.............Warrant Term Sheet

**THIRD AMENDED AND RESTATED**
**LIMITED LIABILITY COMPANY AGREEMENT**
**of**
**HAWKEYE RENEWABLES, LLC**

This THIRD AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT of HAWKEYE RENEWABLES, LLC (the "Company"), a limited liability company organized pursuant to the Act, is entered into as of ~~April~~ May ___, 2010, by and among the Company, those Persons listed on Schedule I that are Members as of the date hereof and the Persons who at any time hereafter become Members of the Company (each a "Member" and, collectively, the "Members") or parties hereto as provided herein.

**RECITALS:**

WHEREAS, the Company was first formed in Delaware under the name "Hawkeye Renewables, LLC ~~(the "Original Company")~~" by the filing of the Original Certificate;

WHEREAS, Hawkeye Intermediate entered into the Second Amended and Restated Limited Liability Company Agreement on June 30, 2006;

WHEREAS, pursuant to this Agreement, the Members desire to amend and restate the Second Amended and Restated Limited Liability Company Agreement, to re-capitalize the Company, pursuant to the terms set forth in the Company's and its affiliates' Joint Prepackaged Plan of Reorganization filed on December 21, 2009 in the Bankruptcy Court (as may be further amended from time to time, the "Plan"), to create and issue Class A Units, Class B Units, Class C Units and a series of Class D Units and to authorize the future issuance of additional series of Class D Units in accordance with this Agreement and the Plan, in each case as of the Effective Date; and

WHEREAS, Hawkeye Intermediate has been ~~[liquidated/~~merged into the Company~~]~~ effective as of the Effective Date.

NOW, THEREFORE, in consideration of the foregoing recitals and the mutual covenants and agreements contained herein, the parties hereto do hereby agree as follows:

**ARTICLE I**
**DEFINITIONS**

Section 1.1    Certain Definitions.    The following terms used in this Agreement shall have the following meanings unless otherwise expressly provided herein:

"Act" shall mean the Delaware Limited Liability Company Act, as amended from time to time, and any successor thereto.

"Additional Member" shall mean any Person who becomes a Member in accordance with Section 4.1, Article XI and/or Article XII.

"Affiliate" shall mean, when used with respect to any Person, any Person directly or indirectly controlling, controlled by, or under common control with such Person. For the purposes of this definition the terms "controlling, controlled by, or under common control" means the possession, directly or indirectly, of the power to direct or cause the direction of management or policies (whether through ownership of securities or any partnership or other ownership interest, by contract or otherwise) of a Person.

"Agreement" shall mean this Third Amended and Restated Limited Liability Company Agreement, including all amendments and/or restatements hereto adopted from time to time in accordance with Article XIV and the Act.

"Allowed" shall have the meaning set forth in Section 1.4 of the Plan.

"Amendments to the Certificate" means the (i) Amended and Restated Certificate of Formation of the Company filed with the Secretary of State of the State of Delaware on February 9, 2005, (ii) Second Amended and Restated Certificate of Formation of the Company filed with Secretary of State of the State of Delaware on June 30, 2006 and (iii) Third Amended and Restated Certificate of Formation of the Company filed with the Secretary of State of the State of Delaware on April [ ]May ___, 2010.

"Annual Budget" shall have the meaning set forth in Section 5.2.

"Annual Report" shall mean a consolidated balance sheet at the end of each fiscal year and the related consolidated statements of income or operations, member's equity and cash flows for such fiscal year, setting forth, in each case, in comparative form the figures for the previous fiscal year, all in reasonable detail and prepared in accordance with GAAP, such statements to be audited and accompanied by a report and opinion of an independent certified public accountant to the effect that such financial statements fairly present the financial condition and results of operations of the Company and its subsidiaries on a consolidated basis in accordance with GAAP consistently applied, together with a narrative report and a "Management's Discussion and Analysis of Financial Condition and Results of Operations" that describes the financial condition and results of operations of the Company and its consolidated subsidiaries for such fiscal year, as compared to amounts for the previous fiscal year and budgeted amounts.

"Available Cash" shall mean with respect to any applicable period, the cash of the Company less any amounts retained by the Company, at the reasonable discretion of the Board, to pay or provide appropriate reserves to meet current, anticipated or contingent Company obligations or expenditures.

"Bankruptcy" shall mean that a Person:

(i)      makes an assignment for the benefit of creditors;

(ii)     files a voluntary petition in bankruptcy;

(iii)    files a petition or answer seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation;

(iv)    files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the Person in any proceeding in the nature of the proceedings listed in (iii) above;

(v)    seeks, consents to or acquiesces in the appointment of a trustee, receiver or liquidator of all or any substantial part of the Person's properties; or

(vi)    has become the subject of any proceeding against the Person seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation, which proceeding is not dismissed within 120 days after commencement or if within 90 days after the appointment without the Person's consent or acquiescence of a trustee, receiver or liquidator of the Person or of all or any substantial part of its properties, the appointment is not vacated or stayed, or within 90 days after the expiration of any such stay, the appointment is not vacated.

"Bankruptcy Code" shall have the meaning set forth in Section 4.4.

"Bankruptcy Court" shall mean the United States Bankruptcy Court for the District of Delaware.

"Blocker Corporation" shall have the meaning set forth in Section 11.12(e).

"Board" shall mean the Board of Directors of the Company created pursuant to Article V.

"Business Day" shall mean any day other than a Saturday, a Sunday or any other day on which banking institutions in New York, New York are required or permitted to close by law or executive order.

"Capital Account" shall mean with respect to each Member, the account maintained for each Member pursuant to Section 8.1.

"Capital Contribution" shall mean any Capital Contribution made by the Members as described in Article VIII.

"Certificate of Formation" shall mean the Second Amended and Restated Certificate of Formation of the Company filed with Secretary of State of the State of Delaware on June 30, 2006.

"Claim" shall have the meaning set forth in Section 1.15 of the Plan.

"Class A Members" shall mean Members that are Record Holders of Class A Units.

"Class A Units" shall have the meaning set forth in Section 4.2(a).

"Class B Members" shall mean Members that are Record Holders of Class B Units.

"Class B Participation Condition" shall have been met if (i) prior to the seventh anniversary of the Effective Date, the Class A Units have been allocated and paid cumulative

3

Distributions of at least $~~580,000,000~~435,000,000$ or (ii) as of such seventh anniversary, in a hypothetical liquidation of the Company effected in accordance with the terms of Section 13.2 of this Agreement on such date, the Class A Units would have been allocated and paid, in the aggregate (when aggregated with all prior Distributions allocated and paid with respect to the Class A Units), cumulative Distributions in excess of $~~580,000,000.~~435,000,000.

"Class B Tag Along Condition" shall have been satisfied if (i) the Class B Participation Condition shall have been satisfied or (ii) prior to the seventh anniversary of the Effective Date, in a transaction or a series of related transactions effected pursuant to Section 11.5(a), the participating Class A Members receive, or have received, in the aggregate, proceeds from such transactions in an amount equal to or greater than $435,000,000.

"Class B Units" shall have the meaning set forth in Section 4.2(a).

"Class C Members" shall mean the Members that are Record Holders of any series of Class C Units.

"Class C Units" shall have the meaning set forth in Section 4.2(a).

"Class D Members" shall mean the Members that are Record Holders of any series of Class D Units.

"Class D Units" shall have the meaning set forth in Section 4.2(a).

"Class D-1 Sharing Percentage" means the percentage equal to (x) $325,000 divided by (y) the Start Value, subject to adjustments for vesting and forfeiture as set forth in the respective award agreement.

"Class D-1 Units" shall have the meaning set forth in Section 4.2(~~d~~e).

"Class Member Percentage" shall mean, with respect to any Member, with respect to Units of any class, a fraction, the numerator of which is the number of Units of such class held by such Member and the denominator of which is the total number of Units of such class issued and outstanding at the time in question.  The Class Member Percentage is set forth with respect to each Member with respect to each class of Units on Schedule I.

"Class Sharing Percentage" shall mean, at the time in question (which is, in the case of any matter on which Members are entitled to vote, the applicable Record Date), with respect to Class A Units, Class B Units, Class C Units or Class D Units, as the case may be, the percentage amount, if any, determined pursuant to the applicable clause of Section 9.1(a) for such class of Membership Interests, based on the order of priority set forth therein and all Distributions at or prior to such time; *provided*, *however*, that until ~~aggregate cumulative~~ Distributions ~~have been made prior to such time such that Distributions at such time would be~~are made pursuant to Section 9.1(a)(ii), the Class Sharing Percentage with respect to the Class A Units shall be ~~100~~99% and the Class C Units shall be 1% and the Class Sharing Percentage with respect to each other class of Units shall be 0%; *provided*, *further*, that until ~~aggregate cumulative~~ Distributions ~~have been made prior to such time such that Distributions at such time would be~~are made pursuant to Section 9.1(a)(iii), the Class Sharing Percentage with respect to the (x) Class A Units

4

shall be ~~100% less~~99% and Class C Units shall be 1%, which in the case of each class of Units set forth in preceding clause (x), shall be reduced by such Units pro rata share of the Class D-1 Sharing Percentage, (y) Class D Units shall initially be the Class D-1 Sharing Percentage and (z) Class ~~C~~B Units shall be 0%.

"Code" shall mean the Internal Revenue Code of 1986, as amended, or any successor thereto.

"Commission" shall mean the Securities and Exchange Commission.

"Company" shall mean Hawkeye Renewables, LLC, a Delaware limited liability company, and any successor Entity.

"Company Indemnitee" shall have the meaning set forth in Section 11.10.

"Confidential Information" shall have the meaning set forth in Section 15.4.

"Contractual Appraisal Rights" shall have the meaning set forth in Section 2.2.

"Conversion" shall have the meaning set forth in Section 11.12(c).

"Conversion Consideration" shall have the meaning set forth in Section 11.12(c).

"Director(s)" shall have the meaning set forth in Section 5.1(a).

"Disposition" shall mean a sale, assignment, gift, exchange, in kind or otherwise, or any other transfer by law or otherwise.

"Distribution" shall mean a transfer of cash, securities or other property made by the Company to Members with respect to such Member's Membership Interest pursuant to Article IX or Article XIII, or as otherwise expressly set forth herein.

"Declining Significant Holder" shall have the meaning set forth in Section 4.5(c).

"Drag-Along Notice" shall have the meaning set forth in Section 11.6(a).

"Drag-Along Notice Date" shall mean the date occurring 19 days prior to the proposed transfer of Units by a Drag-Along Selling Member to a Drag-Along Purchaser.

"Drag-Along Purchaser" shall have the meaning set forth in Section 11.6(a).

"Drag-Along Right" shall have the meaning set forth in Section 11.6(a).

"Drag-Along Selling Members" shall have the meaning set forth in Section 11.6(a).

"Drag-Along Units" shall have the meaning set forth in Section 11.6(a).

"Dragged Members" shall have the meaning set forth in Section 11.6(a).

"Effective Date" shall mean April [ ]May __, 2010.

"Eligible Recipient" shall mean any Director, Officer or employee of the Company or any subsidiary thereof, or any other Person designated in the Management Incentive Program.

"Entity" shall mean, without limitation, foreign or domestic corporations (both non-profit and other corporations), partnerships (both limited and general), joint ventures, limited liability companies, unincorporated associations, business trusts, other trusts and estates.

"Exchange Act" shall mean the Securities Exchange Act of 1934, as amended.

"Fair Market Value" means, with respect to any property or asset, the fair market value of such property or asset as determined by the Board in its reasonable discretion.

"First Lien Credit Agreement Claims" has the meaning set forth in Section 1.41 of the Plan.

"GAAP" shall mean generally accepted accounting principles in the United States applied on a consistent basis.

"Hawkeye Intermediate" means Hawkeye Intermediate, LLC, a Delaware limited liability company, an owner of 100% of the membership interests of the Company immediately prior to the Effective Date and [a dissolved Entity as of the Effective Date] [merged into the Company as of the Effective Date].

"Initial Tag-Along Notice" shall have the meaning set forth in Section 11.5(a).

"Initial Tag-Along Notice Date" shall mean the date occurring 29 days prior to the proposed transfer of Units by a Tag-Along Selling Member to a Tag-Along Purchaser.

"Internal Restructure" shall mean any re-formation, conversion, transfer of assets, transfer of membership interests or other securities, merger, incorporation, liquidation or other transaction of, or relating to, or affecting the Company, completed in compliance with Section 11.12; *provided*, that in any such case the Company or its successor shall continue as an operating Entity in substantially the same manner as prior to such Internal Restructure.

"Investor Members" shall have the meaning set forth in Section 4.10(a).

"Large Holder" shall mean any Member (together with its wholly-owned Affiliates) owning 8% or more of the Class Member Percentage of the Class A Units.

"Management Incentive Program" means that certain Management Incentive Program, the terms of which shall be determined and implemented on or as soon as reasonably practicable after the Effective Date by the Board or any compensation committee thereof in its reasonable discretion.

"Majority Vote" shall mean, with respect to the Members, the affirmative vote of Class A Members owning more than 50% of the aggregate Class Member Percentage of the Class A

Units and, with respect to the Board, the affirmative vote of more than 50% of the total number of Board members at the time of the vote.

"Member(s)" shall have the meaning set forth in the Preamble and includes any transferee of Units in accordance with the terms of this Agreement and any Additional Member. Solely for all federal, state and other tax purposes, the term "Member" shall include a Member's assignee.

"Membership Interest" shall mean all of the limited liability company interests of a Member in the Company, including the right of such Member to receive Distributions (liquidating or otherwise), to be allocated income, gain, loss, deduction, credit, or similar items, to receive information, and to grant consents or approvals.

"Non-Executive Directors" shall mean each Director who is not an Officer or an officer of Hawkeye Energy Holdings, LLC.

"Offered Securities" shall have the meaning set forth in Section 4.5(a).

"Offering Notice" shall have the meaning set forth in Section 4.5(b).

"Offering Period" shall have the meaning set forth in Section 4.5(b).

"Officer" shall mean an officer of the Company elected or appointed pursuant to Section 5.4.

"Old Interests" shall have the meaning set forth in Section 11.12(c).

"Opinion of Counsel" shall mean a written opinion of counsel (who may be regular counsel to the Company or any of its Affiliates) acceptable to the Board in its reasonable discretion.

"Original Certificate" shall mean that certain Certificate of Formation of the Company filed with the Secretary of State of the State of Delaware on January 27, 2005.

"Original Company" shall have the meaning set forth in the Recitals.

"Participating Record Holders" shall have the meaning set forth in Section 11.8.

"Participating Tagged Members" shall have the meaning set forth in Section 11.5(a).

"Permitted Transfer" shall mean a transfer by any Member or any of its Permitted Transferees of any or all of its Units to one or more Permitted Transferees in which such transferee agrees in writing prior to effecting the transfer to be bound by the terms and provisions of this Agreement; *provided, however*, that any such transfer shall be void *ab initio* if on any date thereafter such transferee ceases to be a "Permitted Transferee" and such transfer would not otherwise be permitted under this Agreement (other than a Permitted Transfer to a Permitted Transferee pursuant to clause (i) of the definition thereof and such Permitted Transferee ceases to be a Member as a result of the subsequent transfer of all its Units to another transferee(s)).

7

"<u>Permitted Transferee</u>" shall mean (i) as to any Member that is an Entity, (A) any controlled Affiliate, general partner, managing member or other parent Entity of such Member or any Affiliate of such general partner, managing member or other parent Entity (excluding portfolio companies) or (B) any partnership, limited partnership, limited liability company, corporation or other entity organized, formed or incorporated and managed or controlled by such Member, its general partner or managing member or an Affiliate of its general partner or managing member (excluding portfolio companies) as a vehicle for purposes of making investments and (ii) as to any Member that is an individual, (A) his spouse, his siblings, or other immediate family members or any of their respective lineal descendants ("<u>Beneficiaries</u>") for no consideration or (B) any trust, corporation, limited liability company, partnership or other entity which was organized, formed or incorporated for the benefit of his Beneficiaries and whose voting control is vested in such individual Member or in a Person reasonably acceptable to the Board.

"<u>Person</u>" shall include an individual or any Entity.

"<u>Plan</u>" shall have the meaning set forth in the Recitals.

"<u>Profits</u>" and "<u>Losses</u>" shall mean an amount equal to the Company's taxable income or loss, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

> (i)      Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this definition of "Profits" and "Losses" shall be added to such taxable income or loss;

> (ii)     Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(i) and not otherwise taken into account in computing Profits or Losses pursuant to this definition of "Profits" and "Losses" shall be subtracted from such taxable income or loss;

> (iii)    In the event the Book Value of any Company asset is adjusted pursuant to subparagraphs (b) or (c) of the definition of "Book Value" in <u>Exhibit A</u> the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits or Losses;

> (iv)     Gain or loss resulting from any disposition of Company property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Book Value of the Company property disposed of, notwithstanding that the adjusted tax basis of such Company property differs from its Book Value;

> (v)      In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there

shall be taken into account Depreciation, computed in accordance with the definition of "Depreciation" in Exhibit A;

(vi)     To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Section 743(b) is required pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(4) to be taken into account in determining Capital Accounts as a result of a Distribution other than in liquidation of a Member's interest in the Company, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Profits or Losses; and

(vii)     Notwithstanding any other provision of this definition of "Profits" and "Losses," any items that are specially allocated pursuant to Section 2 or Section 3 of Exhibit A shall not be taken into account in computing Profits or Losses.

"Quarterly Report" shall mean a copy of the unaudited interim financial statements of the Company and its consolidated Member's equity as of the end of such fiscal quarter and for the portion of the fiscal year then ended, containing, on a consolidated basis, balance sheets and related statements of income, retained earnings, and cash flow, in each case, setting forth in comparative form the figures for the corresponding period of the preceding fiscal year, all in reasonable detail certified by the Chief Financial Officer of the Company to have been prepared in accordance with GAAP and to fairly and accurately present (subject to normal year end audit adjustments and absence of footnotes) the financial condition and results of operations of the Company and its subsidiaries, on a consolidated basis, at the date and for the periods indicated therein, together with a narrative report and a "Management's Discussion and Analysis of Financial Condition and Results of Operations" that describes the financial condition and results of operations of the Company and its consolidated subsidiaries for such fiscal year, as compared to amounts for the previous fiscal year and budgeted amounts.

"Record Date" shall mean the date established by the Company for determining (a) the identity of the Record Holders entitled to notice of, or to vote at, any meeting of Members or entitled to exercise rights in respect of any lawful action of Members or (b) the identity of Record Holders entitled to receive any report or Distribution or to participate in any offer.

"Record Holder" shall mean the Person in whose name a Unit is registered on the books of the Transfer Agent as of the opening of business on a particular Business Day, or with respect to other securities, the Person in whose name any such other security is registered on the books that the Company has caused to be kept as of the opening of business on such Business Day, as determined in accordance with the Exchange Act, or any relevant rules promulgated thereunder, including Rule 12g5-1 thereunder.

"Record Holder Indemnitees" shall have the meaning set forth in Section 11.9.

"Representatives" shall have the meaning set forth in Section 15.4.

"Second Amended and Restated Limited Liability Company Agreement" shall mean the Second Amended and Restated Limited Liability Company Agreement of the Company, dated as of June 30, 2006.

"Second Lien Credit Agreement Claims" has the meaning set forth in Section 1.70 of the Plan.

"Securities Act" shall have the meaning set forth in Section 11.8.

"Selling Expenses" means the underwriting fees, discounts, selling commissions and stock transfer taxes applicable to the Class A Units and Class C Units (or successor securities) registered by the Participating Record Holders and any other expenses directly incurred by the Participating Record Holders (including legal expenses).

"Significant Holder" shall mean (i) any Member (together with its wholly-owned Affiliates) owning 3% or more of the Class Member Percentage of the Class A Units, (ii) Credit Suisse AG, Cayman Islands Branch (together with its Affiliates) and (iii) Standard General L.P. and any of its Affiliates.

"Specified Percentage" shall mean, with respect to any Subscribing Significant Holder, a fraction, the numerator of which is the number of Class A Units held by such Subscribing Significant Holder and the denominator of which is (x) the total number of Class A Units issued and outstanding at the time in question less (y) the total number of Class A Units held by any Declining Significant Holder.

"Start Value" shall mean the hypothetical liquidation value of the Company on the first Business Day following the Effective Date, which value shall be determined by the Board, by Majority Vote, as soon as possible after the Effective Date, but in no event later than 30 days after the Effective Date or upon such other date as ordered by the Bankruptcy Court.

"Subscribing Significant Holder" shall have the meaning set forth in Section 4.5(c).

"Successor Corporation" shall have the meaning set forth in Section 11.12(c).

"Supermajority Vote" shall mean the affirmative vote of Class A Members holding 66 2/3% or more of the aggregate Class Member Percentage of the Class A Units.

"Tag-Along Notice" shall have the meaning set forth in Section 11.5(a).

"Tag-Along Purchaser" shall have the meaning set forth in Section 11.5(a).

"Tag-Along Right" shall have the meaning set forth in Section 11.5(a).

"Tag-Along Selling Member" shall have the meaning set forth in Section 11.5(a).

"Tag-Along Units" shall have the meaning set forth in Section 11.5(a).

"TaggedTagging Members" shall have the meaning set forth in Section 11.5(a).

10

"Tax Distribution" shall have the meaning set forth in Section 9.1(c).

"Taxing Jurisdiction" shall mean the taxing jurisdiction of the federal government and of any state, local or foreign government that collects tax, interest or penalties, however designated, on any Member's share of the income or gain attributable to the Company.

"Threshold" shall have the meaning set forth in Section 11.2(d).

"TMP" shall have the meaning set forth in Section 10.3.

"Transfer Agent" shall mean [~~_____~~]American Stock Transfer and Trust Company, LLC; or such other bank, trust company or other Person (including the Company or one of its Affiliates) as shall be appointed from time to time by the Company to act as registrar and transfer agent for the Units.

"Transfer Notice" shall have the meaning set forth in Section 11.2(e).

"Transfer Restriction Notice" shall have the meaning set forth in Section 11.2(d).

"Transfer Restriction Notice Revocation" shall have the meaning set forth in Section 11.2(d).

"Treasury Regulations" shall mean the permanent, temporary or proposed regulations issued by the Department of the Treasury that are promulgated under the Code, as amended.

"Units" shall mean Class A Units, Class B Units, Class C Units, Class D Units and any other class of Membership Interests that may be issued by the Company from time to time.

Section 1.2    Construction of Terms; Captions.

(a)    All references in this Agreement to articles, sections, subsections and other subdivisions refer to corresponding articles, sections, subsections and other subdivisions of this Agreement unless expressly provided otherwise.

(b)    Titles appearing at the beginning of any of such subdivisions are for convenience only and shall not constitute part of such subdivisions and shall be disregarded in construing the language contained in such subdivisions.

(c)    As used in this Agreement, the phrases "this Agreement", "any provision of this Agreement," "the provisions of this Agreement" and derivative or similar phrases, and the terms "hereof," "herein," "hereby", "hereunder" and derivative or similar words, shall mean or refer only to any express provision actually written in this Agreement and not to any provision of the Act that may have application to the Company.

(d)    Words in the singular form shall be construed to include the plural and *vice versa*, unless the context otherwise requires.

11

(e)     Unless the context requires otherwise: the gender (or lack of gender) of all words used in this Agreement includes the masculine, feminine and neuter.

(f)     Examples shall not be construed to limit, expressly or by implication, the matter they illustrate.

(g)     The word "or" is not exclusive and the word "includes" and its derivatives shall mean "includes, but is not limited to" and corresponding derivative expressions.

(h)     No consideration shall be given to the fact or presumption that one party had a greater or lesser hand in drafting this Agreement.

(i)     All references herein to "$" or "dollars" shall refer to U.S. Dollars.

(j)     Unless the context otherwise requires or unless otherwise provided herein, the terms defined in this Agreement which refer to a particular agreement, instrument or document shall also refer to and include all renewals, extensions, modifications, amendments or restatements of such agreement, instrument or document, provided that nothing contained in this subsection shall be construed to authorize such renewal, extension, modification, amendment or restatement.

(k)     Each Exhibit and Schedule hereto is incorporated herein by reference and made a part hereof for all purposes and references to this Agreement shall include each such Exhibit and Schedule unless the context shall otherwise require.

## ARTICLE II
## FORMATION OF COMPANY

Section 2.1    <u>Organization</u>.    The Company was formed under the name "Hawkeye Renewables, LLC" as a Delaware limited liability company pursuant to the Original Certificate, which was amended and restated by the filing of the Amendments to the Certificate.

Section 2.2    <u>Agreement; Effect of Inconsistencies with Act</u>.    The Members hereby adopt this Agreement as the limited liability agreement of the Company, to set forth the rules, regulations and provisions regarding the management of the business of the Company, the governance of the Company, the conduct of its business and the rights and privileges of its Members.    The Members agree to the terms and conditions of this Agreement, as it may from time to time be amended, supplemented or restated according to its terms.    The Members intend that this Agreement and the agreements attached hereto as exhibits shall be the sole source of the relationship among the parties (subject to, as between such Member and the Company, any agreements or arrangements that any Member and the Company may enter into on or after the date hereof to the extent permitted by, and in accordance with, this Agreement), and, except to the extent a provision of this Agreement expressly incorporates federal income tax rules by reference to sections of the Code or Treasury Regulations or is expressly prohibited or ineffective under the Act, this Agreement shall govern, even when inconsistent with, or different than, the provisions of the Act or any other law.    To the extent any provision of this Agreement is prohibited or ineffective under the Act, this Agreement shall be considered amended to the smallest degree possible in order to make such provision effective under the Act.    If the Act is

12

subsequently amended or interpreted in such a way as to validate a provision of this Agreement that was formerly invalid, such provision shall be considered to be valid from the effective date of such interpretation or amendment.  Each Member shall be entitled to rely on the provisions of this Agreement, and no Member shall be liable to the Company or to any other Member for any action or refusal to act taken in good faith reliance on this Agreement.  Notwithstanding anything herein to the contrary, Section 18-210 of the Act (entitled "Contractual Appraisal Rights") shall not apply or be incorporated into this Agreement.

Section 2.3    Effective Date and Term.  This Agreement is effective as of the date first above written.  The Company commenced on the date the Original Certificate was filed with the Secretary of State of Delaware and shall continue in existence until it is dissolved and terminated in accordance with the terms hereof.

Section 2.4    Name.  The name of the Company shall be "Hawkeye Renewables, LLC". The Company may adopt and conduct its business under such assumed or trade names as the Board may from time to time determine.  The words "Limited Liability Company," "LLC," or similar words or letters shall be included in the Company's name where necessary for the purpose of complying with the laws of any jurisdiction that so requires.  The Board may change the name of the Company at any time and from time to time and shall notify the Members of such change in the next regular communication to the Members.

Section 2.5    Registered Agent and Office.  The registered agent for the service of process and the registered office shall be that Person and location reflected in the Certificate of Formation.  The Board may, from time to time, change the registered agent or office through appropriate filings with the Delaware Secretary of State.  If the registered agent ceases to act as such for any reason or the location of the registered office shall change, the Board shall promptly designate a replacement registered agent or file a notice of change of address as the case may be.

Section 2.6    Principal Executive Office.  The principal executive office of the Company is located at 21050 140th Street, Iowa Falls, IA 50126.  The Company may locate its principal executive office at any other place or places as the Board may, from time to time, deem advisable.  The Company may maintain offices at such other place or places within or outside the State of Delaware as the Board determines to be necessary or appropriate.

Section 2.7    Foreign Qualification.  The President and Chief Executive Officer, Chief Financial Officer, any Vice President, the Secretary and any Assistant Secretary of the Company are, and each of them individually is, hereby authorized to qualify the Company to do business as a foreign limited liability company in any state or territory in the United States in which the Company may wish to conduct business and each is hereby designated as an authorized person, within the meaning of the Act, to execute, deliver and file any amendments or restatements of the Certificate of Formation, any other certificates and any amendments or restatements thereof necessary for the Company (subject to any required consent of the Members) to so qualify to do business in any such state or territory.

13

## ARTICLE III
## BUSINESS OF COMPANY

Section 3.1    Permitted Businesses.  The Company's purposes, and the nature of the business to be conducted and promoted by the Company, are to (a) to the extent approved by the Board, engage in the transaction of any lawful business for which a limited liability company may be organized under the Act and (b) engage in all lawful activities and to enter into, exercise the rights and enjoy the benefits under, and discharge the obligations of the Company pursuant to, all contracts, agreements, and other instruments which the Board determines to be necessary or suitable for or incidental to the accomplishment and conduct of the foregoing purposes in clause (a).  The Company shall be empowered to do any and all acts and things necessary and appropriate for the furtherance and accomplishment of the purposes and business described in this Section 3.1 and for the protection and benefit of the Company.

Section 3.2    Fiscal Year.  The fiscal year of the Company shall end on December 31.

## ARTICLE IV
## MEMBERS AND UNITS

Section 4.1    Members.

(a)    The identity and, if available, address of each Member, the number and class of Units held by such Member and such Member's Class Member Percentage is set forth on Schedule I attached hereto, which Schedule may be amended from time to time by the appropriate Officers of the Company or the Transfer Agent to reflect the admission, removal or substitution of any Member, the issuance of any new or additional securities to such Persons and the address of any Member, in each case effected in accordance with the terms of this Agreement.

(b)    A Person shall be admitted as a Member and shall become bound by the terms of this Agreement if such Person purchases or otherwise lawfully acquires any Units and becomes the Record Holder of such Units in accordance with the provisions of Article XI or Article XII hereof.  A Person may become a Record Holder without the consent or approval of any of the Members.  A Person may not become a Member without acquiring a Unit.

(c)    Notwithstanding anything herein to the contrary, the Company shall be entitled to recognize the Record Holder as the owner of Units and, accordingly, shall not be bound to recognize any equitable or other claim to or interest in such Unit on the part of any other Person, regardless of whether the Company shall have actual or other notice thereof, except as otherwise provided by law or any applicable rule, regulation, guideline or requirement of any national securities exchange on which such Units are listed for trading.  Without limiting the foregoing, when a Person (such as a broker, dealer, bank, trust company or clearing corporation or an agent of any of the foregoing) is acting as nominee, agent or in some other representative capacity for another Person in acquiring and/or holding Units, as between the Company on the one hand, and such other Persons on the other, such representative Person shall be the Record Holder of such Units.

Section 4.2    Classes of Membership Interests.

(a)    Each Member's relative rights, privileges, preferences and obligations with respect to the Members are represented by that Member's Membership Interests.  There shall initially be ~~three~~four classes of Membership Interests: (i) a class consisting of ~~[100,000]~~1,000,000 authorized Class A Membership Interests, which shall be referred to herein as "Class A Units"; (ii) a class consisting of ~~[5,000]~~50,000 authorized Class B Membership Interests, which shall be referred to herein as "Class B Units" (iii) a class consisting of 50,000 authorized Class C Membership Interests, which shall be referred to herein as "Class C Units"; and ~~(iii)~~iv) a class consisting of ~~[5,000]~~50,000 authorized Class D Membership Interests, which shall be referred to herein as "Class D Units".  A Member's relative rights, privileges, preferences and obligations with respect to the Membership Interests will be determined under this Agreement and the Act.  Any Units purchased or redeemed by the Company shall become authorized but unissued Units.  Each class of Units of the Company shall have the rights and privileges accorded such class as are set forth in this Agreement.

(b)    Class A Units have all the rights, privileges, preferences, and obligations specifically provided for in this Agreement.  Except as specifically provided in this Agreement to the contrary, the Class A Units will be entitled to share in Distributions only if and to the extent set forth in Article IX and Article XIII.  Each Record Holder of Class A Units shall be entitled to vote for all matters for which the vote of the Class A Members may be permitted or required hereunder or under the Act in accordance with such Member's Class Member Percentage with respect to the Class A Units.  The Company and the Members agree that the aggregate Capital Account balance as of the Effective Date with respect to ~~all~~the Class A Units and the Class C Units held by the respective Class A Members and Class C Members shall be equal to their proportionate share of the Start Value.  For the avoidance of doubt, as of the Effective Date, the aggregate Capital Account balance of the (i) Class A Members shall equal 99% of the Start Value and (ii) Class C Members shall equal 1% of the Start Value.  The Start Value shall be allocated to Capital Account balances of the ~~each~~Member and Class C Member as of the Effective Date proportionately in accordance with the number of Class A Units and Class C Units held by ~~each Class A~~such Member as of such date.  The Start Value and the allocation of the Start Value shall be used consistently by all parties (including the Company and the Members) for all federal income tax purposes.

(c)    At the time of the issuance of each Class B Unit, such Class B Unit is intended to constitute a profits interest within the meaning of Section 2.02 of Revenue Procedure 93-27, 1993-2 C.B. 343 as modified by Revenue Procedure 2001-43, 2001-2 C.B. 191.  Each Class B Unit shall have a Capital Account of zero on the Effective Date.

(d)    ~~(c)~~ Class B Units and Class C Units shall have only the rights, privileges, preferences, and obligations specifically provided for in this Agreement.  The Class B Units and Class C Units will be entitled to share in Distributions and allocations under this Agreement only if and to the extent set forth in Article IX and Article XIII.  The Class B Units and Class C Units shall have no voting rights except as expressly set forth ~~in Section 14.1(d)~~herein.  Other than the Class B Units and the Class C Units issued on the Effective Date, no additional Class B Units and Class C Units shall be issued without the prior approval of (i) the Class A Members by a Majority Vote.  ~~At the time of the issuance of each Class C Unit, such Class C Unit is intended to constitute a profits interest within the meaning of Section 2.02 of Revenue Procedure 93-27, 1993-2 C.B. 343 as modified by Revenue Procedure 2001-43, 2001-2 C.B. 191.  Each Class C~~

15

~~Unit shall have a Capital Account of zero on the Effective Date.~~, and  (ii)(A) with respect to an issuance of additional Class B Units, the holders of a majority of the issued and outstanding Class B Units and (B) with respect to an issuance of additional Class C Units,  the holders of a majority of the issued and outstanding Class C Units.

(e)  ~~(d)~~ The Class D Units, which shall be issued in one or more series, shall have only the rights, privileges, preferences, and obligations specifically provided for in this Agreement.    Each series of Class D Units will be entitled to share in Distributions and allocations under this Agreement only if and to the extent set forth in Article IX and Article XIII. The Class D Units shall have no voting rights except as set forth in Section 14.1(d).  No Class D Units other than a series of Class D Units referred to as "Class D-1 Units" issued to the Non-Executive Directors shall be issued on the Effective Date.  Subsequent to the Effective Date, the Company is authorized to issue additional series of Class D Units from time to time (not to exceed the maximum number of authorized Class D Units) to one or more Eligible Recipients pursuant to the terms and conditions of this Agreement, the Management Incentive Program and subject to such other terms and conditions, including without limitation, with respect to vesting, forfeiture and repurchase, as may be approved by a Majority Vote of the Board.  No series of Class D Units, however, shall be issued if such issuance would cause the aggregate Class Sharing Percentage of the Class A Units and the Class C Units to adjust downward in an amount greater than 2% of the aggregate Class Sharing Percentage of the Class A Units and the Class C Units prior to such issuance.  At the time of the issuance of any series of Class D Units, such series of Class D Units is intended to constitute profits interest within the meaning of Section 2.02 of Revenue Procedure 93-27, 1993-2 C.B. 343 as modified by Revenue Procedure 2001-43, 2001-2 C.B. 191.  Each series of Class D Units shall have a Capital Account of zero on the date it is issued and the Company shall redetermine the Book Value of its assets and the Capital Accounts of all Members immediately prior to the issuance of any new series of Class D Units, in accordance with Article VIII and Exhibit A.  Absent actual fraud, manifest error or self dealing, the judgment of the Board as to such Book Value shall be conclusive.  Further, the issuance of each series of Class D Units under this Agreement is intended to be consistent with Section 83 of the Code, and each Class D Member shall make and file with the Internal Revenue Service a "Section 83(b) Election" in such form as required by applicable Treasury Regulations (Treas. Reg. §1.83-2).  Any Section 83(b) Election shall be filed within 30 days of the date of grant of Class D Units to a Class D Member.

Section 4.3    Issuances of Additional Securities.

(a)    Subject to the provisions set forth in Section 4.2, this Section 4.3, Section 4.14, Section 14.1 and the requirements of the Act and other applicable laws, the Board may, at any time, and from time to time, issue or take subscriptions for additional Units or other classes of membership interests or other securities without the consent of the Members.

(b)    The consideration for subscriptions to, or the purchase of, such securities shall be paid in such form and in such manner as the Board shall determine.  In the absence of actual fraud, manifest error or self-dealing in the transaction, the judgment of the Board as to the value of such consideration shall be conclusive.

16

(c)     Subject to the provisions set forth in <u>Section 4.2</u>, this <u>Section 4.3</u>, <u>Section 4.14</u> and <u>Section 14.1</u>, the Board shall have the power to create and cause the Company to issue, whether or not in connection with the issue and sale of any Units or other securities of the Company, rights or options entitling the holders thereof to purchase from the Company any Units or other securities of any class or series (whether or not such class or series have theretofore been created), such rights or options to be evidenced by such instrument(s) as shall be approved by the Board.  The terms upon which, including the time(s) (which may be limited or unlimited in duration) at or within which, and the price(s) at which any such Units or other securities may be purchased from the Company upon the exercise of any such right or option shall be on such terms as stated in a resolution adopted by the Board providing for the creation and issue of such rights or options and, in every such case, shall be set forth or incorporated by reference in the instrument(s) evidencing such rights or options.  In the absence of actual fraud, manifest error or self-dealing in the transaction, the judgment of the Board as to the consideration for the issuance of such rights or options and the sufficiency thereof shall be conclusive.

Section 4.4     <u>Limitation on Issuance of Non-Voting Equity Securities</u>. Notwithstanding any other provision in this Agreement, pursuant to Section 1123(a)(6) of Chapter 11 of Title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), the Company will not issue non-voting equity securities (which shall not be deemed to include any <u>Class B Units,</u> Class C Units, Class D Units or warrants or options to purchase any Membership Interests); *provided*, *however*, that this provision (i) will have no further force or effect beyond that required under Section 1123 of the Bankruptcy Code, (ii) will have such force and effect, if any, only for so long as such section is in effect and applicable to the Company or any of its wholly-owned subsidiaries and (iii) in all events may be amended or eliminated in accordance with applicable law as from time to time in effect.

Section 4.5     <u>Preemptive Rights</u>.

(a)     In the event that (i) the number of outstanding equity securities is increased by the sale of additional Units or other equity securities or interests convertible thereto (or options, warrants or exercisable securities therefor) <u>(other than Class B Units or Class C Units)</u> or (ii) the Company sells debt securities or otherwise incurs debt (other than in connection with the sale of debt securities or pursuant to any credit agreement entered into on arms' length terms with an unrelated third party financial institution) (any of the issuances set forth in the preceding clauses (i) and (ii)<u>, subject to such exclusions</u>, "<u>Offered Securities</u>"), each Significant Holder shall be entitled, directly or through any Affiliate, to subscribe for such additional number of Offered Securities in proportion to such Significant Holder's Class Member Percentage with respect to the Class A Units.  Notwithstanding the foregoing provisions of this <u>Section 4.5(a)</u>, holders of Class A Units shall not have any preemptive rights to purchase or subscribe for (i) any series of Class D Units issued to Eligible Recipients, (ii) any series of Class D Units issued to satisfy conversion or exercise rights associated with any securities or option rights provided to Eligible Recipients, (iii) Offered Securities issued in connection with a merger, purchase of assets, recapitalization or any other transaction in each case involving a change of control of the Company, (iv) any equity or debt securities issuable upon conversion or exercise of an Offered Security for which preemptive rights have already been applied or (v) any Offered Securities offered in an aggregate amount less than or equal to $10,000,000.  <u>Each</u>

17

Member holding Class B Units or Class C Units shall have the right of first refusal to purchase with respect to the issuance by the Company of additional Class B Units or Class C Units or instruments convertible into such Units, as the case may be, as may be necessary in order to permit such Member to maintain its then current percentage of holdings in such class as of immediately prior to such issuance.

(b)     The Secretary shall transmit a written notice ("Offering Notice") to all Significant Holders of the terms of any authorized issuance of Offered Securities.   The Significant Holders, to the extent provided herein, shall have the option to purchase the Offered Securities at the price, if applicable, and on the terms set forth in the Offering Notice by notifying the Secretary in writing within 10 days (the "Offering Period") of the receipt of the Offering Notice of their intent to exercise their preemptive rights on a pro rata basis with all other Significant Holders.

(c)     In the event that any Significant Holder fails to exercise in full its preemptive rights within the Offering Period (a "Declining Significant Holder"), any other Significant Holder electing to fully exercise its preemptive rights (a "Subscribing Significant Holder") shall have the right to purchase some or all of the Offered Securities not purchased by such Declining Significant Holder in an amount equal to the amount of Offered Securities not purchased by such Declining Significant Holder multiplied by such Subscribing Significant Holder's Specified Percentage.

(d)     Closing by the Significant Holders who exercise their preemptive rights shall take place no later than 30 days following the date of the Offering Notice.  If all Offered Securities that Significant Holders are entitled to purchase pursuant to this Section 4.5 are not elected to be purchased as provided in subsections 4.5(b) and 4.5(c) hereof, the Company may, during the ninety (90) day period following the expiration of the period provided in subsection 4.5(b) hereof, offer the remaining unsubscribed portion of such Offered Securities to any Person at a price and on terms no more favorable to the purchasers thereof than those offered to the Significant Holders.  If the Company does not complete the sale of the Offered Securities within such period, the preemptive rights provided hereunder shall be deemed to be revived and such Offered Securities shall not be offered unless first reoffered to the Significant Holders in accordance herewith.

(e)     The preemptive rights set forth in this Section 4.5 shall terminate simultaneously with the effectiveness of the Company's initial public offering.

Section 4.6     Fully Paid and Non-Assessable Nature of Units.  All Units issued pursuant to, and in accordance with the requirements of this Article IV shall be validly issued, fully paid and non-assessable Units in the Company, except as such non-assessability may be affected by Sections 18-607 or 18-804 of the Act and except to the extent otherwise provided in this Agreement.

Section 4.7     Splits and Combinations.  The Board may set a Record Date for and make a Distribution of Units to Record Holders or may effect a subdivision or combination of any class or series of Units based on each Member's respective proportionate interest in each such class of Units; *provided, however*, that after such Distribution, subdivision or combination, each

Member shall have the same Class Member Percentage with respect to such class as before such Distribution, subdivision or combination.

Section 4.8    <u>Withholding</u>.  Notwithstanding any other provision of this Agreement, the Company shall comply with any withholding requirements under any law in connection with the payment of Distributions in respect of Units and shall remit amounts withheld to and file required forms with applicable Taxing Jurisdictions.  If, and to the extent, the Company is required to make any such tax payment, such Member's proportionate share of such Distribution shall be reduced by the amount of such tax payment (which tax payments shall be treated as a Distribution to such Member pursuant to <u>Section 9.1</u> hereof).  In the event of any claimed over-withholding, Members shall be limited to an action against the applicable Taxing Jurisdiction.  If an amount required to be withheld was not withheld from an actual Distribution, the Company may reduce subsequent Distributions by the amount of such required withholding.  Each Member agrees to furnish the Company with such forms or other documentation as are necessary to assist the Company in determining the extent of, and in fulfilling, its withholding obligations.

Section 4.9    <u>Members Not Agents of Company</u>.  No Member, solely by virtue of his interest in the Company, is an agent of the Company.  No Member shall have authority to transact any business for the Company or to bind the Company by his acts as a Member.

Section 4.10    <u>Members Have No Exclusive Duty to Company or to Other Members; No Fiduciary Duty</u>.

(a)    Each Member acknowledges and affirms that Members, other than Members who are Officers, employee Directors or other employees of the Company (such Members, "<u>Investor Members</u>"), and their respective Affiliates may have, and may continue to, participate, directly or indirectly, in investments in ethanol properties and Entities engaged in the ownership, acquisition, exploration, development, operation and management of ethanol properties which are, or will be, suitable for the Company or competitive with the Company's business.

(b)    Each Member, individually and on behalf of the Company, expressly (i) waives any conflicts of interest or potential conflicts of interest that exist or arise as a result of any such investments and agrees that no Investor Member nor any of their respective representatives shall have liability to any Member or any Affiliate thereof, or the Company with respect to such conflicts of interest or potential conflicts of interest, (ii) acknowledges and agrees that no Investor Member nor any of their respective representatives will have any duty to disclose to the Company or any other Member any such business opportunities, whether or not competitive with the Company's business and whether or not the Company might be interested in such business opportunity for itself (except to the extent that such representative learns of such opportunity strictly in his or her capacity as a Director or Officer), (iii) agrees that the terms of this <u>Section 4.10</u> to the extent that they modify or limit a duty or other obligation, if any, that an Investor Member may have to the Company or any other Member under the Act or other applicable law, rule or regulation, are reasonable in form, scope and content; and (iv) waives to the fullest extent permitted by the Act any duty or other obligation, if any, that an Investor Member may have to the Company or another Member, pursuant to the Act or any other

applicable law, rule or regulation, to the extent necessary to give effect to the terms of this Section 4.10.

Section 4.11    Rights of Members.    In addition to other rights provided by this Agreement or by applicable law (including the Act), subject to its compliance with Section 15.4, each Significant Holder shall have the right, for a lawful purpose reasonably related to such Member's interest in the Company as a Member in the Company, upon reasonable written demand, at least three (3) Business Days in advance, containing a concise statement of such purposes and at such Member's own expense:

(a)    to obtain true and full information regarding the status of the business and financial condition of the Company;

(b)    promptly after becoming available, to obtain a copy of the Company's federal, state and local income tax returns for each year;

(c)    to have furnished to such Member a current list of the name and last known business, residence or mailing address of each Member;

(d)    to have furnished to him a copy of this Agreement and the Certificate of Formation and all amendments thereto, together with copies of the executed copies of all powers of attorney pursuant to which this Agreement, the Certificate of Formation and all amendments thereto have been executed;

(e)    any information relating to the Company necessary to enable such Member to prepare his or its federal and state income tax returns; and

(f)    to obtain such other information regarding the affairs of the Company as is just and reasonable and consistent with the stated purposes of the written demand;

*provided, however*, that, at the Company's request, prior to the delivery of any of the foregoing information, such Significant Holder shall execute and deliver to the Company a confidentiality agreement relating to any or all of the matters described in this Section 4.11 in a form reasonably acceptable to the Company (in addition to such Person's obligations under Section 15.4).

Section 4.12    Liability of Members.

(a)    To Third Parties.    Unless otherwise provided by the Act, no Member shall be liable under any judgment, decree or order of a court, or in any other manner, for any debt, obligation or liability of the Company, whether arising in contract, tort or otherwise, or for the acts or omissions of any other Member, or any agent or employee of the Company.

(b)    To the Company.    If a Member receives either a return, in whole or in part, on his Capital Contribution or a Distribution made by the Company when the property of the Company is not sufficient to pay all liabilities of the Company except liabilities to Members on account of Capital Contributions, such Member is liable to the Company to the extent now or hereafter provided by the Act.

Section 4.13   No Expulsion or Withdrawal. Subject to Section 11.4, neither the Members nor the Board may at any time expel any Member under the terms of this Agreement; *provided, however*, that transfers of Units resulting in a Person no longer being a Member may occur as permitted under Section 4.1 and Article XI, and when a transferee of Units becomes a Record Holder of such Units, such transferring Member shall cease to be a Member with respect to the Units so transferred.  Except as permitted in Article XI and this Section 4.13, no Member shall have the right to withdraw, resign or retire from the Company as a Member.

Section 4.14   Approval by Members of Certain Actions. The following actions may not be undertaken by or on behalf of the Company without the prior approval of the Class A Members by a Majority Vote:

(a)    the Disposition of all of substantially all of the Company's assets in a single transaction or a series of related transactions;

(b)    as set forth in Section 14.1(a), amendments, restatements, supplements, waivers and other modifications to this Agreement;

(c)    the making of any expenditures, the lending or borrowing of money, the assumption or guarantee of, or other contracting for, indebtedness and other liabilities, the issuance of evidences of indebtedness, including indebtedness that is convertible into securities of the Company, and the incurring of any other obligations in one transaction (or a series of related transactions) in an amount equal to or greater than $35,000,000 in the aggregate;

(d)    the merger, consolidation, recapitalization or other combination of the Company with or into any other Entity, except a wholly-owned Affiliate of the Company, except pursuant to Section 11.12;

(e)    reorganization of the Company into another form of legal entity, except pursuant to Section 11.12;

(f)    cause the Company to become a public reporting company under the Exchange Act;

(g)    the dissolution or liquidation of the Company or consent to the appointment of a receiver, liquidator, assignee, custodian, or trustee for the purpose of winding up the affairs of the Company;

(h)    the entering into of any listing agreements with any national securities exchange and the delisting of some or all of the Units from, or requesting that trading be suspended on, any such exchange;

(i)    subject to Section 4.2(d), any issuances of Class C Units other than the Class C Units issued on the Effective Date;

(j)    subject to Section 4.2(d), any issuances of Class B Units other than the Class B Units issued on the Effective Date; or

(k)    (j) any redemption, repurchase or conversion of any Units other than on a pro rata basis with Units of the same class, or any redemption, repurchase or conversion of Class C Units or Class D Units other than repurchases of Class D Units at a nominal price pursuant to a forfeiture, vesting or similar provision relating thereto.

Section 4.15    Meetings of Members.

(a)    Annual Meetings.  An annual meeting of the Members shall be held at the principal executive office of the Company or at any place, within or without the State of Delaware, and at such date, which date shall be within 13 months of the last annual meeting, and time as the Board may from time to time elect.  At such annual meeting an agenda item shall include the election of Directors (other than the Director position reserved for the President and Chief Executive Officer) and the transaction of any business authorized to be transacted by the Members.  The initial annual meeting shall take place no later than thirteen months following the Effective Date.

(b)    Special Meetings.  Special meetings of the Members may be called by not less than a Majority Vote of the Class A Members or by the Board.  The Class A Members calling a special meeting or the Board, as the case may be, may designate any place, either within or outside the State of Delaware, as the place of special meeting.  If no designation is made, the place of special meeting shall be the principal executive office of the Company.

(c)    Quorum.  A number of outstanding Class A Units equal to a majority of the aggregate Class Member Percentage of the Class A Units, represented in person, by telephone or other electronic communication or by proxy, shall constitute a quorum at any meeting of the Members, except with respect to any matter requiring approval by more than a Majority Vote of Class A Units, a number of Class A Units equal to the minimum Class Member Percentage of the Class A Units required to approve the matter shall constitute a quorum for such matter.

(d)    Notice of Meetings.  Except as provided in Section 4.15(f) of this Agreement, notice of the place, day and hour of any meeting and the purpose or purposes for which the meeting is called shall be given not less than 10 Business Days nor more than 60 days before the date of the meeting by or at the direction of the Board or the person or persons calling the meeting, to each Member entitled to vote at such meeting.  For purposes of determining the Members entitled to notice of or to vote at a meeting of the Members, the Board may set a Record Date, which shall not be less than 10 nor more than 60 days before the date of the meeting (unless such requirement conflicts with any rule, regulation, guideline or requirement of any national securities exchange on which the Units are listed for trading, in which case the rule, regulation, guideline or requirement of such exchange shall govern).  If no Record Date is fixed by the Board, the Record Date for determining Members entitled to notice of or to vote at a meeting of Members shall be at the close of business on the day next preceding the day on which notice is given.  A determination of Members of record entitled to notice of or to vote at a meeting of Members shall apply to any adjournment or postponement of the meeting; *provided, however*, that the Board may fix a new Record Date for the adjourned or postponed meeting.

(e)     Manner of Acting.  For all matters other than as set forth in Section 5.1(b), a Majority Vote of the Class A Members, voting together, shall be the act of the Members, unless the vote of a greater or lesser proportion or number, or that of a separate class of Units, is otherwise required by this Agreement.

(f)     Action by Members Without a Meeting.  All actions with respect to the Company may be taken without a meeting of the Members; *provided*, *however*, that (i) any such action is evidenced by one or more written consents describing the action taken, signed by Members holding an aggregate Class Member Percentage of Class A Units (or such other or greater or lesser proportion or number, or an aggregate Class Member Percentage of a separate class, of Units, as the case may be) as is otherwise required to approve a matter and delivered to (x) the Company for filing with the Company records and (y) the Class A Members as of the applicable Record Date and (ii) in the case of any amendment, restatement, waiver or other modification of this Agreement, such action is in accordance with Section 14.1.

(g)     Waiver of Notice.  When notice is required to be given to any Member, a waiver thereof in writing signed by the Member entitled to such notice, whether before, at or after the time stated therein, shall be equivalent to the giving of such notice.

(h)     Proxies.  Members who are entitled to vote may vote at any meeting either in person or by proxy in writing, which shall be filed with the Company before being voted. Such proxy shall entitle the holders thereof to vote the Units of the Member granting the proxy at any meeting or any adjournment of such meeting, but shall not be valid after the final adjournment thereof.  No proxy shall be valid after the expiration of 11 months from the date of its execution unless the Member executing it shall have specified therein the length of time it is to continue in force, which shall be for some limited period.

(i)     Meetings by any Form of Communication.  Any and all Members entitled to vote at any meeting may participate in a meeting by the use of any means of communication by which all Members participating may simultaneously speak and hear each other during the meeting.  A Member participating in a meeting by this means is deemed to be present in person at the meeting.

(j)     Adjournment.  When a meeting is adjourned to another time or place, notice need not be given of the adjourned meeting and a new Record Date need not be fixed, if the time and place thereof are announced at the meeting at which the adjournment is taken, unless such adjournment shall be for more than 30 days. At the adjourned meeting, the Company may transact any business which might have been transacted at the original meeting. If the adjournment is for more than 30 days or if a new Record Date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given in accordance with this Article IV.

(k)     Conduct of a Meeting. Based upon the terms of this Agreement, the Board shall have full power and authority concerning the manner of conducting any meeting of the Members, including the determination of Persons entitled to vote, the existence of a quorum, the satisfaction of the requirements of this Article IV, the conduct of voting, the validity and effect of any proxies and the determination of any controversies, votes or challenges arising in connection with or during the meeting or voting. All minutes shall be kept with the records of the

Company maintained by the Board.  The Board may make such other regulations consistent with applicable law and this Agreement as it may deem advisable concerning the conduct of any meeting of the Members, including regulations in regard to the appointment of proxies, the appointment and duties of inspectors of votes, the submission and examination of proxies and other evidence of the right to vote.

(l)    Member Lists.  A complete list of Members entitled to vote at any meeting of Members, arranged in alphabetical order and showing the address of each such Member and the number of outstanding Units registered in the name of such Member, shall be open to the examination of any Class A Member, for any purpose germane to the meeting, during ordinary business hours, for a period of at least 10 days before the meeting, at the principal place of business of the Company. The Member list shall also be produced and kept at the time and place of the meeting during the whole time thereof, and may be inspected by any Class A Member who is present.

(m)    Voting and Other Rights.  Only those Record Holders of outstanding Units on the Record Date set pursuant to Section 4.15(d) and entitled to vote shall be entitled to notice of, and to vote at, a meeting of Members or to act with respect to matters as to which the holders of the outstanding Units have the right to vote or to act.  All references in this Agreement to votes of, or other acts that may be taken by, the outstanding Units shall be deemed to be references to the votes or acts of the Record Holders of the outstanding Units entitled to vote. With respect to outstanding Units that are held for a Person's account by another Person (such as a broker, dealer, bank, trust company or clearing corporation, or an agent of any of the foregoing), in whose name such outstanding Units are registered, such other Person shall, in exercising the voting rights in respect of such outstanding Units on any matter, and unless the arrangement between such Persons provides otherwise, vote such outstanding Units in favor of, and at the direction of, the Person who is the beneficial owner, and the Company shall be entitled to assume it is so acting without further inquiry.  The provisions of this Section 4.15(m) (as well as all other provisions of this Agreement) are subject to the provisions of Section 4.1(c).  Only Record Holders of Units entitled to vote at the relevant time shall be entitled to vote on matters which holders of such Company securities are entitled to vote on or approve under this Agreement or the Act, unless otherwise required by the Act or the instrument governing the rights of such holders.

Section 4.16    Management by Members.  Except as provided in this Article IV, Section 5.1(a) and Section 5.1(b), the Members or holders of other securities of the Company shall take no part in the management, control or operation of the Company.  No Member or such other holder, by virtue of its status as such, shall have any management power over the business and affairs of the Company or actual or apparent authority to enter into, execute or deliver contracts on behalf of, or to otherwise bind, the Company.  The Members shall not be entitled to approve or consent to any merger or consolidation under Section 18-209 of the Act unless first approved by the Board and submitted to the Class A Members for approval in accordance with this Article IV.Section 4.14.

Section 4.17    Fiduciary Duties.  The Board and the Officers owe the Members the traditional fiduciary duties that directors and officers of a corporation organized under the General Corporation Law of the State of Delaware owe such corporation and its shareholders.

24

# ARTICLE V
# MANAGEMENT OF THE COMPANY

Section 5.1    The Board.

(a)    Authority; Number; Initial Composition.  Except as otherwise expressly provided in this Agreement, all authority of the Company shall be vested in, and all decisions relating to the management and business affairs of the Company shall be made by, the Board. The Board shall initially be composed of five members (the "Directors"), one of whom shall be the Chief Executive Officer of the Company.  The Directors initially shall be Bruce Rastetter, ~~Jim~~James Continenza, Mark Beemer, Don Draizin and Steve Pumilia.  The Directors shall be elected at each annual meeting of the Members in accordance with clause (b) below.  The Chairman of the Board initially shall be [~~ ~~]James Continenza.  Except as specifically provided in this Agreement, the authority and functions of the Board, on the one hand, and of the Officers, on the other, shall be identical to the authority and functions of the board of directors and officers, respectively, of a corporation organized under the General Corporation Law of the State of Delaware.  The members of the Board shall be designated as the "manager" within the meaning of the Act.  In addition to the powers that now or hereafter can be granted to "managers" under the Act and to all other powers granted under any other provision of this Agreement, the Board shall have full power and authority to do, and to direct the Officers to do, all things and on such terms as it determines to be necessary or appropriate to conduct the business of the Company and to effectuate the purposes set forth in Section 3.1.

(b)    Annual Election of Directors.  At each annual meeting of the Members, Directors (other than the Director position reserved for the Chief Executive Officer) shall be elected to hold office until the next succeeding annual meeting of the Members by a plurality of the votes cast by the Class A Members, voting together, present in person or represented by proxy at the annual meeting and entitled to vote thereon.  The Chairman of the Board shall be designated by a Majority Vote of the Directors at the Board meeting immediately following each annual meeting.

(c)    Removal; Vacancies.  Each Director shall hold office until his successor is duly elected or until his removal, death or resignation.  Any Director may be removed from the Board, by a Majority Vote of the Class A Members, on a "with cause" basis consistent with "with cause" removal of board members as applied to Delaware corporations, or with or without cause, by a Majority Vote of the Board; *provided, however*, that the Chief Executive Officer may be removed as a Director only in connection with his termination as Chief Executive Officer. Except as provided in the immediately preceding sentence, a Director may not be removed from the Board.  In the event that a vacancy is created on the Board at any time by the death, disability, retirement, resignation or removal of a Director, the Board, by a Majority Vote, shall have the right to designate a replacement therefor subject to the requirements of Section 5.1(a). Nominations of persons for election to the Board at any annual meeting occurring subsequent to January 1, 2011 may be made by or at the direction of (x) the Board or (y) any Class A Member; *provided*, that such Class A Member delivers notice of his nominations to the Secretary no later than the close of business on the 60th day nor earlier than the close of business on the 120th day before the first anniversary of the preceding year's annual meeting or such earlier or later date if otherwise agreed by a Majority Vote of the Board.

25

Section 5.2    Annual Budgets.    An annual budget for the Company (the "Annual Budget"), which shall set forth budgeted revenues, expenses, capital expenditures and financial performance metrics for the subsequent fiscal year (excluding capital expenditures for acquisitions) and shall include actual versus budgeted figures for the previous fiscal year, shall be presented to, and shall be subject to approval by, the Board in a meeting of the Board to be held in the third fiscal quarter of each year.  On no less than a quarterly basis, the Board shall review with the management of the Company the status of actual revenues, expenses, capital expenditures and financial performance metrics for the immediately prior quarter and for the year then to date in comparison with amounts forecasted for such periods in the Annual Budget.

Section 5.3    Meetings of the Board; Written Consents.

(a)    Meetings Generally.  Meetings of the Board shall be held at the principal executive office of the Company or at any place, within or without the State of Delaware, and at such date and time as the Board may from time to time elect, for the transaction of any business authorized to be transacted by the Board; *provided*, that the Board must hold at least four (4) meetings per annum and monthly telephonic meetings for business updates.

(b)    Regular Meetings.  Regular meetings of the Board shall be held at such times and places as may be fixed from time to time by resolution adopted by the Board and communicated to all Directors.  Except as otherwise provided by statute, the Certificate of Formation, or this Agreement, any and all business may be transacted at any regular meeting.  Except as may be otherwise expressly provided by statute, the Certificate of Formation or this Agreement, neither the business to be transacted at, nor the purpose of, any regular meeting of the Board need be specified in the notice or waiver of notice of such meeting.

(c)    Special Meetings.  Special meetings of the Board may be called by any of the Board members, the Chairman of the Board or the Chief Executive Officer.  The Person(s) calling a special meeting may designate any place, either within or outside the State of Delaware, as the place of special meeting.  If no designation is made, the place of meeting shall be the principal executive office of the Company.  Except as may be otherwise expressly provided by statute, the Certificate of Formation or this Agreement, neither the business to be transacted at, nor the purpose of, any special meeting of the Board need be specified in the notice or waiver of notice of such meeting.

(d)    Meetings by any Form of Communication.  Any and all Board members may participate in an annual or special meeting by the use of any means of communication by which all Board members participating may simultaneously speak to and hear each other during the meeting.  A Board member participating in a meeting by this means is deemed to be present in person at the meeting.

(e)    Quorum.  A minimum of four (4) of the outstanding Board members represented in person or by telephone or other electronic communication shall constitute a quorum at any meeting of the Board.  If a quorum shall not be present at any meeting of the Board, the Directors present thereat may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present.

(f)      <u>Notice of Meetings; Waiver of Notice</u>.  Notice of the place, day and hour of any meeting shall be given not less than five Business Days before the date of the meeting, in the case of any regular meeting, and 48 hours before the date of the meeting, in the case of any special meeting.  Any such notice may be delivered to each Director either personally or by facsimile, electronic transmission (including email) or overnight courier.  When notice is required to be given to any Board member, a waiver thereof in writing signed by the Person entitled to such notice, whether before, at or after the time stated therein, shall be equivalent to the giving of such notice.

(g)      <u>Manner of Acting</u>.  A Majority Vote of the Board members shall be the act of the Board, unless the vote of a greater or lesser proportion or number is otherwise required by this Agreement.

(h)      <u>Action Without a Meeting</u>.  All actions with respect to the Company may be taken without a meeting of the Board; *provided*, *however*, that any such action is evidenced by one or more written consents describing the action taken, signed by all of the Directors and delivered to the Company for filing with the Company records; *provided further, however*, that an employment or other agreement with an Officer of the Company that is also a Director may be approved by the written consent of that number of Directors having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all Directors entitled to vote thereon were present and voted.  Action taken under this <u>Section 5.3(h)</u> is effective when all of the Directors have signed the consent, unless the consent specifies a different effective date.

(i)      <u>Committees</u>.  The Board shall have the power to appoint any committees as it may deem advisable and may delegate such authority to such committees as is not inconsistent with the Act.  Each committee shall have two or more members, who shall serve at the pleasure of the Board.

(j)      <u>Compensation</u>.  The compensation of the members of the Board is as set forth on <u>Exhibit B</u> hereto.

(k)      <u>Board Observers</u>.  In addition to the foregoing, any Large Holder shall have the right to designate one non-voting Board observer who will be entitled to receive notices of all Board meetings, to attend all meetings of the Board, to participate in all deliberations of the Board and receive copies of all materials provided to the Board; *provided, however*, that such observer shall have no voting rights with respect to actions taken or not taken by the Board; *provided, further*, that if the Board reasonably believes that any materials provided to the Board contain Confidential Information, the Company shall inform each Board observer that such materials contain Confidential Information, and if such Board observer after being so informed still desires to receive such materials, such Board observer shall, and shall cause each Representative of its Affiliates to, prior to receipt of such Confidential Information, comply with the confidentiality provisions of each Member as set forth in <u>Section 15.4</u>.  Notwithstanding the foregoing, upon advance written notice, the Company may exclude any Board observer from having access to any portions of a Board meeting (and any related materials) during which it is reasonably determined by the Board that such Board observer has an existing or potential conflict of interest with respect to the matters to be addressed by the Board.

Section 5.4    Officers.

(a)    Number.  The Officers of the Company shall be a President and Chief Executive Officer, Chief Financial Officer and a Secretary and may also include one or more Vice Presidents (who may be further classified by such descriptions as "executive," "senior," "assistant" or otherwise) and Assistant Secretaries, each of whom shall be appointed by the Board.  The Board may create such other offices or positions, and appoint Officers to fill such other offices or positions, as the Board may deem necessary or desirable.  The Board shall identify the roles and responsibilities of each additional Officer not expressly identified below by resolution at the time of such Officer's appointment.  Any two or more offices may be held by the same person.

(b)    Chairman of the Board.  The Chairman of the Board shall preside when present at all meetings of the Members and the Board.  The Chairman of the Board shall advise and counsel other Officers and shall exercise such powers and perform such duties as shall be assigned to or required of the Chairman of the Board from time to time by the Board or this Agreement.

(c)    President and Chief Executive Officer.  The President and Chief Executive Officer shall have general charge and supervision of the business of the Company; and, in general, he shall perform all duties incident to the office of the president and chief executive officer of a Delaware corporation, and such other duties as, from time to time, may be assigned to or required of him by the Board or this Agreement.  The President and Chief Executive Officer shall be a Director.

(d)    Secretary.  The Secretary shall record all the proceedings of the meetings of the Members and the Board and of any committees in a book to be kept for that purpose; he shall see that all notices are duly given in accordance with the provisions of this Agreement; he shall be custodian of the records of the Company and shall keep or cause to be kept (by the Transfer Agent or otherwise) a record of Record Holders in the form of Schedule I hereto showing the names of the Members and their addresses and their respective Class Member Percentages, as they may vary from time to time; and, in general, he shall perform all duties incident to the office of secretary of a corporation, and such other duties as, from time to time, may be assigned to or required of him by the Board, the President and Chief Executive Officer or this Agreement.

(e)    Assistant Secretaries.  The Assistant Secretary or, if there be more than one, the Assistant Secretaries in the order determined by the Board shall, in the absence (or inability or refusal to act) of the Secretary, perform the duties and have the powers of the Secretary.

(f)    Chief Financial Officer.  The Chief Financial Officer shall keep and maintain, or cause to be kept and maintained, adequate and correct books and records of account of the Company.  The Chief Financial Officer shall receive and deposit all moneys and other valuables belonging to the Company in the name and to the credit of the Company and shall disburse the same only in such manner as the President and Chief Executive Officer or the appropriate Officers of the Company may from time to time determine; shall render, whenever

requested, an account of all his transactions as Chief Financial Officer and of the financial condition of the Company, and shall perform such further duties as the President and Chief Executive Officer~~, this Agreement or~~ and the Board may prescribe.

(g)     Vice Presidents.   In the absence (or inability or refusal to act) of the President and Chief Executive Officer, the Vice President (or in the event there be more than one Vice President, the Vice Presidents in the order designated by the Board) shall perform the duties and have the powers of the President and Chief Executive Officer.

(h)     Term of Office, Removal and Resignation.

(i)     Each Officer shall hold office until his successor shall have been duly elected and shall have been qualified, or until his death, or until he shall resign or shall have been removed in the manner provided hereinafter.

(ii)     An Officer serves at the pleasure of the Board, and the Board may remove an Officer at any time with or without cause and the Board also may eliminate any Officer position at any time; *provided, however,* that such removal or elimination shall be without prejudice to the contract rights, if any, of the Officer so removed or whose position was so eliminated.

(iii)     Any Officer may resign at any time and for any reason.

(iv)     In the event of a vacancy in any office because of death, resignation or removal, the Board shall appoint a successor to such office.

(v)     This Section 5.4(h) is subject to the contractual rights of an Officer, if any.

(i)     Compensation.   The Board may set the compensation of the Company's Officers, subject to the contractual rights of an Officer, if any.

## ARTICLE VI
## EXCULPATION AND INDEMNIFICATION

Section 6.1     Exculpation of Members, Board and Officers. No Member, Director or Officer (or any other Person that is or was serving at the request of the Company as a member, manager, director, governor, officer, partner, employee or agent of another Entity) shall be liable to the Company or any Member for any claims, costs, expenses, damages or losses arising out of conduct or decisions undertaken or omitted in good faith and in the belief that such conduct or omission was in, or not opposed to, the interests of the Company (*provided*, that such conduct or omission did not constitute gross negligence or willful misconduct on the part of the Member, Director or Officer) and, with respect to any criminal action or proceeding, had no reasonable cause to believe his or its conduct was unlawful.

Section 6.2     Indemnification.   The Company shall indemnify any Person who was or is a party, or is threatened to be made a party, to any threatened, pending or completed claim, action, suit or proceeding, whether civil, criminal, administrative or investigative, including

29

appeals (other than an action by or in the right of the Company), by reason of the fact that such Person is or was a Member, Director or Officer of the Company, or is or was serving at the request of the Company as a member, manager, director, governor, officer, partner, employee or agent of another Entity against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by such Person in connection with such claim, action, suit or proceeding if such Person acted in good faith and in a manner he reasonably believed to be in, or not opposed to, the best interests of the Company, and with respect to any criminal action or proceeding, had no reasonable cause to believe his or its conduct was unlawful.  Further, the Company shall indemnify any Person who was or is a party, or is threatened to be made a party, to any threatened, pending or completed claim, action, suit or proceeding by or in the right of the Company to procure a judgment in its favor by reason of the fact that such Person is or was a Member, Director or Officer of the Company, or is or was serving at the request of the Company as a member, manager, director, governor, officer, partner, employee or agent of another Entity against expenses (including attorneys' fees) actually and reasonably incurred by such Person in connection with the defense or settlement of such claim, action, suit or proceeding.  Notwithstanding the foregoing, no indemnification under this <u>Section 6.2</u> shall be made in respect of any claim, issue or matter as to which such Person shall have been adjudged to be liable for gross negligence or willful misconduct in the performance of such Person's duty to the Company unless and only to the extent that the court in which such claim, action, suit or proceeding was brought shall determine upon application that, despite the adjudication of liability but in view of all circumstances of the case, such Person is fairly and reasonably entitled to indemnity for such expenses which such court shall deem proper. The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of *nolo contendere* or its equivalent, shall not, of itself, create a presumption that the Person did not act in good faith and in a manner which he reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to any criminal action or proceeding, had reasonable cause to believe that his conduct was unlawful.

Section 6.3    <u>Indemnification When Successful on Merits or Otherwise</u>. To the extent that a Member, Director or Officer of the Company has been successful on the merits or otherwise in defense of any action, suit or proceeding referred to in <u>Section 6.2,</u> or in defense of any claim, issue or matter therein, such Person shall be indemnified against expenses actually and reasonably incurred by such Person in connection with such successful defense, notwithstanding that such Person has not been successful on any other claim, issue or matter in any such action, suit or proceeding.

Section 6.4    <u>Payment of Expenses in Advance of Disposition of Action</u>. Expenses (including attorneys' fees) incurred in investigating or defending a civil or criminal claim, action, suit or proceeding shall be paid by the Company in advance of the final disposition of such claim, action, suit or proceeding upon receipt of an undertaking by or on behalf of the Member, Board Director or Officer to repay such amount if and to the extent that it shall be ultimately determined that such Person is not entitled to be indemnified by the Company as authorized in this <u>Article VI</u>.

Section 6.5    <u>Non-Exclusivity of Article</u>. The indemnification and advancement of expenses authorized in and provided by this <u>Article VI</u> shall not be deemed exclusive of and shall be in addition to any other right to which those indemnified may be entitled under the

Certificate of Formation, any statute, rule of law, agreement, vote or action of Members or otherwise, both as to actions in such Person's official capacity and as to actions in another capacity while holding such office, and shall continue as to a Person who has ceased to be a Member, Director or Officer and shall inure to the benefit of the heirs, executors and administrators of such Person.

Section 6.6    Insurance.  The Company may purchase and maintain insurance on behalf of any Person who is a Director, Officer, employee or agent of the Company, or is or was serving at the request of the Company as a member, manager, director, governor, officer, partner, employee or agent of another Entity against any liability asserted against such Person or incurred by such Person in such capacity, whether or not the Company is required or permitted to indemnify such Person against such liability under the provisions of this Article VI or otherwise.

Section 6.7    Authorization for Indemnification.  Any indemnification under this Article VI (unless ordered by a court) shall be made by the Company only as authorized in the specific case upon a determination that indemnification of the Director, Officer or other Person is proper in the circumstances because such Person has met the applicable standard of conduct set forth herein.  Such determination shall be made (i) by the disinterested members of the Board, or (ii) if the Board so directs, by independent legal counsel in a written opinion.  To the extent that a Director, Officer or other Person has been successful on the merits or otherwise in defense of any action, suit or proceeding referred to in this Article VI, or in defense of any claim, issue or matter therein, such Person shall be indemnified against expenses (including attorneys' fees) actually and reasonably incurred in connection therewith, without the necessity of authorization in the specific case.

Section 6.8    Good Faith Defined. For purposes of any determination under Section 6.1 or Section 6.2, a Person shall be deemed to have acted in good faith and in a manner such Person reasonably believed to be in or not opposed to the best interests of the Company, or, with respect to any criminal action or proceeding, to have had no reasonable cause to believe such Person's conduct was unlawful, if such Person's action is based on the records or books of account of the Company or another enterprise, or on information supplied to such Person by the Officers of the Company or another enterprise in the course of their duties, or on the advice of legal counsel for the Company or another enterprise or on information or records given or reports made to the Company or another enterprise by an independent certified public accountant or by an appraiser or other expert selected with reasonable care by the Company or another enterprise.

Section 6.9    Indemnification by a Court.  Notwithstanding any contrary determination in the specific case under Section 6.1 or Section 6.2, and notwithstanding the absence of any determination thereunder, any ~~Class A~~ Member, Director or Officer may apply to any court of competent jurisdiction in the State of Delaware for indemnification to the extent otherwise permissible under Section 6.1 or Section 6.2.  The basis of such indemnification by a court shall be a determination by such court that indemnification of the ~~Class A~~ Member, Director or Officer is proper in the circumstances because such Person has met the applicable standards of conduct set forth in Section 6.1 or Section 6.2, as the case may be.  Neither a contrary determination in the specific case under Section 6.7 nor the absence of any determination thereunder shall be a defense to such application or create a presumption that the ~~Class A~~ Member, Director or Officer seeking indemnification has not met any applicable standard of

31

conduct.  Notice of any application for indemnification pursuant to this <u>Section 6.9</u> shall be given to the Company promptly upon the filing of such application.  If successful, in whole or in part, the ~~Class A~~ Member, Director or Officer seeking indemnification shall also be entitled to be paid the expense of prosecuting such application.

Section 6.10   <u>Certain Definitions</u>. For purposes of this <u>Article VI</u>: (i) "the Company" shall include, in addition to the resulting entity, any constituent entity (including any constituent of a constituent) absorbed in a consolidation or merger which, if its separate existence had continued, would have had power and authority to indemnify its members, managers, directors, governors, officers, partners and employees or agents, so that any Person who is or was a member, manager, director, governor, officer, partner, employee or agent of such constituent entity, or is or was serving at the request of such constituent entity as a member, manager, director, governor, officer, partner, employee or agent of another limited liability company, corporation, partnership, joint venture, trust, employee benefit plan or other enterprise, shall stand in the same position under the provisions of this <u>Article VI</u> with respect to the resulting or surviving entity as he or it would have with respect to such constituent entity if its separate existence had continued; (ii) references to "fines" shall include any excise taxes assessed on a Person with respect to an employee benefit plan; (iii) references to "serving at the request of the Company" shall include any service as a Member, Director, Officer, employee or agent of the Company which imposes duties on, or involves services by, such Member, Director, Officer, employee or agent with respect to an employee benefit plan, its participants or beneficiaries; and (iv) a Person who acted in good faith and in a manner he reasonably believed to be in the interest of the participants and beneficiaries of an employee benefit plan shall be deemed to have acted in a manner "not opposed to the best interests of the Company" as referred to in this <u>Article VI</u>.

Section 6.11   <u>Survival of Indemnification and Advancement of Expenses</u>.  The indemnification and advancement of expenses provided by, or granted pursuant to, this <u>Article VI</u> shall continue as to a Person who has ceased to be a Member, Director or Officer and shall inure to the benefit of the heirs, executors, administrators and successors of such a Person and their directors, officers, shareholders and members and shall survive the dissolution, liquidation and termination of the Company.

Section 6.12   <u>Certain Indemnification Rights</u>.  The rights provided for in this <u>Article VI</u>, with respect to any Officer or Director (a) shall be contract rights based upon good and valuable consideration, pursuant to which such Officer or Director, as applicable, may bring suit as if the provisions of this <u>Article VI</u> were set forth in a separate written contract between such Officer or Director, as applicable, and the Company, (b) shall fully vest at the time such Officer or Director, as applicable, first assumes his position as an Officer or Director, as applicable, of the Company, (c) are intended to be retroactive and shall be available with respect to any act or omission occurring prior to the adoption of this <u>Article VI</u>, (d) shall continue as to any Officer or Director who has ceased to be an Officer or Director of the Company and (e) shall inure to the benefit of each Officer and Director's heirs, executors and administrators.

32

## ARTICLE VII
## ACCOUNTS AND RECORDS

Section 7.1    Records to be Maintained.  The Board shall keep or cause to be kept at the principal office of the Company appropriate books and records with respect to the Company's business, including all books and records necessary to provide to the Members any information required to be provided pursuant to this Agreement.  Any books and records maintained by or on behalf of the Company in the regular course of its business, including the record of the Record Holders, books of account and records of Company proceedings, may be kept on, or be in the form of, computer disks, hard drives, punch cards, magnetic tape, photographs, micrographs or any other information storage device; *provided*, that the books and records so maintained are convertible into clearly legible written form within a reasonable period of time.  The books of the Company shall be maintained, for financial reporting purposes, on an accrual basis in accordance with U.S. GAAP.

Section 7.2    Access to Records.    The records required to be maintained by the Company pursuant to Section 7.1, and any other books and records of the Company, wherever situated, are subject to inspection and copying upon three Business Days prior notice from any Significant Holder, by and at the expense of, such Significant Holder, during regular business hours of the Company; *provided, however*, that notwithstanding the foregoing, each Class A Member shall continue to have all information and similar rights provided for elsewhere in this Agreement and by applicable law (including the Act).  If a Significant Holder seeks to inspect or copy any books and records of the Company pursuant to this Section 7.2 and the Board reasonably believes that any of such books and records sought to be inspected or copied contain Confidential Information, the Company shall inform such Significant Holder that such books and records contain Confidential Information, and if such Significant Holder after being so informed still desires to inspect or copy such books and records, such Significant Holder shall, and shall cause each of its Representatives and the Representatives of its Affiliates to, prior to receipt of such Confidential Information, comply with the confidentiality provisions of each Member as set forth in Section 15.4.

Section 7.3    Annual Audit.   The accounts of the Company will be audited (at the expense of the Company) as of the close of each fiscal year by an independent certified public accounting firm selected by the Board.

Section 7.4    Reports to Class A Members, Class B Members and Class C Members. The ~~Board shall cause to be prepared and furnished (at the expense of the Company) by mail~~Company will use its commercially reasonable efforts to deliver to each:

(a)    Class A Member, Class B Member and Class C Member or by posting on a public website that such Class A Member, Class B Member and Class C Member has access to, including with respect to disassociated Persons who no longer are Class A Members, Class B members or Class C Members, respectively, but were Class A Members, Class B Members or Class C Members at any time during such fiscal quarter, as soon as practicable, but in no event later than 45 days after the end of each fiscal quarter, other than the last fiscal quarter of each fiscal year, a Quarterly Report; and

(b)    Class A Member , Class B Member and Class C Member or by posting on a public website that such Class A Member, Class B Member and Class C Member has been notified of and given access to, including with respect to disassociated Persons who no longer are Class A Members, Class B Member or Class C Members, respectively, but were Class A Members, Class B Member or Class C Members at any time during such fiscal year, as soon as practicable, but in no event later than 120 days after the end of each fiscal year of the Company, an Annual Report.

(c)    Quarterly Reports and Annual Reports shall include a statement as to any material variances between the budgeted figures in the Annual Budget and the actual performance of the Company. In addition, such reports shall also include the amount of Distributions during the applicable reporting period and the aggregate amount of Distributions from the Effective Date through the end of the applicable reporting period.

(d)    Each Class CD Member shall have only the right to obtain this Agreement.  The Class CD Members shall have no right to obtain any other information under this Agreement.

Section 7.5    Conference Calls.  Promptly after Quarterly Reports are available but not later than five (5) Business Days thereafter (beginning with the Quarterly Report for the quarter ending June 30, 2010), the Company shall hold a conference call of a type customarily held by companies subject to the reporting requirements of the Exchange Act for the Class A Members and Class C Members to discuss the results of the prior quarter and other relevant matters; *provided, however*, that if the Board determines in good faith upon the advice of legal counsel that such a call would be inadvisable due to the provisions of the Securities Act or Exchange Act as a result of any proposed financing, acquisition, merger or other significant transaction involving the Company, the Company may suspend, delay or (if suspension or delay is not reasonably practical under the circumstances) cancel such calls so long as and to the extent that it discontinues all similar calls with investors in or persons or entities that do business with the Company.

**ARTICLE VIII**
**CONTRIBUTIONS AND CAPITAL ACCOUNTS**

Section 8.1    Capital Account.  The Company shall maintain a Capital Account for each Member on the books of the Company.  Each Member's Capital Account shall be maintained in accordance with the provisions of Treasury Regulations Section 1.704-1(b)(2)(iv) and the provisions of this Agreement.

Section 8.2    Adjustments to Capital Account.  The Capital Account of a Member shall be credited with the amount of all Capital Contributions by such Member to the Company, which, in the case of holders of (i) Class A Units outstanding on the Effective Date, shall consist of asuch Member's pro rata portion of thesuch Member's First Lien Credit Agreement Claims against the Company and its Affiliates which were exchanged for Membership Interests pursuant to the Plan and (ii) Class C, (ii) Class C Units outstanding on the Effective Date, shall consist of such Member's pro rata portion of such Member's Second Lien Credit Agreement Claims against the Company and its Affiliates which were exchanged for Membership Interests pursuant

34

to the Plan and (iii) Class B Units and Class D Units shall be determined in accordance with Section 4.2(c) and (de), respectively.  The Capital Account of a Member shall be increased by the amount of any Profits (or items of income or gain) allocated to such Member, and decreased by (i) the amount of any Losses (or items of loss or deduction) allocated to such Member, (ii) the amount of any cash distributed to such Member and (iii) the fair market value of any asset distributed in kind to such Member (net of all liabilities secured by such asset that such Member is considered to assume or take subject to under Section 752 of the Code).  The Capital Account of the Member also shall be adjusted appropriately to reflect any other adjustment required pursuant to Treasury Regulations Section 1.704-1 or 1.704-2, as they may be amended or replaced and adjustments required with respect to a redetermination of the Book Value of Company Assets pursuant to Exhibit A.

Section 8.3    Member Information.  The Company shall amend Schedule I from time to time to reflect any changes in the names or addresses of the Members or their respective Units and Class Member Percentages and such amended Schedule I shall be provided to any Significant Holder as promptly as practicable following such Significant Holder's written request to the Company for such amended Schedule I.

Section 8.4    Capital Contributions.  No Member shall be required to make any Capital Contribution.

Section 8.5    Sale or Exchange of Units. In the event of a transfer of some or all of a Member's Units, the Capital Account of the transferring Member shall become the Capital Account of the transferee acquiring such Units, to the extent it relates to the portion of the Units transferred.

Section 8.6    Interest and Preferential Rights. Except as otherwise provided in this Agreement, no interest shall accrue on any Capital Accounts, and no Member shall have any preferential rights with respect to Distributions or upon dissolution of the Company except as otherwise expressly provided herein.

Section 8.7    Compliance with Section 704(b) of the Code. The provisions of this Agreement and Exhibit A attached hereto, as they relate to the maintenance of Capital Accounts and the allocation of Profits and Losses are intended, and shall be construed, and, if necessary, modified, to cause the allocations of Profits, Losses, income, gain and credit pursuant to Article IX to have substantial economic effect under the Treasury Regulations promulgated under Section 704(b) of the Code, in light of the Distributions made pursuant to Article IX and the Capital Contributions deemed made pursuant to this Article VIII.  Notwithstanding anything herein to the contrary, this Agreement shall not be construed as creating a deficit restoration obligation or otherwise personally obligating any Member to make a Capital Contribution in excess of the initial Capital Contribution, as set forth in the first sentence of Section 8.2, made by that Member.

## ARTICLE IX
## DISTRIBUTIONS AND ALLOCATIONS

Section 9.1    Distributions.  Except as otherwise provided in Section 13.2(c) (relating to Distributions to Members upon liquidation of the Company), any Distributions made by the Company shall be made in the order of priority set forth in this Section 9.1.  Except as otherwise provided in Section 13.2(c) (relating to Distributions to Members upon liquidation of the Company), the Board may, but shall not be obligated to, make Distributions at any time or from time to time.

(a)    Primary Distribution Waterfall.  Distributions made pursuant to this Article IX shall be made in the following order of priority:

(i)    First, ~~100~~99% to the holders of Class A Units and 1% to the holders of Class C Units until the sum of aggregate cumulative Distributions made under this Section 9.1(a)(i) (including the aggregate amounts withheld from holders of Class A Units and Class C Units under Section 4.8) equals the Start Value;

(ii)    Second, (~~x~~A) ~~100~~99% to the holders of Class A Units ~~less~~and 1% to the holders of Class C Units, less, with respect to each class of Units set forth in preceding clause (A), such Units pro rata share of the Class D-1 Sharing Percentage and (~~y~~B) the Class D-1 Sharing Percentage to the Non-Executive Directors until the sum of aggregate cumulative Distributions made to the holders of Class A Units under Section 9.1(a)(i) and this Section 9.1(a)(ii) in the aggregate (including the aggregate amounts withheld from holders of Class A ~~Units and Class D~~ Units under Section 4.8) equals $~~580,000,000~~435,000,000; and

(iii)    Thereafter, (~~a~~A) ~~90.0~~89.1% to the holders of Class A Units, (B) 10% to the holders of Class B Units, (C) 0.9% to the holders of Class C Units, less, with respect to each class of Units set forth in preceding clauses (A)-(C), such Units pro rata share of the Class D-1 Sharing Percentage~~,~~ and (~~b~~D) the Class D-1 Sharing Percentage to the Non-Executive Directors ~~and (c) 10% to the holders of Class C Units~~; provided, that if the Class ~~C~~B Participation Condition has not been met, then the percentages set forth in this Section 9.1(a)(iii) shall be (x) ~~100~~99% to the holders of Class A Units ~~less~~and 1% to the holders of Class C Units, less, with respect to each class of Units set forth in preceding clause (x), such Units pro rata share of the Class D-1 Sharing Percentage, (y) the Class D-1 Sharing Percentage to the Non-Executive Directors and (z) 0% to the holders of Class ~~C~~B Units.

(b)    Pro Rata Sharing of Distributions by Holders of a Class of Units.  Distributions made to the holders of a particular class of Units under Section 9.1(a) will be made to such holders in proportion to their respective Class Member Percentage with respect to such particular class of Units.

(c)    Tax Distributions.

36

(i)        At the Board's sole discretion, the Board may cause the Company to distribute to each Member with respect to each calendar quarter an amount of cash (a "Tax Distribution") which in the good faith judgment of the Board equals (x) the amount of taxable income allocable to such Member with respect to its Units in respect of such calendar quarter (net of taxable losses allocated to the Member in respect of its Units in prior calendar quarters and not previously taken into account under this clause), multiplied by (y) the combined maximum federal, state and local income tax rate to be applied with respect to such taxable income (calculated for all such Members using the Board's determination of the highest maximum combined marginal federal, state and local income tax rates to which any such Member may be subject and taking into account the character of such taxable income and the deductibility of state income tax for federal income tax purposes, subject to any applicable limitations on deductibility).

(ii)       For the purposes of calculating the amounts payable under Section 9.1(a), Tax Distributions shall be treated as advances of any amounts such Members are entitled to receive pursuant to Section 9.1(a) and shall be offset against any amounts such Members are entitled to receive pursuant to or in accordance with Section 9.1(a).

(d)        Cash and Non-Cash Distributions.  Distributions may be in cash, securities or other property, or partly in both.  The amount of any non-cash distributable property to be distributed in accordance with this Section 9.1 shall be its Fair Market Value.  Non-cash Distributions shall be made ratably to all Members eligible to receive such Distributions.

(e)        Distributions Are Made to Record Holders.  Each Distribution in respect of a Unit shall be paid by the Company, directly or through the Transfer Agent or through any other Person or agent, only to the Record Holder of such Unit as of the Record Date set for such Distribution. Such payment shall constitute full payment and satisfaction of the Company's liability in respect of such payment, regardless of any claim of any Person who may have an interest in such payment by reason of an assignment or otherwise.

(f)        Limitations on Distributions. No Distribution shall be declared and paid unless, after the Distribution is made, the fair market value of the Company's assets is in excess of all liabilities of the Company, including reasonable reserves for operating expenses and debt service, but excluding liabilities to Members on account of their Capital Accounts.

Section 9.2      Distributions upon Merger, Sale or Similar Transaction.  In the event of a Distribution or other receipt of proceeds in connection with a sale of all or substantially all of the Company's assets or Membership Interests, a merger of the Company or a similar transaction, or a transaction giving rise to Drag-Along Rights under Section 11.6 or a transaction giving rise to Tag-Along Rights under Section 11.5, each Member shall receive in exchange for the Units transferred by such Member in such transaction the same portion of the aggregate consideration from such transaction that such Member would have received if such aggregate consideration received in such transaction had been distributed by the Company in accordance with Section 9.1(a) and (b).  Each Member and other Person made party hereto shall take all necessary or desirable actions in connection with the Distribution of the aggregate consideration from any

such transaction as necessary to implement the economics contemplated by this Agreement, including, without limitation, executing and delivering a proceeds sharing agreement to reflect the foregoing.

Section 9.3    Allocations of Profits and Losses.    After giving effect to the principles, definitions and special allocations set forth in Exhibit A attached hereto, Profits and Losses for any taxable year, and in the discretion of the Board, individual items of income, gain, loss and deduction of the Company, shall be allocated among the Members in such a manner as to reduce or eliminate, to the extent possible, any difference, as of the end of such taxable year, between (a) the sum of (i) the Capital Account of each Member, (ii) such Member's share of Company Minimum Gain and (iii) such Member's Member Nonrecourse Debt Minimum Gain and (b) the respective net amounts, positive or negative, which would be distributed to them (or for which they would be liable to the Company, apart from Section 13.6), determined as if the Company were to (i) sell the assets of the Company for an amount equal to their Book Value and (ii) distribute the proceeds of such sale pursuant to Section 9.1(a) and (b).

Section 9.4    Allocations between Transferor and Transferee.    If a Member transfers or assigns any of his or its Units or if an Additional Member is admitted pursuant to Article XII, the distributive shares of the various items of Profits and Loss allocable among the Members during such taxable year of the Company shall be allocated either (a) as if the Company's taxable year had ended on the date of the transfer or admission, or (b) based on the number of days of such taxable year before and after the transfer or admission without regard to the results of Company activities in the respective portions of such taxable year.    The Board shall determine which method shall be used to allocate the distributive shares of the various items of Profits and Losses between the Members and any substitute or Additional Members.

## ARTICLE X
## TAXES

Section 10.1    Methods of Elections.    The Board shall approve the making of any tax elections for the Company allowed under the Code or the tax laws of any Taxing Jurisdiction. Each Member, by becoming a Member, agrees not to treat any tax item or such Member's individual tax return in a manner inconsistent with the treatment of such item by the Company, as reflected on the Schedule K-1 or other information statement furnished by the Company to such Member, or file any claim for refund relating to any such item which would result in such inconsistent treatment.    Each Member agrees to supply the Company with information necessary to give proper effect to any such election.    The Board shall have the authority to make any tax elections for the Company allowed under the Code, or the tax laws of any Taxing Jurisdiction, including the authority to elect out of Subchapter K of the Code, without Member approval and to take any action in connection therewith to cause such election to be made, including but not limited to signing and filing on behalf of the Company or the Members any applicable form or notice.

Section 10.2    Taxes of Taxing Jurisdictions.    To the extent that the laws of any Taxing Jurisdiction so require, each Member will submit an agreement indicating that the Member will make timely income tax payments to the Taxing Jurisdiction and that the Member accepts personal jurisdiction of the Taxing Jurisdiction with regard to the collection of income taxes

38

attributable to the Member's income, and interest and penalties assessed on such income.  If the Member fails to provide such agreement, the Company may withhold and pay over to such Taxing Jurisdiction the amount of tax, penalties and interest determined under the laws of the Taxing Jurisdiction with respect to such income.  This Section 10.2 shall allow the Company to withhold and pay over any federal, state or foreign income taxes as required by applicable law.  Any such payments with respect to the income of a Member shall be treated as a Distribution for purposes of Article IX.  The Members may, where permitted by the rules of any Taxing Jurisdiction, file a composite, combined or aggregate tax return reflecting the income of the Company and pay the tax, interest and penalties of some or all of the Members on such income to the Taxing Jurisdiction, in which case the Company shall inform the Members of the amount of such tax, penalties and interest so paid.

Section 10.3    Tax Matters Partner.  The Board shall select a tax matters partner ("TMP") if required under Section 6231(a)(7) of the Code.  The TMP may be removed, and a successor TMP selected, from time to time by the Board.  The TMP shall not take any actions (including without limitation extending the statute of limitations, filing a request for administrative adjustment, filing suit concerning any Company tax matter, or entering into a settlement agreement relating to any Company tax matter), or execute or file any statements or forms, on behalf of the Company unless and until the TMP is authorized to do so by the Board.  The TMP shall promptly notify the Members if any tax return or report of the Company is audited or if any adjustments are proposed by any governmental body.  In addition, the TMP shall promptly furnish to the Members all notices concerning administrative or judicial proceedings relating to federal income tax matters as required under the Code.  During the pendency of any such administrative or judicial proceeding, the TMP shall furnish to the Members periodic reports, not less often than monthly, concerning the status of any such proceeding.  Without a Majority Vote of the Class A Members, the TMP shall not extend the statute of limitations, file a request for administrative adjustment, file suit concerning any tax refund or deficiency relating to any Company administrative adjustment or enter into any settlement agreement relating to any Company item of income, gain, loss, deduction or credit for any fiscal year of the Company.

Section 10.4    Tax Returns.  The Company shall deliver to each of its Members (a) annually, within 60 days after the end of such fiscal year, estimated Schedule K-1 tax reporting for the Company as of the end of and for such fiscal year and (b) within 75 days of the Company's year-end, a final Schedule K-1, along with copies of all other federal, state, or local income tax returns or reports filed by the Company for the previous year as may be required as a result of the operations of the Company.  In addition, the Company shall provide, to the extent reasonably available, such other information as a Member may reasonably request for purposes of complying with applicable tax reporting requirements.

## ARTICLE XI
## DISPOSITION OF A MEMBER'S UNITS; REGISTRATION RIGHTS

Section 11.1    Transfers Generally.  The term "transfer," when used in this Agreement with respect to a Unit, shall be deemed to refer to a transaction by which the owner of a Unit assigns such Unit to another Person who is or becomes a Member, and includes a sale, assignment, gift, exchange or any other disposition by law or otherwise, including any transfer upon foreclosure of any pledge, encumbrance, hypothecation or mortgage.  No Member may

transfer all or a portion of such Member's Units, except as permitted under <u>Section 4.1</u> and this <u>Article XI</u>. Any attempt to transfer a Member's Units or any portion thereof which does not comply with the terms and conditions of this Agreement shall be null and void. <u>The transfer restrictions set forth in Sections 11.1 through 11.7 shall terminate simultaneously with the effectiveness of the Company's initial public offering.</u>

Section 11.2    <u>Restrictions on Transfer of Units</u>.

(a)    Subject to (i) the provisions of this Agreement, including with respect to any series or class of securities of the Company, the provisions of any statement of designations or other instrument establishing such series or class, (ii) any contractual provision set forth herein binding on any Member and (iii) provisions of applicable law including the Securities Act, the Bankruptcy Code and the rules, regulations and interpretations related thereto, Units shall be freely transferable to any Person. Any attempted transfer that is prohibited by this Agreement shall be null and void and shall not be effective to transfer any Units, but only to the minimum extent necessary to prevent the transfer from being a transfer that is prohibited. The Company may institute legal proceedings to force rescission of a transfer prohibited by this Agreement and to seek any other remedy available to it at law, in equity or otherwise, including an injunction prohibiting any such transfer.

(b)    Notwithstanding anything herein to the contrary, (i) no sale, disposition or other transfer of any Units shall be made if such sale, disposition or other transfer would violate the then applicable federal or state securities laws or rules and regulations of the Commission, any state securities commission or any other governmental authority with jurisdiction over such sale, disposition or other transfer, (ii) no sale, disposition or other transfer of Units shall be made if, following such proposed sale, disposition or other transfer, the Board determines that such proposed sale, disposition, or other transfer could cause the Company to be treated as a "publicly traded partnership" for purposes of Section 7704 of the Code and (iii) without approval by a Majority Vote of the Board, no sale, disposition or other transfer of any Units shall be made to any Person which is principally engaged in the ownership, acquisition, exploration, development, operation and management of ethanol properties.

(c)    No Record Holder of Units shall transfer any such Units to any Person (including Permitted Transfers) nor shall the Company effect the transfer of any Units to any Person, if, at the time of or after giving effect to such transfer, the Company has or would have 100 or more Record Holders of Membership Interests; *provided*, that a Member may transfer Units (i) to another Person that, immediately prior to the transfer, is a Record Holder of Units, (ii) to the Company, (iii) if such transfer consists of all of its Units held by such transferring Record Holder, to a single Person who is treated as a single Record Holder of Units under the Exchange Act or (iv) if the Board determines, on advice of counsel, that such proposed transfer would not result in the Company becoming a "publicly traded partnership" for purposes of Section 7704 of the Code.

(d)    By the fifth Business Day after the Company has 100 ("<u>Threshold</u>") or more Record Holders of Units, the Company shall provide written notice to the Members stating the number of holders of record of Units (the "<u>Transfer Restriction Notice</u>"). The Company shall notify the Transfer Agent of such issuance and provide a copy of the Transfer Restriction Notice

40

to the Transfer Agent.  The Company may revoke the Transfer Restriction Notice due to a decline in the number of Record Holders below the Threshold by providing written notice to the Members stating the number of holders of record of Units (the "<u>Transfer Restriction Notice Revocation</u>").

(e)    A transfer of Units that is completed or attempted after the Company issues a Transfer Restriction Notice shall be null and void and not effective unless either (x)(i) the holder seeking to make such transfer provides a Transfer Notice (as defined below) to the Company and (ii) such transfer is approved in advance by a Majority Vote of the Board; *provided*, that the Board shall be required to approve such transfer if such transfer is permitted under clauses <u>(i)</u>-<u>(iii)</u> of <u>Section 11.2(c)</u> or (y) the Company has issued a Transfer Restriction Notice Revocation.  No Transfer Notice is required for transfers that occur prior to the issuance by the Company of a Transfer Restriction Notice.  "<u>Transfer Notice</u>" means a written notice to the Board and, if there be one in office, the Secretary of the Company, at least five and not more than 20 Business Days prior to completion of a transfer, which notice states (i) the name, address, telephone and facsimile numbers and e-mail address of the proposed transferor and transferee(s), (ii) the number of Units subject to the proposed transfer, (iii) the proposed date of completion of the proposed transfer and (iv) such other information as the Board from time to time may reasonably require.

(f)    The Board shall have the power to determine, in its reasonable discretion, all matters related to this <u>Section 11.2</u>, including matters necessary or desirable to administer or to determine compliance with this <u>Section 11.2</u> and, absent actual fraud, manifest error, or self dealing, the determinations of the Board shall be final and binding on the Company and the Record Holders of Units.

(g)    Nothing contained in this <u>Article XI</u>, or elsewhere in this Agreement, shall preclude the settlement of any transactions involving Units entered into through the facilities of any national securities exchange on which such Units are listed or admitted to trading.

Section 11.3    <u>Registration and Transfer of Units</u>.

(a)    The Company shall keep or shall cause the Transfer Agent to keep on behalf of the Company a register that, subject to such reasonable regulations as it may prescribe and subject to the provisions of <u>Section 11.2</u>, this <u>Section 11.3</u>, <u>Section 11.5</u>, <u>Section 11.6</u> and <u>Section 11.7</u> will provide for the registration and transfer of Units and the Class Member Percentage held by each Member.  The Transfer Agent is hereby appointed registrar and transfer agent for the purposes of registering Units and transfer of such Units as herein provided.

(b)    The Company shall not recognize any transfer of Units until a Joinder Agreement, executed and delivered by the transferee, substantially in the form of <u>Exhibit C</u>, is surrendered to the Transfer Agent.

(c)    By acceptance of the transfer of any Units, each transferee of a Unit (including any nominee holder or an agent or representative acquiring such Units for the account of another Person) (i) shall be admitted to the Company as a Member with respect to the Units so transferred to such Person when any such transfer or admission is reflected in the books and

records of the Company, with or without execution of this Agreement, (ii) shall be deemed to agree to be bound by the terms of, and shall be deemed to have executed, this Agreement, (iii) shall become a Record Holder of the Units so transferred, (iv) represents that the transferee has the capacity, power and authority to enter into this Agreement, (v) grants powers of attorney to the Officers of the Company and (vi) makes the consents and waivers contained in this Agreement.  The transfer of any Units and the admission of any new Member shall not constitute an amendment to this Agreement except as provided in Article XII and Section 14.1(b)(ii).  No charge shall be imposed by the Company for transfer of Units.

(d)    All out of pocket costs and expenses, taxes or other governmental changes incurred by a Member in connection with any transfer by a Member of all or a part of its Units shall be borne by such Member.

Section 11.4    The Board and Employment Agreements.    A Member who is also a Director or an employee of the Company or one of its Affiliates may elect or be required to transfer some or all of his or its Units as stipulated in any employment, Board or comparable agreement between such Member and the Company, so long as the terms of such agreement are set forth in an agreement with such individual entered into in accordance with the Plan or on the Effective Date or otherwise approved by a Majority Vote of the Board.

Section 11.5    Tag-Along Rights.

(a)    In the event of any proposed transfer in any one transaction or in a series of related transactions by any Class A Member or Class A Members (hereinafter for purposes of this Section 11.5, collectively, the "Tag-Along Selling Member") of its or their Class A Units constituting in the aggregate 50% or more of the aggregate Class Member Percentage of the Class A Units (determined as of the date the Initial Tag-Along Notice is given or, in the absence of such notice, on the last date the Initial Tag-Along Notice could have been given hereunder in compliance with this Section 11.5) to any Person (such Person being hereinafter referred to as the "Tag-Along Purchaser"), other than in a bona fide public distribution pursuant to an effective registration statement under the Securities Act or in a transaction where Drag-Along Selling Members exercise their rights under Section 11.6, each of the other Class A Members (hereinafter for purposes of this Section 11.5, the "Tagged Members"), any Class C Member and, to the extent that the Class B Tag Along Condition has been satisfied, any Class B Member shall have the irrevocable and exclusive right, but not the obligation (the "Tag-Along Right" and, hereinafter for purposes of this Section 11.5, such Members who exercise such Tag Along Right, the "Tagging Members"), to require the Tag-Along Purchaser to purchase a percentage of each TaggedTagging Member's Class A Units equal to the product of (i) a fraction, the numerator of which is the aggregate Class Member Percentage of the Units proposed to be transferred by the Tag-Along Selling Members and the denominator of which is the aggregate Class Member Percentage of the Units owned by the Tag-Along Selling Members and (ii) the aggregate Class Member Percentage of the Class A Units held by such TaggedTagging Member (such Units representing such Class Member Percentage being referred to collectively as the "Tag-Along Units").  The consideration received by the Tag-Along Selling Member(s) and the Tagging Members shall be allocated among such Members in the manner set forth in the distribution waterfall under Section 9.1(a), without giving effect to any dilution from the issuance of Class D Units as contemplated thereunder.  The Tag-Along Selling Members shall give notice (the

42

"Initial Tag-Along Notice") to the ~~Tagged~~Tagging Members at least 30 days prior to the date of the proposed transfer, stating:

> (i)     the name and address of the Tag-Along Purchaser;

> (ii)     the proposed amount of consideration and terms and conditions of payment offered by such Tag-Along Purchaser (if the proposed consideration is not cash, the Initial Tag-Along Notice shall describe the terms of the proposed consideration) and any other material terms and conditions of the Tag-Along Purchaser's offer;

> (iii)     the number of Units proposed to be transferred; and

> (iv)     that the Tag-Along Purchaser has been informed of the Tag-Along Right and has agreed to purchase the Units in accordance with the terms hereof;

*provided*, that any failure by any Tag-Along Selling Member to give such Initial Tag-Along Notice in accordance with the terms set forth in this Section 11.5(a) within such 30-day period shall be deemed an election by such Tag-Along Selling Member to terminate the proposed sale of its Units to the Tag-Along Purchaser, effective as of the Initial Tag-Along Notice Date, and such Tag-Along Selling Member agrees not to sell its Units to the Tag-Along Purchaser for a period of 90 days subsequent to the Initial Tag-Along Notice Date.

The Tag-Along Right shall be exercised by any or all of the ~~Tagged~~Tagging Members by giving notice to the Company ("Tag-Along Notice"), a copy of which will be forwarded by the Company to each Tag-Along Selling Member, within 10 days following receipt of the Initial Tag-Along Notice, indicating its election to exercise the Tag-Along Right (hereinafter referred to for purposes of this Section 11.5, the "Participating Tagged Members"). The Tag-Along Notice shall state the amount and type of Units that such Participating Tagged Member proposes to include in such transfer to the Tag-Along Purchaser.  Failure by any ~~Tagged~~Tagging Member to give such Tag-Along Notice within such ten-day period shall be deemed an election by such ~~Tagged~~Tagging Member not to sell its Units pursuant to the Initial Tag-Along Notice. The closing with respect to any sale to a Tag-Along Purchaser pursuant to this Section shall be held at the time and place specified in the Initial Tag-Along Notice but in any event within 60 days of the date the Initial Tag-Along Notice is given. Consummation of the sale of Units by any Tag-Along Selling Member to a Tag-Along Purchaser shall be conditioned upon consummation of the sale by each Participating Tagged Member to such Tag-Along Purchaser of the Tag-Along Units, if any.

(b)     In the event that the Tag-Along Purchaser does not purchase the Tag-Along Units from the Participating Tagged Members on the same terms and conditions as purchased from the Tag-Along Selling Member, then the Tag-Along Selling Member making such transfer shall purchase on such terms and conditions as stated in the Tag-Along Notice such Tag-Along Units if the transfer occurs.

(c)     The Tag-Along Selling Members who are parties to a sale to a Tag-Along Purchaser shall arrange for payment (in accordance with Section 9.2) (by bank cashier's check or certified check or by wire transfer of immediately available funds) directly by the Tag-Along

Purchaser to each Participating Tagged Member, upon delivery of an appropriate assignment in form and substance reasonably satisfactory to the Tag-Along Purchaser, which assignment shall be made free and clear of all liens, claims and encumbrances except as provided by this Agreement or as otherwise agreed to by such Tag-Along Purchaser; *provided*, *however*, that each such Participating Tagged Member shall not be required to make any other representations or warranties in connection with such sale except that it has the authority to sell its Units, is the sole owner of such Units and has good and valid title to such Units and that the sale of its Units does not violate any agreement to which it is a party or by which it is bound.

(d)    If at the end of 60 days following the date on which an Initial Tag-Along Notice was given, the sale of Units by the Tag-Along Selling Members and the sale of the Tag-Along Units have not been completed in accordance with the terms of the Tag-Along Purchaser's offer, all the restrictions on sale, transfer or assignment contained in this Agreement with respect to Units owned by the Members shall again be in effect.

(e)    In the event that any Class B Member is not a Tagging Member or a Dragged Member, for purposes of Section 11.5 and Section 11.6, then any (i) Distributions received by Class B Members who were Dragged Members or Tagging Members and (ii) Distributions received by Class A Members in such transaction shall not be included in any calculation of the Class B Participation Condition and Class B Tag Along Condition.

Section 11.6    <u>Drag-Along Rights</u>.

(a)    In the event of any proposed transfer of Class A Units constituting in the aggregate 55% or more of the aggregate Class Member Percentage of the Class A Units determined as of the date the Drag-Along Notice is given by one or more Members (hereinafter for purposes of this <u>Section 11.6</u>, collectively the "<u>Drag-Along Selling Members</u>") to a Person (that is not an Affiliate of the Company) (such Person being hereinafter referred to as the "<u>Drag-Along Purchaser</u>"), other than in a bona fide public distribution pursuant to an effective registration statement under the Securities Act, such Drag-Along Selling Members shall have the right (the "<u>Drag-Along Right</u>"), to require each other Member, including Class B Members, Class C Members and Class D Members (hereinafter for purposes of this <u>Section 11.6</u>, the "<u>Dragged Members</u>"), to transfer to the Drag-Along Purchaser each such Dragged Member's entire amount of Units (such Units as may be required to be so transferred being hereinafter referred to as the "<u>Drag-Along Units</u>") along with all of the Units of the Drag Along Selling Member(s); *provided*, that each Dragged Member, with respect to its Units, receives consideration on a pro rata basis with all other Dragged Members owning Units of the same class, and such consideration shall be allocated in the manner set forth in the distribution waterfall set forth in Section 9.1. The Drag-Along Selling Members shall exercise their Drag-Along Right by giving notice (the "<u>Drag-Along Notice</u>") to each Dragged Member at least 20 days prior to the date of the proposed transfer stating:

(i)    the name and address of the Drag-Along Purchaser;

(ii)    the proposed amount of consideration and terms and conditions of payment offered by such Drag-Along Purchaser (if the proposed consideration is not cash, the notice shall describe the terms of the proposed consideration);

44

(iii)    the Units proposed to be transferred; and

(iv)    that the Drag-Along Purchaser has been informed of the Drag-Along Right and has agreed to purchase the Units in accordance with the terms hereof;

*provided*, that each Drag-Along Selling Member agrees that any failure by such Drag-Along Selling Member to give such Drag-Along Notice in accordance with the terms set forth in this Section 11.6(a) within such 20-day period shall be deemed an election by such Drag-Along Selling Member to terminate the proposed sale of its Units to the Drag-Along Purchaser, effective as of the Drag-Along Notice Date, and such Drag-Along Selling Member agrees not to sell its Units to the Drag-Along Purchaser for a period of 90 days subsequent to the Drag-Along Notice Date.

The closing with respect to any transfer to a Drag-Along Purchaser pursuant to this Section shall be held at the time and place specified in the Drag-Along Notice but in any event within 60 days of the date the Drag-Along Notice is given.

(b)    Consummation of the transfer of Units by any Member to a Drag-Along Purchaser (i) shall be conditioned upon consummation of the transfer by each Drag-Along Selling Member to such Drag-Along Purchaser of the Units proposed to be transferred by the Drag-Along Selling Members and (ii) may be effected by a transfer of the Units or the merger, consolidation or other combination of the Company with or into the Drag-Along Purchaser or its Affiliate, in one or a series of related transactions.

(c)    In the event that the Drag-Along Purchaser does not purchase the Drag-Along Units from the Dragged Members on the same terms and conditions as purchased from the Drag-Along Selling Members, then such Dragged Members shall have the right to require the Company to cause the Drag-Along Selling Members making such transfer to purchase on such terms and conditions such Drag-Along Units if the transfer occurs.

(d)    The Drag-Along Selling Members who are parties to a transfer to a Drag-Along Purchaser shall arrange for payment (in accordance with Section 9.2) (by bank cashier's check or certified check or by wire transfer of immediately available funds) directly by the Drag-Along Purchaser to each Dragged Member, upon delivery of an appropriate assignment in form and substance reasonably satisfactory to the Drag-Along Purchaser, which assignment shall be made free and clear of all liens, claims and encumbrances, except as provided by this Agreement or as otherwise agreed to by such Drag-Along Purchaser.  In connection with any transfer pursuant to a Drag-Along Notice, no Dragged Member shall be required to (i) make any representations or warranties except that it has the authority to transfer its Units, is the sole owner of such Units and has good and valid title to such Units, and that the transfer of such Units does not violate any agreement to which it is a party or by which it is bound and (ii) be subject to any post-closing covenants.  The agreement effecting any proposed transfer pursuant to a Drag-Along Notice shall provide that a Dragged Member shall have no individual liability, other than in connection with any breach of any representations or warranties that may be delivered as set forth in clause (i) of the preceding sentence, in which case liability resulting from a breach of such representations or warranties may not exceed the lesser of (i) its pro rata share of the

45

aggregate consideration received and (ii) the net proceeds actually received by such Dragged Member pursuant to such transfer.

(e)     If at the end of 60 days following the date on which a Drag-Along Notice was given, the sale of the Units by the Drag-Along Selling Members and the sale of the Drag-Along Units have not been completed in accordance with the terms of the Drag-Along Notice, all the restrictions on sale, transfer or assignment contained in this Agreement with respect to Units owned by the Drag-Along Selling Members shall again be in effect.

Section 11.7   Permitted Transfers.   Notwithstanding any of the provisions of this Agreement, Permitted Transfers shall not be subject to the provisions of Section 11.5 and Section 11.6.

Section 11.8   Piggyback Registration Rights.   If the Company or any successor company after giving effect to the transactions contemplated by Section 11.12, shall at any time propose to file a registration statement under the Securities Act of 1933, as amended (the "Securities Act") for an offering of securities for cash (other than an offering relating solely to an acquisition registering securities on Form S-4 (or any successor form) or an offering relating solely to an employee benefit plan registered on Form S-8 (or any successor form)), then the Company shall give written notice of such proposed offering to the Record Holders of Class A Units and Class C Units (which shall include any securities into which such Class A Units may have been reclassified or exchanged in a transaction effected pursuant to Section 11.12), which notice shall offer such Record Holders the opportunity to include in such offering such number or amount of Class A Units and Class C Units held by such Record Holders as such Record Holders may request in writing, within 20 Business Days of such written notice or, if the circumstances of such proposed offering so dictate, such shorter time as is reasonably practicable under the circumstances but, in no event, less than 10 Business Days following the receipt of such notice.  If the proposed offering pursuant to this Section 11.8 shall be an underwritten offering, the Company shall use its commercially reasonable efforts to cause the managing underwriter or managing underwriters of such proposed underwritten offering to permit the Class A Units requested to be included in the registration statement on the same terms and conditions as the Class A Units being sold for the Company's own account; provided, that in the event that the managing underwriter or managing underwriters of such offering advise the Company and the Record Holders in writing that in their opinion the inclusion of all or some of the Class A Units would adversely and materially affect the success of the underwritten offering, the Company shall include in such underwritten offering only that number or amount, if any, of Class A Units held by the Record Holders that, in the opinion of the managing underwriter or managing underwriters, will not so adversely and materially affect the offering.  All Record Holders of Class A Units and Class C Units (which shall be automatically converted to Class A Units in connection with the offering described in this Section 11.8 or any other event which results in the Class A Units, or any successor securities, becoming publicly traded on an exchange) proposing to participate in such registration ("Participating Record Holders") shall enter into an underwriting agreement in customary form with the managing underwriter or underwriters selected by the Company for such underwritten offering; provided, however, that the Participating Record Holders shall not be required to make any representations or warranties in connection with such registration other than representations and warranties as to (i) the Participating Record Holder's ownership of its Class A Units or Class C Units, as the case may

46

be, to be sold or transferred free and clear of all liens, claims and encumbrances, (ii) the Participating Record Holder's power and authority to effect such transfer, (iii) matters pertaining to compliance with securities laws as may be reasonably requested, (iv) if applicable, the Participating Record Holder's organization and good standing and (v) written information relating to the Participating Record Holder that such Participating Record Holder has furnished in writing expressly for inclusion in the registration statement and; *provided*, *further*, that the liability of any Participating Record Holder will be in proportion to, and limited to, the net amount received by such Participating Record Holder from the sale of such Participating Record Holder's Class A Units or Class C Units pursuant to the registration statement.  The Company shall cause each registration statement and each prospectus relating thereto, and any amendment or supplement thereto, as of each effective date of the applicable registration statement, prospectus, amendment or supplement, (i) to comply in all material respects with the applicable requirements of the Securities Act and the rules and regulations of the Commission and (ii) not to contain any untrue statement of a material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading, except insofar as the same are made in reliance on, and in conformity with, any information with respect to a Participating Record Holder furnished in writing to the Company by such Participating Record Holder expressly for use therein.  Except as set forth in Section 11.9, all costs and expenses of any such registration and offering (other than the underwriting discounts and commissions) shall be paid by the Company, other than Selling Expenses of the Participating Record Holders which shall be paid by each Participating Record Holder requesting piggyback registration in accordance with such Participating Record Holder's pro rata share of the Class A Units registered in the piggyback registration.

Section 11.9    Indemnification of Record Holders in Connection with Registration.  If underwriters are engaged in connection with any registration referred to in Section 11.8, the Company shall provide indemnification, representations, covenants, opinions and other assurance to the underwriters in form and substance reasonably satisfactory to such underwriters. Further, in addition to and not in limitation of the Company's obligation under Article VI, the Company shall, to the fullest extent permitted by law, indemnify and hold harmless the Record Holders, their respective officers, directors, partners, employees, legal counsel, accountants and agents and each Person who controls each Holder (within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act) and any agent thereof (collectively, "Record Holder Indemnitees") against any losses, claims, demands, actions, causes of action, assessments, damages, liabilities (joint or several), costs and expenses (including interest, penalties and reasonable attorneys' fees and disbursements), resulting to, imposed upon, or incurred by the Record Holder Indemnitees, directly or indirectly, under the Securities Act or otherwise (hereinafter referred to in this Section 11.9 as a "claim" and in the plural as "claims") based upon, arising out of or resulting from any untrue statement or alleged untrue statement of any material fact contained in any registration statement under which any Company securities were registered under the Securities Act or any state securities or Blue Sky laws, in any preliminary prospectus (if used prior to the effective date of such registration statement), in any summary or final prospectus or in any amendment or supplement thereto (if used during the period the Company is required to keep the registration statement current), or in any other marketing or road show materials, or arising out of, based upon or resulting from the omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements made therein not misleading; *provided*, *however*, that the Company shall not be

liable to any Indemnified Person to the extent that any such claim arises out of, is based upon or results from an untrue statement or alleged untrue statement or omission or alleged omission made in such registration statement, such preliminary, summary or final prospectus or such amendment or supplement, in reliance upon and in conformity with written information furnished to the Company by or on behalf of such Indemnified Person specifically for use therein.

Section 11.10  <u>Indemnification of Company in Connection with Registration</u>.   If underwriters are engaged in connection with any registration referred to in <u>Section 11.8</u>, ~~the Members~~<u>each Member</u> shall, to the fullest extent permitted by law, indemnify and hold harmless the Company and its respective officers, directors, partners, employees, legal counsel, accountants and agents (collectively, "<u>Company Indemnitees</u>") against any losses, claims, demands, actions, causes of action, assessments, damages, liabilities (joint or several), costs and expenses (including interest, penalties and reasonable attorneys' fees and disbursements), resulting to, imposed upon, or incurred by the Company Indemnitees, directly or indirectly, under the Securities Act or otherwise (hereinafter referred to in this <u>Section 11.10</u> as a "claim" and in the plural as "claims") based upon, arising out of or resulting from any untrue statement or alleged untrue statement of any material fact furnished to the Company by or on behalf of such ~~Company Indemnitee~~<u>Member</u> specifically for use in any registration statement under which any Company securities were registered under the Securities Act or any state securities or Blue Sky laws, in any preliminary prospectus (if used prior to the effective date of such registration statement), in any summary or final prospectus or in any amendment or supplement thereto (if used during the period the Company is required to keep the registration statement current), or in any other marketing or road show materials, or arising out of, based upon or resulting from the omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements made therein not misleading. <u>Notwithstanding the foregoing, in no event shall the liability of any Member under this Section 11.10 be in excess of the net proceeds received by such Member in the offering to which such registration referred to in Section 11.8 relates.</u>

Section 11.11  <u>Notices</u>.  Any request to register Units pursuant to <u>Section 11.8</u> shall (i) specify the Units intended to be offered and sold by the Person making the request, (ii) express such Person's present intent to offer such Units for distribution, (iii) describe the nature or method of the proposed offer and sale of Units, and (iv) contain the undertaking of such Person to provide all such information and materials and take all action as may be required in order to permit the Company to comply with all applicable requirements in connection with the registration of such Units.

Section 11.12  <u>Internal Restructure</u>.

(a)    The Company may effect an Internal Restructure.  Each Member agrees that it will consent to and raise no objections to an Internal Restructure; *provided* that (i) the Internal Restructure is undertaken in a manner that results in the Members continuing to have substantially the same direct or indirect ownership of the Company's assets in place prior to the Internal Restructure, (ii) the Internal Restructure preserves the relative economic, governance, disposition and other interests, preferences, priorities and designations of the Members in the Company or any Entity that succeeds to the Company in such Internal Restructure transaction,

and (iii) such Member does not reasonably determine that the Internal Restructure has a reasonable risk of having an adverse legal, regulatory, tax or accounting effect on such Member. Each Member hereby agrees that it will execute and deliver all agreements, instruments and documents as are required, in the reasonable judgment of the Board to be executed by such Member in order to consummate the Internal Restructure while continuing in effect, to the extent consistent with such Internal Restructure, the terms and provisions of this Agreement.

(b)    The Members acknowledge that an Internal Restructure may be undertaken in connection with other events, such as a public offering of the Company or an acquisition of another business or entity and, if so determined by the Board, such Internal Restructure may be conditioned upon, and deemed completed immediately before, any such event.

(c)    The Members acknowledge that, to engage in an initial public offering, it may be necessary or advisable for the Company to merge or convert into (a "Conversion") a corporation (such corporation, the "Successor Corporation").    Accordingly, if the Board determines it to be in the best interests of the Company to engage in an initial public offering and to effect a Conversion, the Members agree that the Company's capital structure shall be restructured in the manner described in this Section 11.12 and the Members shall vote and take all other action necessary in order to effect such Conversion.  In connection with a Conversion, all Membership Interests in the Company (the "Old Interests") will be exchanged, immediately prior to (and subject to the completion of, the initial public offering, and subject to appropriate tax planning to ensure any Conversion is not itself a taxable event) for common stock of the surviving corporation (the "Conversion Consideration").  In determining the portion of the Conversion Consideration to be exchanged for the Old Interests, the Company shall determine what portion of the Conversion Consideration would have been distributed among all of the holders of the Old Interests if the Company's sole asset consisted of the Conversion Consideration (valued at the offering price to the public in the initial public offering) and the Company had distributed the Conversion Consideration in the same manner Distributions would have been made in a complete liquidation of the Company taking into account the various rights, preferences and designations governing the Old Interests (which rights, preferences and designations are set forth in this Agreement, each as they may exist before the Conversion). Once the Company determines the portion of the Conversion Consideration that would have been distributed to each class or series of Old Interests if the Company had been liquidated immediately before the Conversion, the Board will then determine the exchange ratio of the Old Interests into common shares of the surviving corporation.  For the avoidance of doubt, if the Company engages in an initial public offering, immediately prior to the effectiveness of such initial public offering, (i) the Class C Units shall convert into a pro rata share of the class of voting common stock issued to holders of Class A Units in connection with such initial public offering, and (ii) the Class B Units shall convert into warrants to acquire shares of common stock on the terms set forth in Exhibit D.

(d)    Upon the consummation of an Internal Restructure, the surviving Entity or Entities shall assume or succeed to all of the outstanding debt and other liabilities and obligations of the Company.  To the extent practicable, the governing instruments of the surviving entity shall incorporate the governance provisions and piggyback registration right provisions of this Agreement.  All Members shall take such actions as may be reasonably required and otherwise

49

cooperate in good faith with the Company in connection with consummating an Internal Restructure, including voting for or consenting thereto.

(e)     If any Investor Member or its limited partners or investors has a structure involving ownership of all or a portion of its interests in the Company, directly or indirectly, through one or more single purpose entities (a "Blocker Corporation"), at the request of any such Investor Member in connection with any Conversion, the Blocker Corporation may be merged into the Successor Corporation in a tax-free reorganization such that the Blocker Corporation is not subject to a level of corporate tax upon consummation of the proposed initial public offering or subsequent dividend payments or sales of stock; *provided* that (i) such merger could not reasonably be expected to result in any costs or liabilities that are not indemnified or reimbursed by the holders of equity interests in or the Affiliates of the Blocker Corporation or other adverse effects (other than de minimis adverse effects) to the Company or any of the Members (other than to (A) the Blocker Corporation in the event that the Blocker Corporation is neither merged nor otherwise combined with the Successor Corporation nor utilized as the issuer in an initial public offering and (B) the Investor Member or its Affiliates through which the Blocker Corporation directly or indirectly holds its interest in the Company or Successor Corporation), (ii) such Blocker Corporation has no material assets other than equity interests in the Company and (iii) such Blocker Corporation has no liabilities.

## ARTICLE XII
## ADMISSION OF ADDITIONAL MEMBERS

Section 12.1    Additional Members.    From the date hereof (and without limiting the ability of Persons to become Additional Members upon a permitted transfer of Units by a Member), any Person acceptable to the Board may become an Additional Member of the Company for such consideration as the Board shall determine.  No Additional Member shall be entitled to any retroactive allocation of income, gain, loss, deduction or credit by the Company. At the Board's option, at the time the Additional Member is admitted, the Company may close its books (as though the Company's taxable year had ended) or make pro rata allocations of income, gain, loss, deduction or credit to the Additional Member for that portion of the Company's taxable year in which the Member was admitted in accordance with the provisions of Section 706(d) of the Code and the Treasury Regulations promulgated thereunder.  Upon admission of an Additional Member, Schedule I of this Agreement shall be amended in order to reflect such Additional Member's Class Member Percentage in the Company.

## ARTICLE XIII
## DISSOLUTION AND WINDING UP

Section 13.1    Term and Dissolution. The Company shall continue in full force and effect in perpetuity, except that the Company shall be dissolved and its affairs wound up prior to such date, upon the first to occur of the following events:

(a)     The approval by a Majority Vote of the Class A Members that the Company should dissolve.

(b)     At such time as there are no Members.

50

(c)    The entry of a decree of judicial dissolution of the Company under Section 18-802 of the Act by a court of competent jurisdiction.

Upon the dissolution of the Company, no further business shall be done in the Company name or on the Company's behalf except the completion of any incomplete transactions and the taking of such action as shall be necessary for the winding up of the affairs of the Company and the distribution of its assets.

Section 13.2    <u>Distribution of Assets on Dissolution</u>. Upon the <u>statutory</u> dissolution of the Company, the Board shall (i) cause the Company property to be sold in such manner as it deems appropriate to obtain the reasonably best prices for its property, (ii) value Company property at its then Fair Market Value for assets that the Board determines need not be sold, but may be distributed in kind to the Members, (iii) determine the Capital Accounts of the Members pursuant to <u>Article IX</u> by treating the day of liquidation as the final day of the fiscal year of the Company, and (iv) take the following actions and make the following distributions out of property of the Company in the following manner and order:

(a)    To creditors, including Members who are creditors, to the extent permitted by law, in satisfaction of Company liabilities.

(b)    To establish any reserves for the period of time the Board deems necessary and advisable to provide for the payment of contingent or unascertainable liabilities.

(c)    To Members in accordance with <u>Section 9.1</u>.

Section 13.3    <u>Reasonable Time</u>.    A reasonable time shall be allowed for the orderly winding up of the business and affairs of the Company and the liquidation of its assets in order to maximize the realization of full value therefrom, but in all events, as required by Treasury Regulation Section 1.704-1(b)(2)(ii).

Section 13.4    <u>Cancellation of Certificate of Formation</u>.    Upon the completion of the Distribution of Company cash and property as provided in <u>Section 13.2</u> in connection with the liquidation of the Company, the Company shall be terminated and the Certificate of Formation and all qualifications of the Company as a foreign limited liability company in jurisdictions other than the State of Delaware shall be canceled and such other actions as may be necessary to terminate the Company shall be taken.

Section 13.5    <u>Return of Contributions</u>.    No Director or any Officer of the Company will be personally liable for, or have any obligation to contribute or loan any monies or property to the Company to enable it to effectuate, the return of the Capital Contributions of the Members or Record Holders, or any portion thereof, it being expressly understood that any such return shall be made solely from the Company's assets.

Section 13.6    <u>Capital Account Restoration</u>.    No Member shall have any obligation to restore any negative balance in its Capital Account upon liquidation of the Company.

Section 13.7    <u>Effect of Dissolution</u>. Upon dissolution, the Company shall cease carrying on, as distinguished from the winding up of, the Company business, but the Company shall not

be terminated, but shall continue until the winding up of the affairs of the Company is completed and a Certificate of Cancellation with respect to the Company, or the equivalent thereof, has been issued by the Delaware Secretary of State.

## ARTICLE XIV
## AMENDMENT

Section 14.1    Amendments.

(a)    Amendments Generally.  Except as provided in Section 14.1(b), (c) or (d), amendments, restatements, supplements, waivers and other modifications of this Agreement may be effected, from time to time, by Majority Vote of the Class A Members.

(b)    Amendments by the Board.  The Board, without the approval of any Member, may amend any provision of this Agreement (including the Exhibits and Schedules hereto), and execute, swear to, acknowledge, deliver, file and record whatever documents may be required in connection therewith, to reflect:

(i)    a change in the name of the Company, the location of the principal place of business of the Company, the registered agent of the Company or the registered office of the Company;

(ii)    admission, substitution, withdrawal or removal of Members in accordance with this Agreement;

(iii)    a change that the Board determines in good faith to be necessary or appropriate to qualify or continue the qualification of the Company as a limited liability company under the laws of any state or to ensure that the Members will not be treated as associations taxable as corporations or otherwise taxed as entities for federal income tax purposes;

(iv)    a change that the Board determines, based upon the written legal opinion of independent counsel, (A) subject to Section 14.1(b)(vii), does not adversely affect the Members (including any particular class of Units as compared to other classes of Units) economically or from a governance perspective, (B) to be necessary or appropriate to (1) satisfy any requirements, conditions or guidelines contained in any opinion, directive, order, ruling or regulation of any federal or state agency or judicial authority or contained in any federal or state statute (including the Act) or (2) facilitate the trading of the Units (including the division of any class or classes of outstanding Units into different classes to facilitate uniformity of tax consequences within such classes of Units) or comply with any rule, regulation, guideline or requirement of any national securities exchange on which the Units are or will be listed for trading, compliance with any of which the Board deems to be in the best interests of the Company and the Members, (C) to be necessary or appropriate in connection with action taken by the Board pursuant to Section 4.7 or (D) is required to effect the intent of the provisions of this Agreement or is otherwise contemplated by this Agreement;

52

(v)     a change in the fiscal year, fiscal quarter or taxable year of the Company and any other changes that the Board determines to be necessary or appropriate as a result of a change in the fiscal year or taxable year of the Company;

(vi)    an amendment that is necessary, in the Opinion of Counsel, to prevent the Company or its Directors, Officers, trustees or agents from in any manner being subjected to the provisions of the Investment Company Act of 1940, as amended, the Investment Advisors Act of 1940, as amended, or "plan asset" regulations adopted under the Employee Retirement Income Security Act of 1974, as amended, regardless of whether such are substantially similar to plan asset regulations currently applied or proposed by the United States Department of Labor;

(vii)   an amendment that the Board determines in good faith to be necessary or appropriate in connection with the authorization or issuance of any class or series of Company securities pursuant to <u>Section 4.3</u>; or

(viii)  an amendment to <u>Article IX</u> or <u>Section 13.2</u> solely to reflect the issuance of any new series of Class D Units issued to any Eligible Recipients pursuant to <u>Section 4.2(<s>d</s>e)</u>.

(c)     <u>Amendments to Schedule I</u>.  The foregoing notwithstanding, no express approval of the Board or of the Members shall be necessary to amend, modify or supplement <u>Schedule I</u> in connection with the performance of the Secretary's (or Transfer Agent's, as the case may be) ministerial duties under <u>Section 5.4(d)</u> and <u>Section 11.3</u> (including for clerical or ministerial corrections on or about the Effective Date consistent with the Plan to correct legal names of Members and to correct or include each such Member's respective address in connection with the transfer of any Units or any action contemplated under <u>Section 12.1</u>, <u>Section 14.1(b)(ii)</u>, <u>Section 14.1(b)(iv)(C)</u> or <u>Section 14.1(b)(vii)</u>), respectively, to the extent such amendment, modification or supplement is in connection with an action permitted under this Agreement in accordance with the terms and provisions hereof.

(d)     <u>Amendments Requiring Special Member Consent</u>.  Notwithstanding anything herein to the contrary:

(i)     No provision of this Agreement that establishes Class Member Percentages (or other percentage, proportion or number of Units) required to take any action shall be amended, altered, changed, repealed or rescinded in any respect that would have the effect of reducing such percentage (or proportion or number, as the case may be) unless such amendment is approved by the affirmative vote of holders of outstanding Units whose aggregate Class Member Percentage (or other percentage, proportion or number of Units, as the case may be) constitute not less than the percentage (or proportion or number, as the case may be) requirement sought to be reduced.

(ii)    A Supermajority Vote shall be required to alter, amend or adopt any provision inconsistent with or repeal <u>Section 4.2(a)(ii), (iii) and (iii</u>iv), Section 4.2(c), Section 4.2(d), <u>Section 4.2(e),</u> <u>Section 4.5</u>, <u>Section 4.10</u>, <u>Section 4.12</u>, <u>Section 4.14</u>, <u>Section 5.1</u>, <u>Section 7.4</u>, <u>Section 7.5</u>, <u>Article VIII</u> (except as otherwise provided in <u>Section 14.1(d)(iii)</u>), <u>Article IX</u> (other than as set forth in <u>Section 14.1(b)(viii)</u>), <u>Section 11.5</u>, <u>Section 11.6</u>, <u>Section 11.8</u>, <u>Section 13.2</u> (other than as set forth in <u>Section 14.1(b)(viii)</u>), <u>Section 14.1(a)</u>, <u>(b)</u>, <u>(c)</u>, this <u>Section 14.1(d)(ii)</u> or <u>Article VI</u> or to amend or otherwise alter the defined term "Supermajority Vote".    <u>Notwithstanding any other provision herein, the affirmative vote of the holders of 66 2/3% or more of the Class B Units and/or the Class C Units, as applicable, shall be required to alter, amend or adopt any provision inconsistent with or repeal,  Section 4.2(c), and Section 4.2(d), and, solely to the extent any such alteration,  amendment, or repeal would have a material adverse effect on the rights or preferences of Class B Units or Class C Units expressly set forth in this Agreement, Section 7.4, Section 9.1, Article XI and Section 14.1(d).</u>

(iii)    Without the consent of each Member affected thereby, no amendment to this Agreement may (A) create any obligation with respect to Capital Contributions or (B) otherwise enlarge the obligations of any Member without its consent, unless, in the case of this clause <u>(B)</u>, such shall be deemed to have occurred as a result of an amendment approved pursuant to <u>Section 14.1(d)(iv)</u>.

(iv)    Any amendment<u>, alteration or repeal</u> that would <u>solely </u>have a material adverse effect on the rights or preferences of any class of Units in relation to other classes of ~~Company securities~~<u>Units</u> must be approved by the holders of not less than a majority of Class Membership Percentages of the class affected<u> by such amendment, alternation or repeal</u>.

## ARTICLE XV
## <u>MISCELLANEOUS PROVISIONS</u>

Section 15.1    <u>Entire Agreement</u>.    This Agreement constitutes the entire agreement among the Company and the Members.  No such party shall be bound by any terms, conditions, statements or representations, oral or written, not herein contained.  Each such party hereby acknowledges that such party has not been induced, persuaded or motivated by any promise or representation made by any other party, unless expressly set forth herein.  The Company and each Member has had adequate opportunity to retain legal, accounting, tax and financial counsel to advise it regarding the provisions of this Agreement.  All previous negotiations, statements and preliminary instruments by such parties or their representatives are merged in this Agreement.

Section 15.2    <u>Rights of Creditors and Third Parties</u>.  This Agreement is entered into for the exclusive benefit of the Company, its Members, and their successors.  Except as provided in <u>Article VI</u>, this Agreement is expressly not intended for the benefit of any creditor of the Company or any other Person.

Section 15.3   <u>Waiver of Right to Partition</u>.  Each of the Members irrevocably waives during the term of the Company any right that such Member, in its capacity as a Member, may have to maintain any action for partition with respect to the property and assets of the Company, and hereby agrees, in his capacity as a Member, not to file a bill for an accounting or otherwise proceed adversely in any manner whatsoever against the other Members or the Company, except for fraud or violation of this Agreement.

Section 15.4   <u>Confidentiality</u>.   Each Member will, and will cause each of its Representatives and the Representatives of its Affiliates to, keep confidential all material non-public information received from or otherwise relating to, the Company, its subsidiaries, properties and businesses and all other information which the Company or its subsidiaries have agreed by contract to keep confidential ("<u>Confidential Information</u>") and will not, and will not permit its Representatives to, (a) disclose Confidential Information to any other Person other than (i) to another party hereto for a valid business purpose of the Company, or (ii) in the case of Members who are also officers of the Company, in carrying out their duties in the best interests of the Company, or (b) use Confidential Information for anything other than as necessary and appropriate in carrying out the business of the Company or monitoring such Member's investment and interest in the Company.  The restrictions set forth herein do not apply to any disclosures required by law or regulatory authority (pursuant to the advice of counsel), so long as (A) the Person subject to such disclosure obligations provides prior written notice (to the extent reasonably practicable) to the Company stating the basis upon which the disclosure is asserted to be required, and (B) the Person subject to such disclosure obligations takes all reasonable steps to oppose or mitigate any such disclosure.  As used herein the term "Confidential Information" shall not include information that (i) is or becomes generally available to the public other than as a result of a disclosure by a Member or its partners, directors, officers, employees, agents, counsel, investment advisers or other agents or representatives (all such persons being collectively referred to as "<u>Representatives</u>") in violation of this Agreement, (ii) is or was available to such Member on a non-confidential basis prior to its disclosure to such Member or its Representatives by the Company or (iii) was or becomes available to such Member on a non-confidential basis from a source other than the Company, which source is or was (at the time of receipt of the relevant information) not, to the best of such Member's knowledge, bound by a confidentiality agreement with (or other confidentiality obligation to) the Company or another Person.

Section 15.5   <u>Governing Law; Venue; Waiver of Jury Trial</u>.

(a)    This Agreement, and the application or interpretation hereof, shall be governed exclusively by its terms and by the laws of the State of Delaware, and specifically the Act, applied without respect to any conflicts-of-law principles.

(b)    EACH MEMBER BY ITS AGREEMENT TO BE A MEMBER HEREOF AND TO BE BOUND BY THE TERMS OF THIS AGREEMENT, SHALL BE DEEMED TO HAVE (i) AGREED THAT ANY SUIT, ACTION OR OTHER PROCEEDING ARISING OUT OF OR RELATING TO THE OWNERSHIP OR OPERATION OF THE COMPANY, THE INTERPRETATION, NEGOTIATION OR ENFORCEMENT OF THIS AGREEMENT AND THE OTHER DOCUMENTS AND AGREEMENTS EXECUTED IN CONNECTION WITH THE FOREGOING, WILL BE BROUGHT AND LITIGATED ONLY IN THE

55

APPROPRIATE STATE OR FEDERAL COURT LOCATED IN THE STATE OF DELAWARE, (ii) IRREVOCABLY CONSENTED TO PERSONAL JURISDICTION AND VENUE IN ANY SUCH COURT AND HEREBY WAIVES ANY CLAIM IT MAY HAVE THAT SUCH COURT IS AN INCONVENIENT OR IMPROPER FORUM FOR THE PURPOSES OF ANY SUCH SUIT, ACTION OR OTHER PROCEEDING AND (iii) IRREVOCABLY CONSENTED TO THE SERVICE OF PROCESS OF ANY OF THE AFOREMENTIONED COURTS IN ANY SUCH SUIT, ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO SUCH PARTY AT THE ADDRESS OF SUCH PARTY SET FORTH IN OR DESIGNATED PURSUANT TO SECTION 15.6, OR BY ANY OTHER MEANS PERMITTED BY THE LAWS OF THE STATE OF DELAWARE.

(c)     EACH MEMBER BY ITS AGREEMENT TO BE A MEMBER HEREOF AND TO BE BOUND BY THE TERMS OF THIS AGREEMENT, SHALL BE DEEMED TO HAVE HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY, IRREVOCABLY AND UNCONDITIONALLY WAIVED ITS RIGHTS TO TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER RELATED AGREEMENT AND FOR ANY COUNTERCLAIM THEREIN (IN EACH CASE, WHETHER FOR CLAIMS SOUNDING IN CONTRACT OR IN TORT).

Section 15.6   Notices.  Except as expressly set forth to the contrary in this Agreement, all notices, requests, or consents provided for or permitted to be given under this Agreement must be in writing and must be given either by depositing that writing in the United States mail, addressed to the recipient, postage paid, and registered or certified with return receipt requested or by delivering that writing to the recipient in person, by courier, by electronic transmission (unless recipient does not accept delivery by electronic transmission), or by facsimile transmission; and a notice, request, or consent given under this Agreement is effective on receipt by the Person to receive it.  All notices, requests, and consents to be sent to a Member must be sent to or made at the addresses given for that Member on Schedule I or such other address as that Member may specify by notice to the other Members.  All notices, requests, and consents to be sent to the Company must be sent to or made at the address of the Company's principal place of business or such other address as set forth in Schedule I, or as the Company may specify by notice to the Members.

Section 15.7   Waivers.  The failure of any party to seek redress for violation of or to insist upon the strict performance of any agreement or condition of this Agreement shall not prevent a subsequent act, which would have originally constituted a violation, from having the effect of an original violation. A waiver will only be effective if in writing and signed by the party against whom the waiver is charged.

Section 15.8   Rights and Remedies Cumulative.  The rights and remedies provided by this Agreement are cumulative and the use of any one right or remedy by any party shall not preclude or waive the right to use any or all other remedies. Said rights and remedies are given in addition to any other rights the parties may have by law, statute, ordinance or otherwise.

Section 15.9   Heirs, Successors and Assigns.  Each and all of the covenants, terms, provisions and agreements herein contained shall be binding upon and inure to the benefit of the

parties hereto and, to the extent permitted by this Agreement, their respective heirs, legal representatives, successors and assigns.

Section 15.10 <u>Counterparts</u>.  This Agreement may be executed in counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.

[*Signature Page to Follow.*]

57

## <u>Signatures</u>

  IN WITNESS WHEREOF, the Company has executed this Third Amended and Restated Limited Liability Company Agreement as of the date first above written.

<u>COMPANY</u>:

HAWKEYE RENEWABLES, LLC

By: _____
Name:
Title:

## Schedule I

## MEMBERS AND RECORD OWNERSHIP

| Name and Address of Class A Members | Number of Class A Units Held | Class Member Percentage |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| **Total:** | ~~10,000,000~~ | 100.00% |

| Name and Address of Class B Members | Number of Class B Units Held | Class Member Percentage |
|---|---|---|
| | | |
| | | |
| **Total:** | | 100.00% |

| Name and Address of Class C Members | Number of Class C Units Held | Class Member Percentage |
|---|---|---|
| | | |
| | | |
| **Total:** | | 100.00% |

| Name and Address of Class D-1 Members | Number of Class D-1 Units Held | Class Member Percentage |
|---|---|---|
| | | |
| | | |
| | | |
| **Total:** | | 100.00% |

Schedule I-1

**Exhibit A**

**OTHER ALLOCATION PROVISIONS**

1.    <u>Definitions Relating to Other Allocation Provisions.</u>

      1.1    "<u>Adjusted Capital Account Deficit</u>" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant fiscal year, after giving effect to the following adjustments:

      (a)    Credit to such Capital Account any amounts which such Member is obligated to restore pursuant to any provision of the Agreement or is deemed to be obligated to restore pursuant to the penultimate sentences of Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5); and

      (b)    Debit to such Capital Account the items described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6).

      The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

      1.2    "<u>Company Minimum Gain</u>" has the meaning set forth in Treasury Regulations Sections 1.704-2(b)(2) and 1.704-2(d) with respect to "partnership minimum gain".

      1.3    "<u>Depreciation</u>" means an amount equal to the depreciation, amortization, or other cost recovery deduction allowable for federal income tax purposes with respect to an asset. Except that if the Book Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of any accounting period, Depreciation shall be an amount that bears the same ratio to such beginning Book Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such period bears to such beginning adjusted tax basis, *provided*, *however*, that if the adjusted basis for federal income tax purposes of an asset at the beginning of such period is zero, Depreciation shall be determined with reference to such beginning Book Value using any reasonable method selected by the Board.

      1.4    "<u>Book Value</u>" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

      (a)    The initial Book Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset, as determined by the contributing Member and the Company, which in the case of assets held by the Company on the Effective Date shall be made in a manner consistent with the Start Value;

      (b)    The Book Values of all Company assets shall be adjusted to equal their respective gross fair market values, as determined by the Board, as of the following times: (i) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a *de minimis* contribution of money or other property; (ii) the distribution by the Company of more than a *de minimis* amount of money or other property to a

Member as consideration for an interest in the Company; (iii) the liquidation of the Company within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g) and (iv) in connection with the grant of an interest in the Company (other than a *de minimis* interest) as consideration for the provision of services to or for the benefit of the Company by an existing Member acting in a Member capacity, or by a new Member acting in a Member capacity or in anticipation of being a Member; *provided, however*, that the adjustments pursuant to clauses (i), (ii) and (iv) shall be made only if the Board reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company;

(c) The Book Value of any Company asset distributed to any Member shall be the gross fair market value of such asset (taking Code Section 7701(g) into account) on the date of distribution; and

(d) The Book Values of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Sections 734(b) or 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m) and this Exhibit A; *provided, however*, that Book Values shall not be adjusted pursuant to this subparagraph (d) to the extent the Board determines that an adjustment pursuant to subparagraph (b) above is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this subparagraph (d).

If the Book Value of an asset has been determined or adjusted hereunder, such Book Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

1.5 "Member Nonrecourse Debt" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(4) with respect to "partner nonrecourse debt".

1.6 "Member Nonrecourse Debt Minimum Gain" means an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt were treated as a Nonrecourse Liability, as determined in accordance with Treasury Regulations Section 1.704-2(i)(3).

1.7 "Member Nonrecourse Deductions" has the meaning set forth in Treasury Regulations Sections 1.704-2(i)(1) and 1.704-2(i)(2).

1.8 "Nonrecourse Deductions" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(l).

1.9 "Nonrecourse Liability" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(3).

2. Special Allocations. The allocations in Article IX shall be subject to the following special allocations, which shall be made in the following order of priority:

2.1 Minimum Gain Chargeback. Except as otherwise provided in Treasury Regulations Section 1.704-2(f), notwithstanding any other provision of Article IX or this Exhibit

A-2

A, if there is a net decrease in Company Minimum Gain during any Company fiscal year, each Member shall be specially allocated items of Company income and gain for such year (and, if necessary, subsequent fiscal years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, determined in accordance with Treasury Regulations Section 1.704-2(g). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Treasury Regulations Sections 1.704-2(f)(6) and 1.704-2(j)(2). This Section 2.1 is intended to comply with the minimum gain chargeback requirement in Treasury Regulations Section 1.704-2(f) and shall be interpreted consistently therewith.

2.2     Member Minimum Gain Chargeback. Except as otherwise provided in Treasury Regulations Section 1.704-2(i)(4), notwithstanding any other provision of Article IX or this Exhibit A, if there is a net decrease in Member Nonrecourse Debt Minimum Gain attributable to a Member Nonrecourse Debt during any Company fiscal year, each Member who has a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Treasury Regulations Section 1.704-2(i)(5), shall be specially allocated items of Company income and gain for such year (and, if necessary, subsequent fiscal years) in an amount equal to such Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Treasury Regulations 1.704-2(i)(4). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Treasury Regulations Sections 1.704-2(i)(4) and 1.704-2(j)(2). This Section 2.2 is intended to comply with the minimum gain chargeback requirement in Treasury Regulations 1.704-2(i)(4) and shall be interpreted consistently therewith.

2.3     Qualified Income Offset. In the event any Member unexpectedly receives any adjustments, allocations, or Distributions described in Treasury Regulations 1.704-1(b)(2)(ii)(d)(4), (5) or (6), items of Company income and gain shall be specially allocated to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible; provided, that an allocation pursuant to this Section 2.3 shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in Article IX and this Exhibit A have been tentatively made as if this Section 2.3 were not in the Agreement.

2.4     Gross Income Allocation. In the event any Member has a deficit Capital Account at the end of any Company fiscal year which is in excess of the sum of (a) the amount such Member is obligated to restore pursuant to any provision of this Agreement and (b) the amount such Member is deemed to be obligated to restore pursuant to the penultimate sentences of Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), each such Member shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible; provided, that an allocation pursuant to this Section 2.4 shall be made only if and to the extent that such Member would have a deficit Capital Account in excess of such sum after all other allocations provided for in Article IX and this Exhibit A have been made as if Section 2.3 of this Exhibit A and this Section 2.4 were not in the Agreement.

2.5     Nonrecourse Deductions.  Nonrecourse Deductions for any fiscal year or other period shall be specially allocated to the Members in proportion to their respective Class Member Percentages and Class Sharing Percentages.

2.6     Member Nonrecourse Deductions.  Any Member Nonrecourse Deductions for any fiscal year or other period shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Treasury Regulations Section 1.704-2(i)(1).

2.7     Section 754 Adjustments.  To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Sections 734(b) or 743(b) is required, pursuant to Treasury Regulations Sections 1.704-1(b)(2)(iv)(m)(2) or 1.704-1(b)(2)(iv)(m)(4), to be taken into account in determining Capital Accounts as the result of a Distribution to a Member in complete liquidation of its interest in the Company, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Members in accordance with their interests in the Company if Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(2) applies, or to the Member to whom such Distribution was made in the event that Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(4) applies.

3.     Curative Allocations.

3.1     Definitions.  The "Regulatory Allocations" consist of the "Basic Regulatory Allocations," as defined in Section 3.2 hereof, the "Nonrecourse Regulatory Allocations," as defined in Section 3.3 hereof, and the "Member Nonrecourse Regulatory Allocations," as defined in Section 3.4 hereof.

3.2     Basic Regulatory Allocations.  The "Basic Regulatory Allocations" consist of allocations pursuant to Sections 2.3, 2.4 and 2.7 of this Exhibit A.  Notwithstanding any other provision of this Agreement other than the Regulatory Allocations, the Basic Regulatory Allocations shall be taken into account in allocating items of income, gain, loss, and deduction among the Members so that, to the extent possible, the net amount of such allocations of other items and the Basic Regulatory Allocations to each Member shall be equal to the net amount that would have been allocated to each such Member if the Basic Regulatory Allocations had not occurred.  For purposes of applying the foregoing sentence, allocations pursuant to this Section 3.2 shall only be made with respect to allocations pursuant to Section 2.7 of this Exhibit A to the extent the Board reasonably determines that allocations pursuant to this Section 3.2 will not otherwise be inconsistent with the economic agreement among the parties to this Agreement.

3.3     Nonrecourse Regulatory Allocations.  The "Nonrecourse Regulatory Allocations" consist of all allocations pursuant to Sections 2.1 and 2.5 of this Exhibit A. Notwithstanding any other provision of this Agreement, other than the Regulatory Allocations, the Nonrecourse Regulatory Allocations shall be taken into account in allocating items of income, gain, loss, and deduction among the Members so that, to the extent possible, the net amount of such allocations of other items and the Nonrecourse Regulatory Allocations to each Member shall be equal to the net amount that would have been allocated to each such Member if the Nonrecourse Regulatory Allocations had not occurred.  For purposes of applying the foregoing sentence (a) no allocations

A-4

pursuant to this <u>Section 3.3</u> shall be made prior to the Company fiscal year during which there is a net decrease in Company Minimum Gain, and then only to the extent necessary to avoid any potential economic distortions caused by such net decrease in Company Minimum Gain, and (b) allocations pursuant to this <u>Section 3.3</u> shall be deferred with respect to allocations pursuant to <u>Section 2.5</u> of this <u>Exhibit A</u> to the extent the Board reasonably determines that such allocations are likely to be offset by subsequent allocations pursuant to <u>Section 2</u> of this <u>Exhibit A</u>.

3.4    <u>Member Nonrecourse Regulatory Allocations</u>.   The "<u>Member Nonrecourse Regulatory Allocations</u>" consist of all allocations pursuant to <u>Sections 2.2</u> and <u>2.6</u> hereof. Notwithstanding any other provision of this Agreement, other than the Regulatory Allocations, the Member Nonrecourse Regulatory Allocations shall be taken into account in allocating items of income, gain, loss, and deduction among the Members so that, to the extent possible, the net amount of such allocations of other items and the Member Nonrecourse Regulatory Allocations to each Member shall be equal to the net amount that would have been allocated to each such Member if the Member Nonrecourse Regulatory Allocations had not occurred.   For purposes of applying the foregoing sentence (a) no allocations pursuant to this <u>Section 3.4</u> shall be made with respect to allocations pursuant to <u>Section 2.6</u> of this <u>Exhibit A</u> relating to a particular Member Nonrecourse Debt prior to the Company fiscal year during which there is a net decrease in Member Minimum Gain attributable to such Member Nonrecourse Debt, and then only to the extent necessary to avoid any potential economic distortions caused by such net decrease in Member Minimum Gain, and (b) allocations pursuant to this <u>Section 3.4</u> shall be deferred with respect to allocations pursuant to <u>Section 2.6</u> of this <u>Exhibit A</u> hereof relating to a particular Member Nonrecourse Debt to the extent the Board reasonably determines that such allocations are likely to be offset by subsequent allocations pursuant to <u>Section 2</u> of this <u>Exhibit A</u>.

3.5    <u>Discretionary Curative Allocations</u>.   The Board shall have reasonable discretion, with respect to each Company fiscal year, to (a) apply the provisions of <u>Sections 3.2</u>, <u>3.3</u>, and <u>3.4</u> of this <u>Exhibit A</u> in whatever order is likely to minimize the economic distortions that might otherwise result from the Regulatory Allocations, and (b) divide all allocations pursuant to <u>Sections 3.2</u>, <u>3.3</u>, and <u>3.4</u> of this <u>Exhibit A</u> among the Members in a manner that is likely to minimize such economic distortions.

4.    <u>Other Allocation Rules</u>.

4.1    <u>Allocation of Certain Recapture Items</u>.   To the maximum extent possible, any income recapture under Code Sections 1245 and 1250 shall be allocated to the Members in the same proportions as the depreciation deductions giving rise to such income or recapture were allocated among such Members and their respective predecessors in interest in accordance with applicable Treasury Regulations.

4.2    <u>Section 704(c) Allocations</u>.   In accordance with Code Section 704(c) and the Treasury Regulations thereunder, items of income, gain, loss and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its initial Book Value.   In the event the Book Value of any Company asset is adjusted pursuant to the terms of this Agreement, subsequent allocations of income, gain, loss and any deduction with respect to such asset shall

take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Book Value in the same manner as under Code Section 704(c) and the Treasury Regulations thereunder.  Any elections or other decisions relating to such allocations shall be made by the Board in any manner that reasonably reflects the purpose and intention of this Agreement.  Allocations pursuant to this  Section 4.2 are solely for purposes of federal, state and local taxes and shall not affect or in any way be taken into account in computing, any Member's Capital Account or share of Profits, Losses, other items or Distributions pursuant to any provision of this Agreement.

4.3    Ordinary Income and Capital Gain Items.  Except as provided in Section 4.1, the characterization of allocations as ordinary income and capital gains, including the allocation of gain recognized for federal income tax purposes from a disposition of Company assets shall be proportionate to allocations of Profits and Losses to the Members.

4.4    Certain Available Cash Distributions.  To the extent permitted by Treasury Regulations Section 1.704-2(h)(3), the Board may treat Distributions of Available Cash as having been made from the proceeds of a Nonrecourse Liability or a Member Nonrecourse Debt only to the extent that such Distributions would cause or increase an Adjusted Capital Account Deficit for any Member.

4.5    Allocations to Have "Substantial Economic Effect".  The allocations under the Agreement (including this Exhibit A) are intended to have substantial economic effect and/or be in accordance with the Members' interests in the Company as such terms are defined in Code Section 704(b) and the Treasury Regulations promulgated thereunder.

A-6

**Exhibit B**

**DIRECTOR COMPENSATION**

Executive Directors will receive no compensation.

Non-Executive Directors will receive annual cash compensation equal to $45,000 (non-chairman) or $75,000 (chairman), paid quarterly in equal installments as of the quarterly Board meeting.

Non-Executive Directors who serve as committee chairpersons will receive additional annual cash compensation equal to $10,000 (audit)/$5,000 (compensation), paid quarterly in equal installments as of the quarterly Board meeting.

Non-Executive Directors will be entitled to receive reimbursement for travel expenses and other incidentals incurred in connection with service on the Board.

Non-Executive Directors will also be issued Class D-1 Units as set forth below:

At the Effective Date, the Company will issue to each Non-Executive Director Class D-1 Units. The number of Class D-1 Units for each Non-Executive Director will be determined at the Effective Date.

The aggregate Capital Account balance as of the Effective Date for the Class D-1 Units will be equal to $0 and the holders of the Class D-1 Units will not be entitled to Distributions until the Class A Members receive Distributions equal to the Start Value.  Subsequent thereto, the Non-Executive Directors will be entitled to Distributions equal to the Class D-1 Sharing Percentage.

The Class D-1 Units will vest at 1/3 per year or sooner in the event of a change of control.

B-1

**Exhibit C**

**FORM OF JOINDER**

_____, 20\_\_

Hawkeye Renewables, LLC
21050 140th Street,
Iowa Falls, IA 50126
Attn: Chief Financial Officer

Re:  Third Amended and Restated Limited Liability Company Agreement of Hawkeye Renewables, LLC dated ~~April~~May \_\_, 2010 (the "Agreement")

Ladies and Gentlemen:

By execution of this letter agreement, the undersigned agrees and acknowledges to be bound by the terms and provisions of the Agreement as if **[he][she][it]** were a Member (as such term is defined in the Agreement).

Additionally, the undersigned agrees and acknowledges that the address provided on the signature page hereto shall be included as part of Schedule I of the Agreement as if originally provided therein.

IN WITNESS WHEREOF, the undersigned has executed this Agreement as of the date first written above.

**[Name of Transferee]**
By:_____

Address: _____

_____

_____

Facsimile No.:_____

C-1

**Exhibit D**

**WARRANT TERM SHEET**

| | |
|---|---|
| **Warrants:** | Simultaneously with the effectiveness of the Company's initial public offering, the Company will issue warrants to the respective holders of Class B Units (the "***Class B Warrants***") exercisable for shares of the Company's Class A common stock (the "***Class A Shares***").  Subject to the satisfaction of the Class B Warrant Exercise Condition (as defined below), the Class B Warrants, in the aggregate, shall be exercisable into a percentage of Class A Shares based upon the following formula: |
| | (((Market Cap – Exercise Threshold) x .10)/Market Cap) x 100 |
| | "***Market Cap***" means the product of (a) the volume-weighted average price for the Class A Shares during the period beginning at 9:30:01 a.m., New York City time (or such other time as the exchange on which the Class A Shares are listed (the "***Exchange***") publicly announces is the official open of trading), and ending at 4:00:00 p.m., New York City time (or such other time as the Exchange publicly announces is the official close of trading) as reported by Bloomberg or such other financial service for the five trading days immediately prior to the Exercise Date and (b) the number of issued and outstanding Class A Shares (as set forth in the most recent 10-Q or other more recent periodic or current reports filed by the Company).  All such determinations are to be appropriately adjusted for any stock dividend, stock split, stock combination or other similar transaction during the applicable calculation period. |
| | "***Exercise Threshold***" means $435,000,000, less any Distributions received by Class A Members pursuant to the Agreement prior to the initial public offering. |
| | For the avoidance of doubt, in no event will the aggregate amount of Class A Shares issuable under the Class B Warrants exceed 10% of the Class A Shares, as such number of Class A Shares is adjusted for any stock dividend, stock split, stock combination or similar transaction. . |
| **Expiration Date:** | The Class B Warrants shall expire on the seventh anniversary of the Effective Date. |

| | |
|---|---|
| **Exercise Price:** | Each Class B Warrant shall have an exercise price equal to $0.01 per Class A Share, subject to customary adjustments. |
| **Class B Warrant Exercise Condition:** | The Class B Warrants shall be exercisable at anytime, prior to the Expiration Date, that the Market Cap is greater than the Exercise Threshold (the "***Class B Warrant Exercise Condition***").  Under no circumstances will the Class B Warrants become exercisable during any period when any Class A Member is subject to a lock-up or standstill agreement. |
| **Customary Provisions:** | The warrant certificate representing the Class B Warrants shall have such customary terms and conditions as contained in warrants issued by registered companies listed or quoted on the NASDAQ or NYSE or such successor exchanges. |

**D-2**

Document comparison by Workshare Professional on Tuesday, May 25, 2010 5:28:58 PM

| Input: | |
|---|---|
| Document 1 ID | PowerDocs://WEST/6447702/10 |
| Description | WEST-#6447702-v10-LLC_Agreement |
| Document 2 ID | PowerDocs://WEST/6466200/14 |
| Description | WEST-#6466200-v14-LLC_-_Amended |
| Rendering set | standard01 |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 285 |
| Deletions | 182 |
| Moved from | 6 |
| Moved to | 6 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 479 |